Paul K. Charlton (Bar No. 012449)
Lindsi M. Weber (Bar No. 025820)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:   (602) 530-8500
Email:       paul.charlton@gknet.com
             lindsi.weber@gknet.com

Marcos Jiménez (admitted pro hac vice)
Scott Cosgrove (admitted pro hac vice)
Ann M. St. Peter-Griffith (admitted pro hac vice)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131
Telephone:   (786) 587-1077
Facsimile:   (305) 675-7970
Email:       MJimenez@kasowitz.com
             SCosgrove@kasowitz.com
             AStpetergriffith@kasowitz.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>Plaintiff,<br>v.<br><br>JASON HOPE; et al.,<br><br>Defendants. | Case No. 2:11-cv-00432-DGC<br><br>**REPLY IN SUPPORT OF MOTION TO STRIKE FIRST AMENDED COUNTERCLAIM, OR IN THE ALTERNATIVE, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** |
|---|---|

Plaintiff Verizon Wireless files this Reply in Support of its request to strike, or in the alternative, dismiss the First Amended Counterclaim, filed on or about March 21, 2011, at Dkt. #52 ("First Amended Counterclaim"). As Verizon Wireless showed in its Motion, the First Amended Counterclaim should be stricken or dismissed because it was not filed in accordance with the procedural rules governing pleadings. In the alternative, as Verizon Wireless showed – and Defendants cannot refute – Defendants' First Amended Counterclaim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). This Reply is supported by the record in this case and the following memorandum of points and authorities.

# MEMORANDUM OF POINTS AND AUTHORITIES
## *MOTION TO STRIKE COUNTERCLAIM*

Defendants' First Amended Counterclaim – the subject of Verizon Wireless' *Motion to Strike First Amended Counterclaim, or in the alternative Motion to Dismiss for Failure to State a Claim* (Dkt. #62; the "Motion") – was filed on or about March 21, 2011. After Verizon Wireless filed its Motion, Defendants filed an Answer and Second Amended Counterclaim, on April 1, 2011, purporting to add certain claims, including antitrust claims, which were not included in the First Amended Counterclaim. *See* Dkt. #78. On April 8, 2011, Defendants filed yet another pleading, a First Amended Answer and Restated Second Amended Counterclaim, adding additional purported factual allegations against Verizon Wireless. *See* Dkt. #89. Defendants have not sought leave from this Court to file *any* of their amended or restated claims.[1]

Defendants' Response to Verizon's Motion to Strike and Motion to Dismiss (the "Response") simply ignores the applicable authority governing Verizon Wireless' request to strike the improperly filed First Amended Counterclaim. Pursuant to L.R. Civ. 7.2(m), the Court may strike any "submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." As Verizon Wireless showed in its Motion, the First Amended Counterclaim is procedurally defective because it was not filed as part of any pleading in this case. Defendants' attempts to "cure" this deficiency – by finally filing a responsive pleading in this case along with a *Second* Amended Counterclaim, and then submitting a "restated" Second Amended Counterclaim, without seeking leave of this Court to do so – similarly flout Rule 15. Dkt. #78; *Defendants' Answer and Second Amended Counterclaim filed Subject Their to Rule 12(b) Motions*. As such, the Court should strike or dismiss the First Amended Counterclaim without prejudice, to allow

---

[1] Verizon Wireless' Motion focuses on Defendants' First Amended Counterclaim as that was the only pleading on file when the Motion was filed and Defendants' subsequent, unauthorized filings simply are not properly before the Court because they, like the First Amended Counterclaim, were not filed properly.

Defendants to seek leave to file its counterclaims properly.  *See* Fed. R. Civ. P. 15(a) ("A party may amend its pleading <u>once</u> as a matter of course…") (emphasis supplied).  At a minimum, that will clarify the procedural record and the status of Defendants' pleadings as this case progresses.

Defendants' argument (Response at 2-3) that the Court's March 15, 2011 Order setting a filing deadline for Defendants' responsive pleading somehow excuses their noncompliance with the applicable rules is misguided.  While that Order gave Defendants time to file their responsive pleading to the Complaint, it does not relieve Defendants of their obligation to comply with the applicable Rules.  Similarly, contrary to Defendants' argument (*see* Response at 3), Verizon Wireless' stipulation to the procedural aspects set forth in the March 15 Order does not – and could not – relieve Defendants of those obligations.  Put simply, the procedural rules have meaning, and Defendants' violation of those rules warrants striking the First (and Second) Amended Counterclaims.

## *MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM*

**I.     INTRODUCTION.**

Rather than actually addressing the merits of the issues raised in the Motion, the Response rambles on about unsupported claims of "sham litigation" and a "group boycott" by Verizon Wireless.  *See, e.g.,* Response at 4, 7, 8.  Those meritless arguments – and Defendants' hyperbole regarding various purported actions of Verizon Wireless[2] – do not salvage Defendants' claims which, as Verizon Wireless has shown, are alleged insufficiently as a matter of law.  *See* Motion at 6-15.  Defendants do not – because they

---

[2] For example, paragraph 32 of the Response manufactures an ominous intent behind Verizon Wireless' decision to reference only the relevant portions of a contract for filing on the public docket.  *Compare* Response at 13 ("what is Verizon afraid of disclosing?") *with* Response at 14 ("it is obvious why Verizon presented this Court with only self-serving fragments and tried to hide the facts.").  These allusions are unfounded.  Verizon Wireless merely provided the relevant portions of an exemplary contract, represented that it was offered as an example of substantially similar contracts with all of the various aggregators, and elected not to make public certain highly confidential business information contained in the remainder of that contract.  As Defendants' own filings show, this contract, and the other aggregator contracts, all have been disclosed under the protection of the parties' confidentiality agreements and Verizon Wireless has nothing to be "afraid of disclosing" other than to keep its proprietary information confidential.

cannot – refute that Verizon Wireless is allowed, encouraged, and privileged to engage in conduct to protect and enforce its own contractual, statutory and constitutional rights. As such, Defendants' arguments fail.

## II. THE ALLEGATIONS OF THE FIRST AMENDED COUNTERCLAIM ARE INSUFFICIENT TO STATE A CLAIM.

In their Counterclaim, in a complete reversal of causality, Defendants allege generally that Verizon Wireless is liable to them because it filed a lawsuit to protect itself against Defendants' misconduct, sent a letter to Aggregators alerting them to that misconduct, and issued a press release describing accurately Defendants' acts and the lawsuit Verizon Wireless had filed. *See* First Amended Counterclaim ¶37. However, Defendants do not identify *any* specific statements attributable to Verizon Wireless that are false and/or non-privileged. Thus, they have no claim for disparagement or injurious falsehood. *See* Motion at 7, 11. Defendants' generalized allegations that Verizon Wireless purportedly interfered with JAWA's contracts with the Aggregators and JAWA's customers similarly fail to specify what conduct of Verizon Wireless constitutes a wrongful, unjustified, or improper interference with JAWA's contractual relationships. *Id.* at 8-10. Finally, Defendants do not allege any enforceable contract between them and Verizon Wireless, or any wrongful or improper conduct, to support the imposition of a constructive trust. *Id.* at 12-15. Accordingly, the First Amended Counterclaim fails to state a claim for: (i) tortious interference with contract and business expectancies; (ii) business disparagement/injurious falsehood; (iii) breach of contract; and (iv) constructive trust, and it should be dismissed.

### A. The Texas Action Cannot Serve as a Basis for Liability in this Case.

Apparently realizing the deficiency of their claims, Defendants concoct yet additional, unfounded allegations that are not contained in the First Amended Counterclaim, thus introducing matters that are well outside of the pleadings and inappropriate for consideration on a Rule 12(b)(6) Motion to Dismiss. For example, the Response asserts that Verizon Wireless' supposed communications with the Texas

4

Attorney General, and the subsequent filing of the Texas Action against some of the Defendants, constitute grounds to support the various causes of action alleged.  The First Amended Counterclaim (the operative pleading at issue in the Motion), however, provides nothing more than a basic summary of the Texas Action, and in no way implicates any wrongdoing on the part of Verizon Wireless in conjunction with that action.  In fact, the First Amended Counterclaim does not even allege that *any* communications occurred between Verizon Wireless and the Texas Attorney General, let alone false, disparaging, or otherwise wrongful communications.  In any event, because any such communications are privileged, the Texas Action cannot serve as the basis for liability on the part of Verizon Wireless.  *See* Motion at 7-8.

Moreover, Defendants' apparent contention that the Texas Action is a "sham litigation" – the failure of which allegedly would subject Verizon Wireless to liability – (Response at 6-7) is belied by the actual developments in that action.  In fact, this Court can – and should – take judicial notice of the results of the preliminary injunction hearing in the Texas Action, where the court granted the Texas Attorney General's request for injunctive relief to prevent Defendants from continuing their deceptive marketing practices.  *See* Order dated April 8, 2011 attached at Dkt. #90-1.[3]  There is no "sham" litigation in the Texas Action.

Accordingly, even based on Defendants' tortured argument regarding the interplay of the Texas Action and the alleged conduct of Verizon Wireless, Defendants cannot satisfy the first element of the sham litigation test:  "The Supreme Court has endorsed a two-part test for sham litigation. First, the lawsuit must be objectively baseless in the

---

[3] This Court can take judicial notice of the Order in the Texas Action in ruling on the Motion because that order is a matter of public record and that lawsuit is referenced and argued by Defendants as one of the bases for liability in this action.  *See In re Am. Continental Corp./Lincoln Sav. & Loan Securities Litigation,* 845 F. Supp. 1377, 1385 (D. Ariz. 1993) (court considering a Rule 12(b)(6) motion properly may look beyond the complaint to items in the record of the case, or to matters of general public record) (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988); *Mack v. South Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986) (a motion to dismiss was not converted into a motion for summary judgment when court looked beyond the pleadings to matters of public record).

sense that no reasonable litigant could reasonably expect success on the merits. Only if the challenged litigation is objectively baseless may we consider the litigant's subjective motivation." *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (internal citations omitted). *See also In re Am. Continental Corp.,* 845 F. Supp. at 1385 ("The Ninth Circuit in *Oregon Natural Resources* held that when probable cause exists for the filing of the underlying suit, the *Noerr-Pennington* doctrine bars all types of state law claims challenging that suit, specifically referring to abuse of process and tortious interference claims."). Because the Texas Action is not "objectively baseless," the argument that Verizon Wireless' conduct invokes the "sham litigation" exception to the protections afforded by the *Noerr-Pennington* doctrine fails.

### B. The Letters to the Aggregators Cannot Serve as a Basis for Liability for the Causes of Action Alleged in the First Amended Counterclaim.

The Response also does not show that there was anything false, defamatory, or improper about Verizon Wireless' communications with the Aggregators. As Verizon Wireless previously has set forth, it is well-settled that Verizon Wireless is entitled to protect and enforce its contractual rights through communications with its contracting partners, even if the result purportedly is detrimental to third parties, such as Defendants. *See* Motion at 9-10 and cases cited therein. The Response fails abjectly to set forth any authority or argument that undermines the privileged status afforded to the letters to the Aggregators, based on the Aggregators' close relationship to these proceedings.

Instead, Defendants argue that the letters sent to the Aggregators are not privileged because the "aggregators are not parties to this lawsuit, and no privilege attaches to letters to third parties…." Response at 4. As Defendants' own cases show, however, they are wrong as a matter of law:

> Thus, although Arizona case law, as the trial court noted, has somewhat "muddie[d] the waters" on the appropriate standard to apply in this area, in our view *the recipient must have had a close or direct relationship to the*

*proceeding*[4] *for the privilege to apply.*

*Hall v. Smith,* 214 Ariz. 309, 313, 152 P.2d 1192, 1196 (App. 2007) (emphasis supplied). In further analyzing whether the privilege applies to communication with third parties, the Arizona Court of Appeals in *Hall* reasoned that, in the case of a non-party lessee, the privilege would apply to correspondence sent to the lessee despite the fact that "[t]he lessee there was not a party" because "[it] nonetheless had a practical interest in the litigation's outcome." *Id.* at 315, 152 P.2d at 1198.  Like the non-party lessee in *Hall*, the Aggregators have a practical interest in and "close relationship" to the outcome of this litigation, and therefore the letters informing the Aggregators of the lawsuit and the claims asserted therein are privileged.

The letters to the Aggregators also are protected by the *Noerr-Pennington* doctrine. That doctrine protects "communications between private parties" when they are "sufficiently related to petitioning activity." *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 935, n.8 (9th Cir. 2006) (rejecting argument that demand letters sent from one private party to another to further a party's commercial interests did "not implicate the Petition Clause" because "in nearly every instance in which *Noerr-Pennington* has been applied, including *Noerr* itself, the petitioning conduct at issue was carried out to further the petitioning party's commercial interests.")  The letters to the Aggregators indisputably are closely related to the causes of action and relief sought in this pending litigation, and the protections of the *Noerr-Pennington* doctrine apply.

**C.     The Press Release Cannot Not Serve as a Basis for Liability for the Causes of Action Alleged in the First Amended Counterclaim.**

Pursuant to Ninth Circuit law, a "factual statement need only be substantially true in order to be protected from a suit for defamation." *Unelko Corp. v. Rooney,* 912 F.2d

---

[4] Hypocritically, Defendants argue on the one hand that the very contracts that create this "close relationship" with the Aggregators are the basis for Defendants' breach of contract claims, while simultaneously arguing that there was an insufficiently close relationship between the Aggregators and Verizon Wireless in attempting unsuccessfully to attack the privilege attaching to Verizon Wireless' communications with these parties. *Compare* Response at 13-14 *with* Response at 4, 8.  Defendants cannot have it both ways.

7

1049, 1057 (9th Cir. 1990) (citing *Fendler v. Phoenix Newspapers, Inc.,* 130 Ariz. 475, 636 P.2d 1257, 1261 (Ct. App. 1981)).  The party pursuing a defamation claim must allege that the subject statements were false, and substantial truth is a complete defense to such claims.  *See Read v. Phoenix Newspapers, Inc.,* 169 Ariz. 353, 355, 819 P.2d 939, 941 (1991) (upholding dismissal of libel claim where the statements made in the press were "substantially true" and further holding that "[w]hen the underlying facts are undisputed, the determination of substantial truth is a matter for the court").  Here, Defendants simply cannot show that any of the alleged statements are false.  To the contrary, the statements set forth in the press release are directly related to, and in fact summarize, the allegations contained in the Complaint.  Any minor differences in terminology or legal expression between the alleged defamatory statements and the underlying lawsuit do not give rise to a claim for defamation.  *Id.* at 356, 819 P.2d at 942.  Further, there was a legitimate purpose to the press release; namely, informing Verizon Wireless' customers of their rights and providing information to allow customers to pursue those rights through the refund program.  *See* Press Release at Dkt. #62-1.  Therefore, the claims for business disparagement and injurious falsehood based on the press release fail.  Further, because the press release is neither false nor defamatory, it cannot serve as a basis for liability under any of the other causes of action alleged by Defendants in this case.  *See Unelko*, 912 F.2d at 1058 (claims for trade libel and tortious interference are "subject to the same first amendment requirements that govern actions for defamation").

### D. Defendants Were Not the Intended and Direct Beneficiary of the Aggregator Agreements.

Defendants also contend that they are third-party beneficiaries of the Aggregator Agreements because those agreements reference third parties.  Again, Defendants are wrong and, in fact, their arguments are belied by the express language of Section 11.3 of the Aggregator contract:  "Both Parties understand and agree that nothing contained in this Agreement is intended to confer upon any other Person any rights, benefits or

8

remedies of any kind or character whatsoever under or by reason of this Agreement." *See* Dkt. #62-2. Clearly, no third party beneficiaries were anticipated – or allowed – under the Aggregator Agreement, notwithstanding Defendants' attempt to cram that meaning into its terms. That the agreement may contemplate some potential, tangential involvement by a third party or a class of third parties is insufficient to bestow third-party beneficiary status on Defendants.

Indeed, Arizona law is clear that, in order to create a third-party beneficiary status, that benefit must be set forth expressly in the governing contract:

> Under Arizona law, a party may recover as a third party beneficiary to a contract *only where*: 1) the contract itself indicates an intention to benefit the third party; 2) the benefit contemplated is intentional and direct; and 3) the parties to the contract intend to recognize the putative third party beneficiary as the primary party in interest.

*Cherry v. Bank of America NA,* 90 Fed. Appx. 246, 247, 2004 WL 376826, *1 (9th Cir. Mar. 1, 2004) (rejecting plaintiff's claim that it was a third-party beneficiary of a contract between bank and airline and affirming trial court's dismissal of claim where contract's "primary purpose" was to attract customers to airline and bank, not to benefit the alleged third-party beneficiary).

Under *Cherry,* the mere mention of potential third party involvement in the performance of a contract – *i.e.*, the basis of Defendants' claim here – simply is insufficient by itself to satisfy the foregoing standard, and Defendants' claim should be rejected. *See also In re Mortgages Ltd.,* 427 B.R. 780, 785 (D. Ariz. 2010) (granting motion to dismiss for failure to state a claim and noting that "for a person to recover as a third-party beneficiary of a contract, an intention to benefit that person must be indicated in the contract itself") (internal quotations omitted). Because Defendants have not even alleged, let alone satisfied, these necessary prerequisites to qualify as intended third-party beneficiaries under the Aggregator Agreements, their breach of contract claim based on those agreements fail.

9

### E. There is No Fraudulent or Inequitable Conduct Alleged to Support the Imposition of a Constructive Trust.

In responding to Verizon Wireless' showing that no constructive trust has arisen in Defendants' favor, Defendants misunderstand (or misconstrue) Verizon Wireless' argument. Verizon Wireless did *not* argue that Defendants must plead and/or prove each and every element of common law "actual fraud" in order to state a claim for constructive trust. Response at 16. Rather, it argued, and Defendants have not refuted, that "Defendants have not articulated *any* general facts or circumstances, *let alone pled facts with particularity,* to support a claim for actual *or* constructive fraud." Motion at 15 (emphasis supplied). As the Arizona Supreme Court made clear in *Honk v. Karlsson,* 80 Ariz. 30, 292 P.2d 455 (1957), constructive trusts "are raised by courts of equity whenever it becomes necessary under the particular circumstances of the case to prevent a failure of justice, *but the element of fraud, either actual or implied must always be present.*" *Id.*, 80 Ariz. at 34, 292 P.2d at 457 (emphasis supplied) (internal citation and quotations omitted). In other words, there must be plausible allegations of *some* fraud – either actual or constructive -- to support a constructive trust, even if, as Defendants contend (Response p. 16) "actual fraud" is not always necessary. Because Defendants' counterclaims do not allege adequately *any* fraud, their constructive trust claims fail.

Further, even assuming, contrary to the facts, that there was any identifiable "fund" to which to attach a constructive trust, Defendants still would not prevail. Put simply, there is a difference between a constructive trust and a general claim for damages. As this Court has noted, to recover against a constructive trust: "[T]he claimant is required to demonstrate that the assets in question are themselves the result of ill-gotten gains from the claimant. It is this tracing requirement which distinguishes a constructive trust from a general claim for damages." *In re Allied General Agency,* 229 B.R. 190, 196-97 (D. Ariz. 1998). Defendants, however, have not alleged, and cannot show, that any specifically identifiable funds can be traced to any "ill-gotten gains." Accordingly, the First Amended Counterclaim fails to state a claim for constructive trust and should be dismissed.

### III. CONCLUSION.

For all of these reasons, as well as those set forth in the Motion, Verizon Wireless respectfully requests that the Court dismiss the First Amended Counterclaim.

RESPECTFULLY SUBMITTED this 11th day of April, 2011.

GALLAGHER & KENNEDY, P.A.

Paul K. Charlton
Lindsi M. Weber
2575 East Camelback Road
Phoenix, Arizona 85016-9225

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By */s/ Marcos Jiménez*
Marcos Jiménez
Scott Cosgrove
Ann M. St. Peter-Griffith
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131

*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of April, 2011, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants and non-registered parties.

/s/ *Marcos Jiménez*