Paul K. Charlton (Bar No. 012449)
Lindsi M. Weber (Bar No. 025820)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
Email:        paul.charlton@gknet.com
              lindsi.weber@gknet.com

Marcos Jiménez (admitted pro hac vice)
Scott Cosgrove (admitted pro hac vice)
Ann M. St. Peter-Griffith (admitted pro hac vice)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131
Telephone:   (786) 587-1077
Facsimile:    (305) 675-7970
Email:        MJimenez@kasowitz.com
              SCosgrove@kasowitz.com
              AStpetergriffith@kasowitz.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>                          Plaintiff,<br><br>v.<br><br>JASON HOPE; et al.,<br><br>                          Defendants. | Case No. 2:11-cv-00432-DGC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SECOND MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") hereby opposes Defendants'[1] Second Motion for Preliminary Injunction [D.E. 90] ("Motion" or "Mot."). The Motion should be denied for at least the following three reasons:

First, in its Preliminary Opposition to Defendants' Motion for Temporary Restraining Order [D.E. 29] at the commencement of this case, Verizon Wireless

---

[1] For purposes of this Motion, "Defendants" means all defendants who purport to be parties to the Counterclaim, which is a subset of the defendants that Verizon Wireless sued in its original complaint. This opposition also addresses defendants' preliminary injunction request in their First Amended Counterclaim [D.E. 52]. "Hr. Tr." references are to the preliminary injunction hearing transcript.

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

1    established that access to its network is a privilege and not a right.  Since that filing,
2    defendants have not identified any contractual, statutory, or other legal basis that would
3    support the imposition of a mandatory injunction forcing Verizon Wireless to do business
4    with them.  Verizon Wireless' contracts with defendants' aggregators provide Verizon
5    Wireless with the unilateral discretion to determine which PSMS programs it will permit
6    over its network: "Verizon Wireless will have *sole* discretion regarding which Standard
7    and Premium SMS Programs it wishes to make available to Subscribers." *See* Aggregator
8    Contract, § 3.2.2 (emphasis supplied) (Burmester Decl., ¶¶6-8, dated 3/11/11 & Exh. A).
9    The point is not even subject to debate, as defendants' Chief Financial Officer agreed
10   that Verizon Wireless acted within its rights to deny defendants access to its network.
11   Hr. Tr. 223:24-224:5 (E. Mitchell) (agreeing that Verizon is entitled to refuse to do
12   business with defendants); *see also id.* at 222:22-24.  For this reason alone, defendants'
13   motion fails.

14        Second, in their Motion, defendants claim that "*JAWA's business practices are*
15   *perfectly legitimate*."  Mot. at ¶ 18 (emphasis added).  However, the evidence adduced at
16   the preliminary injunction hearing establishes that defendants *admit lying* to regain access
17   to the Verizon Wireless network after being suspended in March 2009 for breaking
18   Verizon Wireless' rules.  *See infra*, n.2.  Once back on the network, defendants undertook
19   fraudulent, not "perfectly legitimate," business practices:  (i) defendants did not disclose
20   their affiliation with PSMS programs as Verizon Wireless required for their renewed
21   access to its network; instead, defendants hid behind a myriad of single-purpose LLCs with
22   deceptive addresses (UPS store locations); (ii) these shell companies then submitted so-
23   called "carrier-facing URLs" (customer sign-up webpages) that defendants did not intend
24   to use; (iii) defendants subsequently used undisclosed and deceptive URLs they knew
25   Verizon Wireless would not allow to sign up customers; and (iv) defendants concealed
26   these unapproved webpages through *cloaking software* specifically built to frustrate
27   Verizon Wireless' monitoring efforts.

28

1    Third, perhaps because they cannot defend their own behavior, defendants have

2    thrown out a host of claims impugning Verizon Wireless' motives in terminating them and

3    bringing this action, upon which they base their claims of tortious interference and antitrust

4    conspiracy. But even if these claims had any legal relevance (and they do not), defendants

5    have not submitted any evidence that supports their wild charges.

6    Defendants have failed to establish any of the elements to support their request that

7    the Court force Verizon Wireless to do business with them. The evidence shows, however,

8    that the Court should protect Verizon Wireless and its customers from further harm by

9    enjoining defendants from attempting to do business with Verizon Wireless in the future.

10   **SUMMARY OF THE EVIDENCE**

11   A.    Defendants Break the Rules to Obtain Subscriptions, Which Results in the
12         March 26, 2009 Suspension.

13   The starting point for defendants' fraud is early 2009. In violation of Verizon

14   Wireless and industry "double opt-in" rules, defendants *intentionally* bypassed the "PIN to

15   handset" verification requirement and delivered the required PIN to consumers directly on

16   the website. *See* Hr. Tr. 107:15-25 (W. DeStefano). By using this "web opt-in,"

17   defendants were able to bill Verizon Wireless customers for subscriptions they did not

18   request. *See, e.g.,* Pl. Ex. 14, at VZW28935-36 (DeStefano e-mail discussing root cause

19   analysis and affects of web opt-in). Verizon promptly suspended Cylon (JAWA's prior

20   business name) for this violation. *See* Pl. Ex. 54 (March 26, 2009 suspension letter). The

21   suspension letter expressly advised defendants that "ALL programs run in the future, on

22   this or other short codes managed by the content provider, will require disclosure to

23   Verizon Wireless." *Id.*

24   B.    Defendants Lie to Regain Access to the Verizon Wireless Network.

25   Verizon Wireless' suspension was a significant event for defendants. *See* Hr.

26   Trans. 112:7-23 (W. DeStefano). To regain access to the Verizon Wireless network,

27   Jason Hope and Wayne DeStefano created an elaborate lie. In his March 30, 2009 email,

28   Jason Hope represented that the opt-in violation was the result of a rogue employee who

3

1   got the idea from one of defendants' competitors.  Hope assured Verizon Wireless that the

2   responsible employee had been fired, as "[o]bviously such a concept as these sites, which

3   were not approved . . . are completely unacceptable and would never obtain management

4   approval."  *See* Pl. Ex. 13 (March 30, 2009 e-mail from Jason Hope).  Hope also assured

5   Verizon Wireless that new "security features" would prevent similar future misconduct.

6   *Id.*  Days later, DeStefano echoed Hope's lies in a "Root Cause Analysis" for Verizon

7   Wireless' consideration.  *See* Pl. Ex. 14 (DeStefano e-mail with root cause analysis).

8   Defendants' lies achieved their intended effect; in approximately July 2009, Verizon

9   Wireless lifted its suspension of Cylon.  *See* Hr. Tr. 120:13-18 (W. DeStefano).  That

10   defendants lied to regain access to the Verizon Wireless network is not in dispute.  *Id.* at

11   117:23-118:1 ("Q: Read through, it's important. Let me ask it differently. You know that

12   the story about the rogue employee was a lie, don't you? A. Yes. I do know that that didn't

13   happen.").

14          C.      Defendants' Fraud Grows More Sophisticated.

15          After regaining access to the Verizon Wireless network, defendants developed an

16   elaborate scheme designed to defraud Verizon Wireless and facilitate defendants'

17   unapproved marketing of their products to Verizon Wireless customers, including the

18   creation of single purpose vehicles and the "carrier cloak."

19                  i.      The single-purpose vehicles.

20          The March 26, 2009 suspension branded Cylon as a known violator.  *See* Pl. Ex.

21   54.  To evade the scrutiny associated with known violators, Hope and DeStefano

22   implemented a new strategy:  they would create single-purpose LLCs that would not be

23   easily identified with previously-suspended Cylon.  To hide their relationship to Cylon,

24   they rebranded their enterprise "JAWA" and designated different associates, whose names

25   were not publicly linked with Cylon, to lease short codes from the CTIA and activate

26   PSMS programs on the Verizon Wireless network.  Hope and DeStefano also gave each

27   of those single-purpose LLC false business addresses that in reality were UPS store

28   locations in different states.  *See, e.g.,* Hr. Tr. 219:23-220:16 (E. Mitchell); 308:9-23 (C.

4

1    Stephens).  Hiding behind single purpose LLCs protected defendants from the financial

2    effect of another suspension.  If Verizon Wireless got past the cloaking software, found

3    the undisclosed and deceptive webpages, and discontinued them, the other entities could

4    continue to generate funds through other undisclosed webpages.[2]  DeStefano was

5    expressly asked whether the single purpose LLCs were created in response to the March

6    26, 2009 suspension, to hide from state enforcement authorities, and to diversify the

7    enterprise in case of another shutdown.  He did not deny these were the reasons; he

8    testified he could not recall.  *See* DeStefano Dep., 61:16-62:6; 75:17-20; 88:2-15 (played

9    at Hr. Tr. 108:3-11 (W. DeStefano)).[3]

10      In light of DeStefano's testimony, defendants rely on their Chief Financial Officer,

11   Emmett Mitchell, to suggest that the organization of single purpose entities was simply

12   normal business practice.  *See* Hr. Tr. 197:2-6 (E. Mitchell).  Mitchell's testimony ignores

13   the March 26, 2009 suspension letter that required defendants to disclose any attempts to

14   activate short codes on the Verizon Wireless network and the other badges of fraud that

15   have gone unchallenged, including the lies to regain access to the Verizon Wireless

16   network, the cloaking software, and the use of UPS stores as business address for the single

17   purpose LLCs.  Indeed, Mitchell's own words – captured in a late-produced email – proves

18   that even he knew hiding behind the LLCs was not appropriate: [REDACTED]  *See* Hr. Tr.

19   218:21-25 (E. Mitchell) & Pl. Ex. 40 (E. Mitchell e-mail to J. Hope and W. DeStefano)

20   (emphasis added).

21          ii.      The carrier cloak.

22      Defendants' also used a "bait and switch" strategy to carry out their fraud on

23   Verizon Wireless.  To gain access to the Verizon Wireless network, defendants' shell

24   companies submitted webpages that they termed "carrier facing" – the *bait*.  *See, e.g.,* Hr.

25   ───────────────────
     [2] Defendants admittedly created hundreds of unapproved, different, "dynamic" webpages
26   to obtain subscriptions from Verizon Wireless customers..  *See, e.g.,* Hr. Tr. 51:6-20 (R.
     Perry).
27
     [3] Defendants attempted to rehabilitate DeStefano by suggesting his poor recollection was
28   the consequence of being a father of four.  *See* Hr. Tr. 123:8-124:1 (W. DeStefano).

Tr. 32:14-18; 34:7-22; 58:23-6; 60:10-61:8; 76:18-77:5 (R. Perry); 309:2-310-5 (C. Stephens).  Once Verizon Wireless approved these compliant webpages, defendants admittedly used undisclosed webpages that did not comply with Verizon Wireless' rules to enlist customers – the *switch*.  *See, e.g.,* Hr. Tr. 59:7-15; [REDACTED] (R. Perry); 309:19-310:5; 311:11-17 (C. Stephens).  The bait and switch strategy also extended to using different short codes on the same webpage to manipulate refund rates.[4]  This allowed defendants to continue using webpages with high refund rates, while avoiding penalties by carriers.  *See* Hr. Tr. 55:15-7 (R. Perry). Defendants were able to perpetrate this scheme with such effectiveness due to specially built cloaking software intended to prevent detection of their unapproved, deceptive URLs by Verizon Wireless auditors (and other auditors for other carriers).

Defendants' explanation for the cloaking software constantly changes.  Initially, defendants took the position that they did not use cloaking software at all, but a "custom firewall to redirect those internet users attempting direct access to the landing page rather than through a search engine advertising link."  Defendants' Response to Plaintiff's Motion for Preliminary Injunction, ¶ 8 [D.E. 64].  According to defendants, the "firewall" was "*not designed to mislead users or avoid audits, but is used to deter hackers and spies.*"  *Id.* (emphasis supplied).

Subsequently, Hope and DeStefano testified in depositions.  There, they repeatedly denied (1) having knowledge regarding when the carrier cloak was implemented, (2) who gave instructions on how the carrier cloak should operate, and (3) being involved in discussions regarding the decision to cloak Verizon Wireless' auditors.  *See* DeStefano Dep., 29:25-30:7; 31:4-7; 146:11-14 (played at Hr. Tr. 108:12-21 (W. DeStefano)); Hope Dep., 177:6-178:10 (played at Hr. Tr. 130:9-131:15 (J. Hope)).

---

[4] When they applied for PSMS program approval, defendants submitted "static" webpages to Verizon Wireless that disclosed the specific short code on which the PSMS program would run.  *See, e.g.,* Hr. Tr. 58:23-59:15; 59:25-60:9 (R. Perry).  Once Verizon Wireless approved these pages, defendants used undisclosed "dynamic" webpages that, among other things, did not disclose a short code and directed customers to different short codes.

1    Only days before the preliminary injunction hearing – and well after their

2    depositions – defendants' counsel produced e-mails that conclusively proved that Hope

3    and DeStefano had lied under oath.   These emails demonstrate that weeks after Verizon

4    Wireless lifted Cylon's March 26, 2009 suspension, Hope and DeStefano began plans to

5    implement the carrier cloak. *See* Pl. Ex. 38; Pl. Ex. 41 [REDACTED] Pl. Ex. 45

6    [REDACTED.]   At the preliminary injunction hearing, Hope finally admitted his role

7    after being confronted with these e-mails: "I don't have a doubt that I was involved in

8    that." Hr. Tr. 141:8 (J. Hope).   The juxtaposition of Hope's and DeStefano's deposition

9    and hearing testimony demonstrates the lengths to which they will go to conceal their

10   misconduct.   They testified falsely at deposition to hide their involvement in a central

11   issue in this case, and only came clean when confronted with subsequently produced

12   emails.[5]

13       Defendants knew that the cloaking software was wrong. *See, e.g.,* Hr. Tr. 229:2-15

14   (E. Mitchell) ("Q: And you would agree with me that it would be inappropriate on

15   JAWA's part to take intentional steps to frustrate Verizon's ability to conduct an audit? A:

16   Intentional steps, yes.").   Three days after Verizon Wireless brought this lawsuit -- and on

17   the same day this Court entered its temporary restraining order [D.E. 24] -- defendants

18   removed the carrier cloak from their "firewall." *See, e.g.,* Hr. Tr. 97:9-22 (R. Perry);

19   142:14-19 (J. Hope); 229:16-19 (E. Mitchell).   Defendants did not provide Verizon

20   Wireless or this Court with any notice of their action, and were unable to offer any

21   explanation for their action at the preliminary injunction hearing.[6]   The best defendants

22   could muster at the hearing for secretly removing the cloaking software was the "personal

23   ――――――――――
   [5] DeStefano even submitted an errata sheet to change his deposition testimony regarding

24   the first time he heard the phrase "carrier cloak," but made no attempt to correct his false
     deposition testimony regarding his involvement in the decision to implement the carrier

25   cloak. *See* Hr. Tr. 118:20-119:20 (W. DeStefano).

26   [6]Verizon Wireless discovered this through the work of forensic experts on a corrupted hard
     drive provided by defendants in discovery.   Verizon Wireless does not presently know

27   whether the software alteration occurred before or after the Court entered its temporary
     restraining order.

28

1    opinion" of Emmett Mitchell: "I can't tell you why we did it.  I have a personal opinion,

2    but I don't know why we did it. ... [T]he firewalling is conceived as something evil or

3    nasty, maybe illegal.  I don't believe it's illegal.  So we wanted to remove all doubts and be

4    as – as transparent as possible so we can get back in business, so we turned it off." *Id.*

5    230:5-11 (E. Mitchell).[7]

6                             **DISCUSSION**

7    A. Legal Standards For Preliminary And Mandatory Injunctive Relief.

8         The preliminary injunction standard is well-known. *See, e.g., Winter v. Natural*

9    *Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L.Ed.2d 249 (2008) (plaintiff

10   must show likelihood of success on the merits and likelihood of irreparable harm, that

11   the balance of equities tips in plaintiff's favor, and that the injunction serves the public

12   interest).  The Ninth Circuit further recognizes a "sliding scale."  The likelihood of

13   success showing need not be strong if the balance of equities tips sharply in the plaintiff's

14   favor; in that case, "serious questions" will suffice. *Alliance for Wild Rockies v. Cottrell*,

15   622 F.3d 1045, 1049-53 (9th Cir. 2010).  Serious questions exist when a plaintiff shows a

16   "'fair chance of success on the merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d

17   1355, 1362 (9th Cir. 1988) (en banc) (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d

18   1513, 1517 (9th Cir. 1985)).

19         However, the *mandatory* injunction sought by defendants is particularly disfavored.

20   *See Tinsley v. Schriro*, No. CV 07-1676-NVW-CRP, 2008 U.S. Dist. LEXIS 113259, at

21   **9-10 (D. Ariz. June 26, 2008) (courts issue mandatory injunctions only when "the facts

22   and law clearly favor the moving party." *See id.* (internal quotations and citations

23   omitted); *see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d

24   873, 879 (9th Cir. 2009) (mandatory injunctions "are not granted unless extreme or very

25

26   ――――――――――――――――
[7] Defendants' attempt to excuse the use of this cloaking software by asserting that Verizon
Wireless' auditors easily bypassed it (Mot. Par. 15) is absurd.  Not only is this

27   ineffectiveness defense irrelevant, in fact the software prevented the auditors from seeing
Defendants' non-compliant pages for over a year and was only avoided when Verizon

28   Wireless was tipped off as to the software's existence.

1  serious damage will result[,] and are not issued in doubtful cases"). As shown below,
2  Defendants have utterly failed to meet these standards.

3      Moreover, Defendants' request for injunctive relief also should be denied because of
4  their admitted lies to regain access to the Verizon Wireless network and the subsequent
5  fraud they perpetrated on Verizon Wireless. "A party 'who seeks equity must do equity.'
6  ... In order to obtain an injunction ... [a party] must have 'acted fairly and without fraud or
7  deceit as to the controversy in issue.' ... Under the unclean hands doctrine, a court will not
8  grant equitable relief to a party 'tainted with inequitableness or bad faith relative to the
9  matter in which he seeks relief.'" *First Ascent Ventures, Inc. v. DLC Dermacare*, LLC,
10 No. CV-06-1794-PHX-JAT, 2006 U.S. Dist. LEXIS 77945, ** 16-17 (D. Ariz. Oct. 24.
11 2006).

12      B. Defendants Have No Chance Of Success On The Merits.

13      As explained in Verizon Wireless' March 25th Motion to Strike Defendants'
14 Amended Counterclaim and alternative Motion to Dismiss (incorporated by reference),
15 defendants fail to state a claim for relief.[8]

16      **Tortious Interference**. Defendants first seek an injunction based on their tortious
17 interference claims. *See* Mot. p. 10-12. As this Court recognized at the March 11, 2011
18 TRO hearing, a claim for tortious interference requires proof that a party engaged in
19 "improper" conduct. *See, e.g., Wagenseller*, 147 Ariz. at 387-88, 710 P.2d at 1042-43;
20 *Wallace v. Casa Grande Union High School Dist. No. 82 Bd. of Governors*, 184 Ariz. 419,
21 427, 909 P.2d 486, 494 (App. 1995); 3/11/11/ Hrg. Tr. at 4-7. Put differently, liability
22 must be based on more than the act of interference—the interference must be both
23 intentional and improper. *See, e.g., Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs.*
24 *Inc.*, 216 Ariz. 185, 187, 164 P.3d 691, 693 (App. 2007). An act that ultimately may

25

26 [8] Verizon Wireless is only addressing those claims relied on by defendants' in their
   "Second Motion for Preliminary Injunction." Thus, Verizon Wireless is not addressing
27 Defendants' defamation claims that they do not assert as a basis for an injunction in their
   Motion. However, as shown in Verizon Wireless' motion to strike, those claims are
28 baseless as well.

interfere with a contract or expectancy does not by itself give rise to liability, as there is "nothing inherently wrongful in 'interference' itself." *Wagenseller*, 147 Ariz. at 388, 710 P.2d at 1043; *see also Samaritan Health Sys. v. Superior Court*, 194 Ariz. 284, 294, 981 P.2d 584, 594 (App. 1998) (mere fact of breach does not establish improper conduct).

Defendants base their tortious interference claim on the letter Verizon Wireless sent to the aggregators under the contracts between Verizon Wireless and defendants' aggregators *See* Mot. p. 10-12. However, defendants do not articulate why it was "improper" for Verizon Wireless to enforce its contractual rights. Verizon Wireless' exercise of its contractual rights is necessarily "proper." The point is not even fairly debatable, as defendants' CFO recognized at the preliminary injunction hearing. Hr. Tr. 223:24-224:5 (E. Mitchell) ("Q: And in those letters, Verizon expressed that Verizon did not want to do any business with the defendants, right? A: Yes. Q: And they are entitled to do that as you previously mentioned, right? A: Yes."). *See Computer Place, Inc. v. Hewlett-Packard Co.*, 607 F. Supp. 822, 835 (N.D. Cal. 1984) ("The exercise of a contractual right cannot be the basis for a claim of tortious interference."), *aff'd* 779 F.2d 56 (9th Cir. 1985).

Moreover, defendants have only suggested in a conclusory fashion that the aggregators "breached" their separate contracts with defendants – but there is absolutely no explanation (or evidence) explaining how the aggregators breached their contracts with defendants. Defendants cite to no provision that was breached, and the only record evidence on this point is the letter from the aggregators to the defendants explaining why the *defendants* have breached their contractual obligations to their aggregators. *See* E. Mitchell Decl. [D.E. 32], Ex. A-2. It would be wholly inappropriate to blindly assume that the aggregators breached any contractual obligation to defendants on this record.

1    **Antitrust**. Defendants next rely on their purported antitrust claims asserted in their

2    "Restated Second Amended Counterclaim."[9] The antitrust claims are limited to the

3    allegation that Verizon Wireless has engaged in a "horizontal group boycott" that is "*per*

4    *se*" illegal under Section 1 of the Sherman Act. *See* Mot. 12. The notion that Verizon

5    Wireless organized a horizontal boycott is, again, based on the letter Verizon Wireless sent

6    to aggregators enforcing its contractual rights.

7        Preliminarily, the suggestion that Verizon Wireless' letter to the aggregators is the

8    embodiment of an agreement to engage in a horizontal group boycott of defendants is

9    inconsistent with the plain words of the letter. *See* Def. Ex. 533 (March 8, 2011 letter

10   from Verizon Wireless to Motricity). The letter unequivocally states Verizon

11   Wireless' intent to enforce its contractual rights and demands that the aggregators

12   terminate defendants' *access to the Verizon Wireless network. See id.* (stating that the

13   letter is written "[p]ursuant to the [agreement] between Motricity and Verizon

14   Wireless"; that the aggregator must "prevent all customers of Verizon Wireless from

15   opting in"; that "all customers of Verizon Wireless currently opted in to any of the

16   campaigns must be opted-out"; that the aggregator must not allow defendants to

17   "submit a request to Verizon Wireless," that the aggregator "must accept responsibility

18   for the costs that Verizon Wireless will incur," *etc.*). Furthermore, not a single witness

19   has testified or submitted a declaration about an agreement to engage in a group

20   boycott; the only testimony on this point is that the letter communicated Verizon

21   Wireless' demand to the aggregators to stop defendants from accessing the Verizon

22   Wireless network. *See* Hr. Tr. 330:13-331:1; 332:21-333:7 (D. Burmester).

23

24

25   [9] The "Restated Second Amended Counterclaim" is defendants' fourth counterclaim, and
     Verizon Wireless rejects this iteration as properly before the Court. Rule 15 permits a
26   party to amend once as a matter of right; otherwise, a party must obtain leave to amend.
     Defendants have never requested leave to file any of their amended counterclaims. While
27   defendants had until April 29, 2011 to file their response to Verizon Wireless' complaint,
     once they amended their counterclaim, subsequent amended counterclaims required leave
28   of court.

1    Setting aside the absence of any factual support for defendants' antitrust claim, their
2    theory of liability is based on a fundamental misunderstanding of the antitrust laws. The
3    *"per se* rule for group boycotts" is "limited to cases 'involving horizontal agreements
4    among direct competitors.'" *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088
5    (9th Cir. 2000). Defendants do not and cannot claim that Verizon Wireless agreed *with any*
6    *competitor* not to deal with them. The supposed agreement is between Verizon Wireless
7    and the aggregators – but the aggregators are simply middlemen whose role (as alleged by
8    defendants) is to "facilitate the receipt and delivery of wireless customers' messages to
9    JAWA." *See* "Restated Second Amended Counterclaim" at ¶ 40 [D.E. 89].

10    Thus, even assuming that Verizon Wireless agreed with the aggregators to boycott
11    defendants (and it did not), there can be no antitrust claim because Verizon and the
12    aggregators are *not competitors*. At best, defendants' allegations suggest the existence of
13    separate *vertical* agreements between Verizon Wireless and the aggregators, which cannot
14    be treated as a single *horizontal* agreement for purposes of evaluating its effects under the
15    Sherman Act. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); 6
16    Areeda et al., *Antitrust Law* ¶ 1402, at 18. Nothing that defendants have alleged comes
17    remotely closed to the *per se* prohibition on group boycotts.[10]

18    Defendants finally complain that Verizon "called on its direct competitors to block
19    consumer access to JAWA's . . . services." Mot. 13. But, on its face, this allegation does
20    not involve an agreement, and nothing in the antitrust laws prevents Verizon from
21    announcing its intention to terminate its dealings with defendants and calling on other
22    carriers to follow its lead, especially in light of the evidence of defendants' misconduct.
23    The absence of any allegation of agreement among competitors is one of many differences
24    between this case and *McCreery Angus Farms v. American Angus Ass'n*, 379 F. Supp.

25    ───────────────
[10] At the preliminary injunction hearing, defendants' counsel suggested yet another theory
26    of liability; that Verizon Wireless may be culpable under a "hub and spoke" theory. The
allegation is not found in any of defendants' numerous counterclaims, and, therefore,
27    cannot form the basis for an injunction. Regardless, there is no allegation (or evidence) to
show that the aggregators reached an agreement amongst each other with respect to
28    dealings with defendants, which is required to support a hub and spoke theory.

1008 (S.D. Ill. 1974), the case defendants touted at the preliminary injunction hearing. In that case, the defendant association had a "total monopoly" on the registration of certain purebred cattle; the district court found that suspension of the plaintiff from the association constituted a group boycott of the plaintiff. There has been no comparable collective action alleged here.[11]

C. The Equities Highly Favor Verizon Wireless And Its Customers

Defendants have unclean hands and are the polar opposite of parties who deserve equitable relief. Hope and DeStefano abused the privilege of operating on the Verizon Wireless network, resulting in their company's suspension in March 2009. They admittedly concocted an elaborate lie to regain access. *See supra* at pp. 4-5. Subsequently, through their use of shell companies and deceptive, unapproved URLs hidden by the cloaking software they put in place, defendants once again improperly enlisted Verizon Wireless customers, and misdirected Verizon Wireless auditors away from the deceptive webpages defendants did not want Verizon Wireless to discover. *See, e.g.,* Pl. Ex. 5 ("Cloaking Software Flowchart"); *see also supra* at 7-10. Verizon Wireless takes great care to ensure that its network is not used for such improper purposes, and Verizon Wireless must respond to government regulators for the deceptive practices that defendants perpetrated (the California Public Utilities Commission has already launched an inquiry directly stemming from defendants' operations). *See* Hr. Tr. 328: 23-329:5 (D. Burmester). Verizon Wireless' ability to protect its network and its customers from clear recidivists such as defendants would be destroyed through the mandatory injunction that defendants shamelessly seek.

Defendants' conduct has already caused Verizon Wireless incalculable harm, and will cause Verizon Wireless further harm if Verizon Wireless is ordered to do business with defendants in the future. Requiring Verizon Wireless to do business with

---

[11] As defendants' note in their motion, the "New Jersey Antitrust Act, N.J.S.A. 56:9-3 is functionally identical to Section 1 of the Sherman Act. *See Halebian N.J., Inc. v. Roppe Rubber Corp.,* 718 F.Supp. 348, 355 (D.N.J. 1989)." *See* Mot., ¶ 34.

1  defendants would require Verizon Wireless to (a) bill its customers and collect for charges
2  associated with admittedly dishonest individuals and entities; (b) incur brand damage and
3  lose goodwill with its customers; and (c) answer to state and federal regulating authorities
4  who might try to hold Verizon Wireless responsible for defendants' business practices (a
5  State of California inquiry is already underway).

6      Customers have complained about defendants' conduct, threatened to leave
7  Verizon Wireless, and terminated their agreements with Verizon Wireless as a
8  consequence of defendants' behavior. *See* Hr. Tr. 327:6-329:5(D. Burmester).  Verizon
9  Wireless customers blame Verizon Wireless for the manner in which defendants
10 operate, and hold Verizon Wireless accountable.  The resulting damage to Verizon
11 Wireless, its reputation and its customer good will and relations would be
12 immeasurable. *See* Hr. Tr. 327:6-328:22; *see also* 3/11/11 Burmester Decl. at ¶¶15-16;
13 3/7/11 Burmester Decl. ¶¶ 23-24; LaPerch Decl. ¶¶12-74.  In addition, requiring
14 Verizon Wireless to do business with defendants exposes Verizon Wireless to liability to
15 regulators for defendants' business operations.

16     Defendants' assertion that the equities tip in their favor because Verizon
17 Wireless is somehow preventing them from doing business is simply false.
18 Defendants are free to conduct business with any aggregator or any other wireless
19 carrier that will have them.  Their assertion that Verizon Wireless is their "competitor"
20 who seeks to put them out of business is also a fabrication.  *See* Hr. Tr. 325:16-23 (D.
21 Burmester). Verizon Wireless simply wants one thing – that defendants or their
22 associates refrain from seeking to activate PSMS programs on the Verizon Wireless
23 network in the future.[12]

24 ───────────────
   [12] Defendants also suggested at the hearing that the common carrier rules may require
25 Verizon Wireless to grant defendants access to its network.  PSMS programs, however, are
   an information service. *See* 47 U.S.C. Section 153(20).  Information services are not
26 subject to common carrier regulation. *See National Telecomm. Assn, et al., v. Brand
   X*, 545 U.S. 967 (2005).  Verizon Wireless does not offer, and has never offered, access to
27 short codes or PSMS services on a non-discriminate basis indifferently to all persons or
   organizations.  Therefore, Verizon Wireless is under no obligation to enter arrangements to
28 facilitate the exchange of content with defendants. *See National Ass'n of Regulatory*

1

D.  <u>An Injunction Would Be A Disservice To The Public Interest.</u>

2        An injunction would be a disservice to the public interest.  Defendants are known

3    recidivists.  They devised an elaborate scheme involving shell companies, false

4    addresses, concealment mechanisms and deceptive marketing practices.  Allowing them

5    access to Verizon Wireless' network would only give them another opportunity to once

6    again defraud Verizon Wireless and perpetrate their deceptive marketing practices on

7    Verizon Wireless customers, placing Verizon Wireless and its customers at grave risk.

8    Therefore, it is the *denial* of injunctive relief to defendants, as well as granting Verizon

9    Wireless' injunctive relief request, that would serve the public's interest.

10   E.  <u>Defendants Cannot Show Irreparable Harm.</u>

11       Defendants decry that Verizon Wireless will put them out of business.  However,

12   Verizon Wireless is only one carrier.  Defendants as content providers can do business with

13   any other carriers that might want to have them.  And, more fundamentally, *they can*

14   *still sell their content directly to consumers over the internet and bill those customers*

15   *directly for the content*. Finally, even if defendants go out of business, any such

16   consequence would be the result of defendants' fraudulent practices.  The law is clear that

17   self-inflicted injuries do not constitute irreparable harm. *See, e.g., Goldberg v.*

18   *Cablevision Sys. Corp.,* 193 F. Supp. 2d 588, 599-600 (E.D.N.Y. 2002).  Finally,

19   defendants cannot show irreparable harm, as any damages suffered by defendants would

20   be compensable through money damages for lost revenues.  They have not demonstrated

21   how a monetary award would be inadequate, and in fact request money damages as part

22   of their improper Amended Counterclaim at paragraphs 40, 42, 44, 57 and 59.

23

24   _____

25   *Utility Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) ("a carrier will not be a
common carrier where its practice is to make individual decisions, in particular cases,
whether and on what terms to deal"), *cert. denied*, 425 U.S. 992 (1976). *See also,*

26   *Southwestern Bell Telephone co. v. FCC*, 19 F. 3d 1475, 1481(DC Cir. 1994) ("Whether an
entity in a given case is to be considered a common carrier," turns not on its typical status

27   but "on the particular practice under surveillance.")

28

1

## CONCLUSION

2      **WHEREFORE**, Verizon Wireless respectfully requests that this Court deny

3   Defendants' Second Motion for Preliminary Injunction, and grant such further relief as this

4   Court deems just and proper.

5

6      RESPECTFULLY SUBMITTED this 25th day of April, 2011.

7                                 GALLAGHER & KENNEDY, P.A.

8                                 By /s/ Paul K. Charlton

9                                    Paul K. Charlton
                                     Lindsi M. Weber
10                                   2575 East Camelback Road
                                     Phoenix, Arizona 85016-9225
11

12                                KASOWITZ, BENSON, TORRES &
                                  FRIEDMAN LLP
13

14                                   Marcos Jiménez
                                     Scott Cosgrove
15                                   Ann M. St. Peter-Griffith
                                     1441 Brickell Avenue, Suite 1420
16                                   Miami, Florida 33131

17                                   *Attorneys for Plaintiff*

18                        **CERTIFICATE OF SERVICE**

19      I hereby certify that on this 25th day of April, 2011, I electronically transmitted a
     PDF version of this document to the Clerk of the Court, using the CM/ECF System for
20   filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants and
     non-registered parties.
21

22                                _____ /s/ Gloria Kannberg_____

23
     2735658
24

25

26

27

28