1  Douglas F. Behm (Bar No. 014727)
   **DOUGLAS F. BEHM, PLLC**
2  14362 N. Frank Lloyd Wright Blvd., Ste. 1000
   Scottsdale, Arizona 85260
3  Telephone:   480-305-5633
   Email: dbehm@behmlawfirm.com
4
   Charles L. Babcock, admitted *pro hac vice*
5  Richard E. Griffin, admitted *pro hac vice*
   Curt M. Langley, admitted *pro hac vice*
6  **JACKSON WALKER L.L.P.**
   1401 McKinney, Suite 1900
7  Houston, Texas 77010
   Telephone:   713-752-4200
8  Facsimile:   713-752-4221
   Email: cbabcock@jw.com
9           rgriffin@jw.com
            clangley@jw.com
10
11 *Attorneys for Defendants and Counter-Plaintiffs*

12            **IN THE UNITED STATES DISTRICT COURT**

13            **FOR THE DISTRICT OF ARIZONA**

14 | Cellco Partnership d/b/a Verizon Wireless, | No. CV11-432-PHX-DGC |
   |---|---|

15 Plaintiff and Counter-Defendant,

16                                          **COUNTER-PLAINTIFFS' REPLY**
                                            **IN SUPPORT OF THEIR**
17                                          **MOTION FOR PRELIMINARY**
                                            **INJUNCTION**
18 vs.

19 Jason Hope, et al.,

20 Defendants and Counter-Plaintiffs.

21        Counter-Plaintiffs (collectively, "JAWA") reply in support of their request for a

22 preliminary injunction (Doc. #90) as follows:

23 **I.    INTRODUCTION.**

24        Before March 7, 2011, JAWA had roughly 242 employees. With many satisfied

25 customers (Tr. 209-10; Ex. 596) and approximately 40 successful premium text

26 messaging service ("PSMS") products (Tr. 185), JAWA collected about $900,000 per

27 day in gross revenue. Tr. 215. While industry charge-backs (refunds made for any

28 reason) across wireless carriers average 15% for PSMS services, charge-backs to

Verizon customers for JAWA's products average only 4%.  Tr. 210.

Verizon, which is a direct competitor of JAWA (Tr. 213-14), and has no contractual relationship with it (Pl. Ex. 3 (Doc. # 30) ¶ 5), has shut down JAWA's U.S. operations as to *all* cellular carriers, *all* aggregators, and *all* JAWA services. Tr. 201, 204, 205, 213, 215-16, 231. Verizon has demanded that all four aggregators with whom JAWA has direct and essential contractual relationships, and who together account for "not quite a hundred percent, but clearly the vast majority" of the aggregator market, agree to cease doing any business with JAWA. Tr. 204-05, 213, 215-16, 231-32, 336. Verizon issued a call to solidarity to its direct cellular carrier competitors.  Tr. at 207; Ex. 552.  As a result, the four major carriers, representing approximately 90% of the market, have cut off or suspended JAWA's ability to do business, effected through Verizon's orchestration of an aggregator boycott against JAWA. (Tr. 205, 212, 227-28). Verizon also has actively interfered with JAWA's customer contractual relationships, forcing terminations and refunds, unprompted by subscriber requests to opt out or to be refunded. Def. Exs. 530-533; Def. Ex. 602.  The unrebutted testimony at the hearing of this matter was that, without this Court's intervention, JAWA has "no future." Tr. 217.

Verizon argues that all it is doing is "enforcing its contractual rights."  Resp. p. 10.  But Verizon has no contract with JAWA and, in any event, the cases have held for generations that no contract can justify or excuse a violation of the antitrust laws. Verizon argues that "access to its network is a privilege, not a right" (Resp. p. 2), but cites no law or evidence in support of that claim.  In reality, Verizon is a common carrier and that legal status bars it from blocking calls[1] and from discriminating against those who use its network.[2]  Verizon admits that it "directed the aggregators to block traffic to [JAWA's] customers" (Tr. at 331) and its refusal to carry JAWA's traffic because its

---

[1] *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (affirming FCC holding that a text message is a call).  Call blocking is expressly prohibited. *See, e.g., Establishing Just and Reasonable Rates for Local Exchange Carriers; Call Blocking by Carriers,* 22 FCC Rcd 11629, 11631 ¶ 6 (2007) ("Commission precedent provides that no carriers . . . may block, choke, reduce or restrict traffic in any way.").

[2] Title 47 U.S.C. § 202 (a) prohibits "unjust or unreasonable discrimination in . . . practices . . . or services" and "subject[ing] any particular person [or] class of persons . . . to any undue or unreasonable prejudice or disadvantage."

Internet ads allegedly are not 100% compliant with MMA "best practices" and Verizon-specific ("not necessarily arbitrary" Tr. 176) rules is blatantly discriminatory because Verizon does not apply those "best practices" to its own subscription internet ads (Tr. 346), and because Verizon admits that "if you violate the MMA standards you haven't violated any law." Tr. at 335.  In addition, the evidence demonstrates that Verizon violated its own contractual obligations with the aggregators and its own policies – which include notice and an opportunity to cure any alleged problems – in the way in which it "tore down" JAWA.  *See* Def. Ex. 508 (at bates 2134) ("repeat offender" provisions requiring notice and opportunity to cure); Def. Ex. 575-580 at §§ 2.2, 3.13 (Verizon contracts with aggregators requiring notice and opportunity to cure); Tr. 202:8-20, 283:19-285:10. Verizon also claims to have "unilateral discretion" to determine which PSMS programs are allowed, not only on its network, but *any* network.  *See* Def. Exs. 530-533 (letters to aggregators); Tr. 336:14-18.

Verizon's assault on JAWA is a per se violation of the Sherman Antitrust Act and the New Jersey Antitrust Act and improperly interferes with JAWA's contracts with the aggregators and its customers.  The Court therefore should enjoin Verizon from continuing its illegal conduct in order to restore JAWA's ability to do business.

## II.    JAWA WILL PREVAIL ON ITS ANTITRUST CLAIMS.

Verizon misconstrues the law when it argues that JAWA has shown only "separate *vertical* agreements between Verizon Wireless and the aggregators" and that JAWA must have evidence that "the aggregators reached an agreement amongst each other with respect to dealings with [JAWA]" in order to prove a hub-and-spoke conspiracy.  Resp. p.12 & n.10.

Verizon, citing *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000), argues that the per se rule for group boycotts is confined to cases involving agreements among direct competitors.  Resp. p. 12.  Verizon apparently is unaware that the courts recognize a variation of the classic horizontal boycott,[3] for which

---

[3] A classic horizontal boycott which is per se illegal involves the participation of at least two competitors (which need not be competitors of the target). *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.*, 472 U.S. 284, 293 (1985);

the evidence here is compelling: a refusal to deal that is orchestrated through a series of vertical agreements in circumstances where the participants expect that their competitors also will participate. In the leading case on hub and spoke horizontal boycott law, *Toys "R" Us v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000), the Seventh Circuit analyzed what type of circumstantial evidence permits such an inference of a horizontal boycott orchestrated through vertical arrangements. In that case, Toys "R" Us (TRU) convinced toy makers to limit sales to warehouse clubs, which TRU saw as a threat to its position as a leading low-price toy retailer. *See id.* at 931-932.

The court ultimately found that TRU's orchestrated boycott was per se unlawful. *Id.* In reaching this conclusion, the *TRU* court noted that an illegal horizontal agreement may be proven by circumstantial evidence including shifts from prior practices and decisions that deprive entities of previously profitable business. *See id.* at 934-36. "When circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted). This does not mean, however, that one must exclude all possibility that the manufacturers acted independently because "that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." *Id.* at 934-35. "The test states only that there must be *some* evidence which, if believed, would support a finding of concerted action." *Id.* (emphasis original).

Here, the Court has as evidence of the conspiracy the contracts between the aggregators and Verizon (Def. Exs. 578-79, 581-82, 583, 585) and the letter Verizon sent to each of the aggregators, in which Verizon instructed that "*all* message campaigns *associated in any way with any of the defendants* must be terminated immediately" and that each of the aggregators "must terminate *all* of the short codes on its platform to ensure that *all* messaging and premium charges are stopped[.] Def. Exs. 530-533, at 1, 2 (italics added). Moreover, the assurance that all aggregators were subject to the same

*Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001). Here, of course, there is evidence that Verizon asked its competitors – the other cell carriers – to boycott JAWA (Tr. at 207; Def. Ex. 552), and that those entities agreed. Tr. 204-05, 213, 215-16, 231-32, 336.

Verizon demands was very publicly delivered in Verizon's press release vowing to bring a stop to the alleged "fraud" and calling on its competitors to follow suit (Def. Ex. 552), which announcement eliminated any actual need for direct communications by competitors at either the wireless carrier or aggregator level.  This evidence parallels or exceeds the evidence in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), which the TRU court discussed as follows:

> That case too involved actors at two levels of the distribution chain, distributors of motion pictures and exhibitors. Interstate Circuit was one of the exhibitors; it had a stranglehold on the exhibition of movies in a number of Texas cities. The antitrust violation occurred when Interstate's manager, O'Donnell, sent an identical letter to the eight branch managers of the distributor companies, with each letter naming all eight as addressees, in which he asked them to comply with two demands: a minimum price for first-run theaters, and a policy against double features at night. The trial court there drew an inference of agreement from the nature of the proposals, from the manner in which they were made, from the substantial unanimity of action taken, and from the lack of evidence of a benign motive; the Supreme Court affirmed. The new policies represented a radical shift from the industry's prior business practices, and the Court rejected as beyond the range of probability that such unanimity of action was explainable only by chance.

*Id.* at 935.

Another case reinforcing the conclusion that JAWA has presented sufficient evidence to prove a horizontal agreement is *Heartland Surgical Specialty Hospital, LLC v. Midwest Division, Inc.*, 527 F. Supp. 2d 1257 (D. Kan. 2007), in which the court found that a showing that the parties are acting against their own individual business interests is sufficient to infer an illegal agreement.  *Id.* at 1296 (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir.1999)). In *Heartland*, a new specialty hospital in Kansas City (Heartland) brought antitrust claims against managed care companies and other established hospitals based on allegations that the defendants conspired to prevent Heartland from obtaining managed care contracts. *See id.* at 1257. The *Heartland* court noted that "[p]arallel behavior, however, may suggest that an illegal agreement exists when accompanied by a so-called 'plus factor' – that is additional evidence from which an understanding among the parties may be inferred," including a showing that the parties are acting against their own individual business interests. *Id.* at

5

1295-1296 (citations omitted).[4]  Here, of course, the aggregators are acting against their own commercial interests by rejecting JAWA's previously profitable business.

Already cited to the Court, but largely ignored by Verizon, is *McCreery Angus Farms v. American Angus Ass'n*, 379 F.Supp. 1008 (S.D. Ill.), *aff'd*, 506 F.2d 1404 (7th Cir. 1974), a Sherman Act § 1 and § 2 case in which the court enjoined the perpetrators of a group boycott that otherwise would have driven the plaintiff out of business.  The parallels between *McCreery* and this case are astounding.  In *McCreery*, a group of competitors – Angus cattle breeders – formed an organization – the American Angus Association (AAA) – to govern who could do business in their field, and established rules for membership (including rules concerning pure bred cattle).  *See id.* at 1011-12. Here, the wireless carriers and aggregators (including Verizon, Ericsson, mBlox, Motricity, and OpenMarket) jointly associate with the MMA and its "Best Practices" approach to self regulation, as well as the CTIA, which issues short codes.  Tr. at 333-36; Pl. Ex. 30.

In *McCreery*, a cattle breeder would be driven out of business if it were banned from the AAA.  *McCreery*, 379 F.Supp. at 1010-11.  Here, a PSMS provider is run out of business if the four aggregators who make up nearly the entire market all agree to boycott it, particularly when ordered by Verizon's call to the other top three wireless carriers to shut down access to their networks, thus creating the functional equivalent of monopoly power. Def. Exs. 530-33, 552; Tr. 204-05, 213, 215-16, 231, 336.   In *McCreery*, Mr. McCreery was anonymously accused of fraud – of having one purebred bull who was used for blood tests (to qualify for AAA), and a mixed-breed bull (with identical tattoos) which was used for shows (where he consistently won).  *McCreery*,

[4] The Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), gave examples of parallel conduct that would be "plausible grounds to infer an agreement" in a § 1 claim: "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement;" and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Id.* at 1965 n. 4 (internal quotations and citations omitted).

6

379 F.Supp. at 1011-12.  In this case, JAWA is accused of having one set of web pages that consumers sign up on and other web pages that auditors and others may end up on if they are not signing up like a ordinary customer does.  Complaint (Doc. #1) ¶ 5.

In *McCreery*, the AAA did not follow its own procedures before suspending McCreery indefinitely.  *McCreery*, 379 F.Supp. at 1012-16.  In this case, Verizon has not followed its own procedures before terminating JAWA.  Def. Ex. 508 (at bates 2134) ("repeat offender" provisions requiring notice and opportunity to cure); Def. Ex. 575-580 at §§ 2.2, 3.13 (Verizon contracts with aggregators requiring notice and opportunity to cure); Tr. 202, 283-285.  In *McCreery*, Mr. McCreery had no prior notice that the AAA was going to consider the issue of the fraudulent bull at the hearing which resulted in his suspension.  *McCreery*, 379 F.Supp. at 1013.  Here, there was no hearing or notice of any kind before Verizon tore down JAWA.  Tr. 173-74.

In *McCreery*, claims were brought under Sherman Act § 1 (conspiracy to boycott) and § 2 (monopoly).  In deciding that an agreement to boycott existed, the court said it need not go any further than the bylaws of the AAA.  *McCreery*, 379 F.Supp. at 1013 (citing *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246 (1963)).  Here, the evidence of an agreement is the mutual membership in MMA and CTIA (Tr. 333-36), the contracts between the aggregators and Verizon (Def. Exs. 578-79, 581-82, 583, 585), the letters from Verizon to each aggregator telling them to tear down JAWA (Exs. 530-33), the aggregators' unanimous and simultaneous agreement to do so, and Verizon's press release. Tr. 201, 204-05, 213, 215-16, 231-32.

In *McCreery*, the AAA argued that it was justified in acting as it did (to preserve the integrity of the breed), but the court found that at least since 1941 the United States Supreme Court has ruled that there simply is no excuse for horizontal boycotts.  *McCreery*, 379 F.Supp. at 1018 (citing *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703 (1941)).  Here, Verizon says it is trying to protect customers from fraud and is only enforcing its contract rights.  *Fashion Originators* remains good law and holds that even if the target of the boycott is alleged to be acting tortiously, an agreement to refuse to deal with that target should be enjoined.  Finally, in *McCreery*,

7

the court entered an injunction ordering the reinstatement of McCreery Farms to AAA and, if requested by McCreery, requiring publication of the reinstatement.  *McCreery*, 379 F.Supp. at 1020-22.  JAWA has not asked the Court to order Verizon to make any public statement, but it does ask that blocking of JAWA's traffic to customers end and that JAWA's premium text messaging programs be reinstated.

Boycotts condemned as per se unlawful generally involve, as in this case, joint efforts "to disadvantage competitors by either directly denying or persuading or coercing suppliers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers, Inc. v. Pacific. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).  Some cases suggest that a plaintiff alleging that a group boycott is per se unlawful must also show that the firms participating in the boycott had either "market power or unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers*, 472 U.S. at 296.  As already noted, the four aggregators – mBlox, Ericsson, OpenMarket, and Motricity – control nearly 100% of the aggregator market (Tr. 213-14), and the carriers the aggregators cut JAWA off from at Verizon's request – Verizon, AT&T, T-Mobile, and Sprint – comprise about 90% of the wireless market in the U.S. Tr. 213.  For more than 50 years, it has been per se illegal for an established firm to run a smaller, upstart rival out of business by persuading their mutual suppliers – in concert – not to do business with the rival.

> Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality.' Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219, 'such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.'

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209-10 (1959) (footnote and citations omitted; quoting *Fashion Originators*).

### III.   JAWA WILL PREVAIL ON ITS TORTIOUS INTERFERENCE CLAIM.

Verizon argues that it cannot be liable for tortious interference because all it did in tearing down JAWA was enforce its contract rights. Verizon has no contractual relationship with JAWA (Pl. Ex. 3 (Doc. # 30) ¶ 5). Further, Verizon dishonored, rather than honored, its own procedures and duties which specify notice and an opportunity to cure any alleged problems with its PSMS products. Def. Ex. 508 (at bates 2134); Def. Ex. 575-80 at §§ 2.2, 3.13; Tr. 202, 283-285. Verizon's contracts and policies allowed it to suspend specific, "repeat offender," codes, but not *all* short codes of an entity suspected of departures from MMA Guidelines. Tr. 231.

In addition to choking off new and recurring revenue, Verizon has ordered aggregators to withhold $19 million already owing to JAWA from all carriers, further interfering with JAWA's aggregator contracts. Tr. 215-16. Once again, Verizon cites no contract with any entity that entitles it to interrupt cash flow from other carriers and such interruption is a direct breach of the aggregators' contractual obligations to JAWA. Verizon was not authorized to interfere with JAWA's contractual relationships with subscribers by demanding that all customers "currently opted in to any of the campaigns must be opted out from the campaigns, and those customers must be provided with a free text message notifying them of the opt out." Def. Exs. 530-533 (e.g. Ex. 530 at bates 749) (direction to aggregator); Ex. 602 (text messages to JAWA customers).

Verizon reiterates its weary claim that its conduct is justified because JAWA employed redirecting software, although there is no evidence that JAWA's use of a firewall was unlawful. A competent auditor who enters a URL expecting to see a particular landing page and who instead is redirected to an unrelated page, might suspect that redirection software is installed. In fact, Verizon's auditor, Mr. LaPerch, testified that he was able to view JAWA's advertising landing pages "without having to do anything other than hide our IP [address]." Tr. 169-70. Verizon understandably does not address whether the cloaking of its auditor's IP address was unlawful.

**IV.    IRREPARABLE HARM, THE EQUITIES, AND THE PUBLIC INTEREST.**

While Verizon continues its aggressive customer refund campaign[5] in a transparent attempt to manufacture harm, a harm from which it is legally insulated through a nationwide settlement and full release (Tr. 214-15; Def. Ex. 550), the immediate harm JAWA faces is real and irreparable.  Verizon's unlawful conduct has effectively frozen assets necessary for JAWA to make payroll, to cover employee benefits, to keep employees ("we are losing several employees every day"), and to continue in operation.[6] Tr. 204, 215-216.  The undisputed fact is that, without this Court's intervention, JAWA has "no future." Tr. 217.  *See American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1995) ("The threat of being driven out of business is sufficient to establish irreparable harm.").

Permitting the unlawful group boycott Verizon orchestrated to continue plainly is not in the public interest.  The *two* time-barred 2009 customer complaints cited in its opposition to JAWA's motion for preliminary injunction (Doc. #61 Ex. 2 DEFS024661 et seq.) mostly highlighted Verizon's poor customer service. Further, Verizon's Aegis Report states that "Cylon [i.e. JAWA] . . . has had a low instance of intercepts and a relatively low violation history." Def. Ex. 617.  Aegis' Director of Operations pronounced following recent pre-lawsuit re-testing that the JAWA programs "have simply NOT failed, in any area" and "[t]hese guys were clean!!" Def. Ex. 548. Undeterred by the truth, Verizon decided "to tear the content provider down" (Tr. 174), choosing to rely on the rants of Robert Alpert, who worked as a consultant for JAWA two years ago, who says he was never exposed to any JAWA marketing or operational strategies, describing his knowledge of JAWA's operation as "at best, superficial" (Def. Ex. 529), and who is ensnarled in litigation with one of JAWA's owners. Def. Ex. 518.

Verizon's opposition to JAWA's request for injunctive relief rests mostly on the fact, admitted by JAWA, that its owners were untruthful in explaining the reasons for

---

[5] *See* Ex. A to Notice of Filing Declaration of Emmett Mitchell, filed today.  JAWA requests that the Court consider this latest postcard to former Verizon customers as evidence that Verizon's aggression is unrelenting.  The postcard was received after the hearing and, therefore, could not have been introduced as part of the record.
[6] *See McCreary* 379 F. Supp at 1016, 1019 (indefinite suspension shutting down ability to engage in business constituted irreparable injury).

their 2009 violation of Verizon's rules.   Resp. at 2-4.   The undisputed testimony, however, is that JAWA's 2009 infractions have not been, and will not be, repeated.   Tr. 285-86.   Verizon twists the facts when it says that JAWA "created an elaborate lie" in order to "regain access to the Verizon Wireless network."   Resp. p. 4.   JAWA regained that access by submitting the appropriate information about its PSMS products to the aggregators.   In addition, JAWA had a completely legitimate reason for using what Verizon derides as "shell" companies – an ironic criticism, given that the Plaintiff in this case is a Verizon subsidiary – which was to prevent confusion amongst its customers. Tr. 124-26.

Verizon's tortuous interference and illegal boycott causes customers to lose the benefits of JAWA's products (Tr. 288, 291) and, if this Court does not intervene, the blocking of JAWA's ability to send messages to its customers will permanently impact JAWA's reputation in the market.   Balancing the equities, Verizon has nothing to lose from the grant of JAWA's requested injunctive relief and that relief is essential to JAWA's survival.

/////
/////
/////
/////
/////
/////
/////
/////
/////
/////
/////
/////

Respectfully submitted this 28th day of April, 2011.

**DOUGLAS F. BEHM, PLLC**

By:   /s/ Douglas F. Behm
       Douglas F. Behm
       14362 N. Frank Lloyd Wright Blvd.
       Suite 1000
       Scottsdale, Arizona 85260

AND

**JACKSON WALKER L.L.P.**

By:   /s/ Richard E. Griffin
       Charles L. Babcock
       Richard E. Griffin
       Curt M. Langley
       1401 McKinney, Suite 1900
       Houston, Texas 77010

AND

Stephen R. Fogle
112 E. Pecan Street, Suite 2400
San Antonio, Texas 78205

*ATTORNEYS FOR COUNTER-PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Kipp Charlton, Esq.          paul.charlton@gknet.com, gjk@gknet.com

Lindsi Michelle Weber, Esq.       lindsi.weber@gknet.com, jk@gknet.com

Marcos D. Jimenez, Esq.           mjimenez@kasowitz.com, ymorales@kasowitz.com

Scott B. Cosgrove, Esq.           scosgrove@kasowitz.com, anoonan@kasowitz.com

Ann M. St Peter-Griffith, Esq.    astpetergriffith@kasowitz.com

Sandra J. Millor, Esq.            smillor@kasowitz.com

By:    /s/ Richard E. Griffin

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28