Douglas F. Behm – 014727
**DOUGLAS F. BEHM, PLLC**
14362 N. Frank Lloyd Wright Blvd.; Ste. 1000
Scottsdale, Arizona 85260
Telephone:    480-305-5633
Facsimile:     480-305-5634
E-mail: dbehm@behmlawfirm.com

Charles L. Babcock, admitted *pro hac vice*
Richard E. Griffin, admitted *pro hac vice*
**JACKSON WALKER L.L.P.**
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone:    713-752-4200
Facsimile:     713-752-4221
Email: cbabcock@jw.com, rgriffin@jw.com, clangley@jw.com

*Attorneys for Defendants and Counter-Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cellco Partnership d/b/a Verizon Wireless,<br><br>                    Plaintiff,<br><br>vs.<br><br><br>Jason R. Hope, et al.,<br><br>                    Defendants. | No. CV11-432-PHX-DGC<br><br><br><br>**COUNTER-PLAINTIFFS' RESPONSE TO VERIZON'S MOTION TO STRIKE AND MOTION TO DISMISS** |

Counter-Plaintiffs file this Response to Plaintiff's Motion to Strike and Dismiss Counter-Plaintiffs' Second Amended Counterclaim for Failure to State a Claim.

## I.    **VERIZON'S MOTION TO STRIKE SHOULD BE DENIED**

This is the second Motion to Strike filed by Verizon, and it has no more merit than Verizon's first attempt (Doc. #62).  The first time around, Verizon argued that JAWA's counterclaims were defective to the point of being a "nullity" because they were not contained in an answer.  Now, after JAWA filed an answer including a counterclaim, Verizon argues that those earlier "counterclaims" were, contrary to its previous complaints, real, and that JAWA now has filed *too many* counterclaims.

1       A little history is instructive.   After Verizon filed suit on March 7 seeking

2   immediate injunctive relief, JAWA filed its original "counterclaim," seeking injunctive

3   relief against Verizon, on March 11 (Doc. #31).   JAWA filed its first amended

4   "counterclaim" on March 21 (Doc. #52).   Four days later, Verizon filed its first Motion

5   to Strike and Motion to Dismiss (Doc. #62), arguing, among other things, that

6   "Defendants cannot counterclaim without also answering," and calling JAWA's

7   counterclaims "a procedural nullity."   Mot. to Strike (Doc. #62), at 2, 3, *quoting Allied*

8   *Med. Assocs. v. State Farm Mut. Auto. Ins. Co.*, 2009 WL 839063, *1 (E.D. Pa. Mar. 26,

9   2009).

10       Inasmuch as the lack of an answer rendered JAWA's first two "counterclaims" a

11   "nullity," JAWA filed its Answer and included with it JAWA's Second Amended

12   Counterclaim (Doc. #78).   According to Verizon's earlier argument, JAWA's second

13   amended counterclaim really was its original counterclaim, because JAWA's earlier

14   filings were "nullities."   JAWA then amended its answer – but not its counterclaim – on

15   April 10 (Doc. #89).   JAWA had every right to amend its answer.   Fed. R. Civ. P. 15(a).

16       Verizon's Motion to Strike is wholly without merit, and should be denied.[1]

17   ## II.   <u>VERIZON'S MOTION TO DISMISS SHOULD BE DENIED</u>

18       The Federal Rules give a party the right to move for dismissal of a complaint on

19   the ground that it fails "to state a claim upon which relief can be granted."   Fed. R. Civ.

20   P. 12(b).   To survive dismissal, a complaint must set out sufficient facts "to state a claim

21   to relief that is plausible on its face."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

22   (2007).   In order to prevail on its Motion, Verizon must show that "the well-pleaded

23   facts do not permit the court to infer more than the mere possibility of misconduct," and

24   that JAWA's Counterclaim does not show "'that the pleader is entitled to relief.'"

25   *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).   (quoting Fed. R. Civ. P. 8).

26

27   [1] In light of the fact that JAWA entered evidence concerning all of its causes of action
against Verizon in the April 13-14 hearing, Verizon's present Motion is, if not moot,

28   somewhat unmoored from the reality of this case.   *See* Fed. R. Civ. P. 15(b) (pleadings
may be amended to reflect the actual issues upon which a case was tried).

In this case, JAWA has pleaded facts showing that it is entitled to relief; it has pleaded facts demonstrating Verizon's misconduct.   Verizon fails to meet its burden under Rule 12(b)(6) and therefore its Motion to Dismiss should be denied in its entirety.

**A.    Verizon's False and Disparaging Statements Organizing a Boycott Against Counter-Plaintiffs Are Not Privileged.**

Verizon says that it may falsely disparage anyone, make false statements to government agencies, and organize a boycott of JAWA with complete immunity. Verizon even argues that it may act outside of and contrary to its rights under its contracts, and may even violate its own rules and procedures in the name of "protecting its contract rights."   Verizon's view of the law is not merely self-serving, it is wrong.

Counter-Plaintiffs agree that statements made in a lawsuit generally are privileged, although Counter-Plaintiffs do not base their counterclaims on anything stated in this case.   Verizon is wrong, however, in stating that its letters to aggregators are absolutely privileged.   The aggregators are not parties to this lawsuit and no privilege attaches to letters to third parties falsely disparaging Counter-Plaintiffs and their business operations.   Likewise, there is no privilege to organize a boycott targeting Counter-Plaintiffs in violation of the Sherman Act and the New Jersey Antitrust Act.

The Arizona case law focuses on the two sides of the communication alleged to be actionable:   the status of the speaker, and the relationship of the recipient of the communication to the litigation.   In the principal case cited by Verizon, *Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984), the Arizona Supreme Court ruled that the absolute judicial privilege was inapplicable to allegedly defamatory communications made by attorneys to a non-party newspaper reporter, who had provided the reporter with a copy of a class action complaint they intended to (and did) file.   In discussing the scope of the privilege, the Arizona Supreme Court stated the following:

> An attorney is protected by the absolute privilege because "[t]o subject him to actions for defamation would fetter and restrain him in the fearless discharge of the duty which he owes to his client, and which the successful administration of justice demands."   Veeder, *Absolute Immunity In*

> *Defamation: Judicial Proceedings*, 9 Col. L. Rev. 463, 482 (1909). As an immunity which focuses on the status of the actor, the privilege immunizes an attorney for statements made "while performing his function as such." Restatement (Second) of Torts § 586, Comment c. We agree that "*special emphasis must be laid on the requirement that it [statement] be made in furtherance of the litigation and to promote the interest of justice.*" *Bradley v. Hartford Accident & Indemnity Co.*, 30 Cal.App.3d 818, 826, 106 Cal. Rptr. 718, 723 (1973) (emphasis in original). Without that nexus, the defamation only serves to injure reputation.

*Id.*, 141 Ariz. at 613-14. Here, Verizon makes no showing at all that that one of its attorneys made the tortious comments, and that he made the comments while "performing his function as [an attorney]." In fact, the aggregator letters were sent by David Burmester, who is *not* Verizon's attorney, but rather is Verizon's Director of Product Development and Management. *See* Tr. at 325. It is plain that false statements to the aggregators, and an exhortation of a group boycott of Counter-Plaintiffs, made by a non-lawyer business professional could not possibly have been "made in furtherance of the litigation and to promote the interest of justice." In *Green Acres*, the communication which was *not* immune included a copy of the lawsuit itself. *See Green Acres*, 141 Ariz. at 612. Mr. Burmester's statements to the aggregators, which made only passing reference to this lawsuit but which also, like in *Green Acres*, included a copy of the complaint in this case, are *less* entitled to immunity that the statements by lawyers to the reporter found to be *not* privileged in *Green Acres*.

In *Hall v. Smith*, the Arizona Court of Appeals focused on the other side of the tortious communication:

> [I]n our view the recipient [of the defamatory statements] must have had a **close or direct relationship to the proceeding for the privilege to apply**. Exactly how close or direct that relationship must be can only be determined on a case-by-case basis, **with a focus on the underlying principle that the privilege should be applied to "promote candid and honest communication between the parties and their counsel in order to resolve disputes.**" *Krouse* [*v. Bower*, 20 P.3d 895, 900 (Utah 2001).] . . . In addition, a case-specific analysis not only is consistent with, but also should be informed by, the general principle that "the tendency and policy of the courts is to not extend the number or instances of absolute privilege unless the policy upon which privilege is based is found to exist in the new situations." *Laun v. Union Elec. Co.*, 350 Mo. 572, 166 S.W.2d 1065, 1069 (1943)[.]

*Hall v. Smith*, 214 Ariz. 209, 313-14 (App. 2007) (emphases added; citation omitted). In

*Hall*, the allegedly tortious statement was made not to the defendant in the lawsuit, CIGNA AZ, but to CIGNA AZ's corporate parent, CIGNA. In discussing the pertinent issue for purposes of immunity, the relationship of CIGNA to the litigation between Smith and CIGNA AZ, the court found the following:

> On that pertinent question, the record reflects that CIGNA was significantly involved in the Smith-CIGNA AZ litigation. CIGNA sent several of its own employees to investigate Hall's alleged embezzlement of corporate funds, the crux of Smith's claims in her wrongful termination action. And . . . CIGNA selected the Arizona attorneys who defended CIGNA AZ . . .. [U]ndisputed facts in the record support the trial court's conclusion that CIGNA employees/attorneys "orchestrat[ed] the defense of Smith's lawsuit against CIGNA AZ." Indeed, . . . John Tellier, then "Co-Counsel for Defendants," stated that "the attorney primarily in charge of the handling [of the wrongful termination case] was Michael Davis, senior counsel in CIGNA's law department . . .." And, billing records . . . in the
>
> Smith-CIGNA AZ litigation showed numerous telephone calls and letters between Tellier and Christine Ciarrocchi, "an in-house attorney" for CIGNA. Similarly, in an application for attorney fees below, Tellier stated that Ciarrocchi had been assigned "to oversee this litigation."

*Id.* at 314 (footnote omitted).

In this case, there is no showing that the aggregators to whom Verizon sent tortious communications have any nexus or direct interest in this litigation – and certainly not that the aggregators are "orchestrating" Verizon's legal strategy, or that the aggregators' attorneys are deeply involved in representing Verizon to the point of selecting and supervising Verizon's attorneys. Nor would extending the privilege to Mr. Burmester's letters "promote candid and honest communication between the parties and their counsel in order to resolve disputes."

Finally, Verizon does not contend that its statements in the press release are privileged, nor does it deny making them, and for that reason alone, Verizon's Motion to Dismiss should be denied.

**B.**   **The Motion to Dismiss the Tortious Interference Claim Should be Denied.**

Verizon principally argues that its actions were not improper because all Verizon was doing was asserting its rights under its contracts with the aggregators, and refers to those contracts in support if its position. The problem with this argument is that

Verizon's conduct goes far beyond Verizon's contractual rights and unlawful acts do not gain immunity simply because the conduct was contractually permitted.  Assuming, purely for the sake of argument, that Verizon's contracts with the aggregators allow Verizon to direct the aggregators to block Counter-Plaintiffs' text messages from being sent over Verizon's network, the letter Verizon sent to each of the aggregators was not restricted to tearing down JAWA's business with Verizon; the letters instructed the aggregators that "*all* message campaigns *associated in any way with any of the defendants* must be terminated immediately" and that each of the aggregators "must terminate *all* of the short codes on its platform to ensure that *all* messaging and premium charges are stopped[.]"  Def. Exs. 530-533, at 1, 2 (italics added).[2]  Nothing in any contract cited by Verizon suggests that Verizon has the right to interfere with JAWA's relationships with other wireless carriers and with JAWA's customers who use those other carriers' networks.  This conduct is especially egregious because Verizon admits that it is unable to identify any customer of any Counter-Plaintiff who has been defrauded or otherwise injured.  *See* Complaint ¶ 83.

## C. <u>The Motion to Dismiss the Conspiracy Claim Should Be Denied.</u>

Counter-Plaintiffs have sufficiently pleaded their conspiracy to tortiously interfere with Counter-Plaintiffs' contracts with its customers.  *See* Second Amend. Counterclaim ¶¶ 44-45, 49-50.  Verizon conspired with Robert Alpert to interfere with Counter-Plaintiffs' contracts with the aggregators and Counter-Plaintiffs' subscribers, and conspired with the aggregators to interfere with Counter-Plaintiffs' contracts with its subscribers, reinforced by a public call to all wireless carriers to refuse to deal with

---

[2] Verizon's reliance on the *Noerr-Pennington* doctrine (in footnote 5 of its Motion) is misplaced.  The letters to aggregators on which the tortious interference claims are *partially* based were not demand letters directly threatening litigation which later was filed – which was the basis for the Ninth Circuit's application of *Noerr-Pennington* in *Theme Productions*.  546 F.3d at 1008.  The letters to the aggregators did not directly threaten litigation, and no lawsuit has been filed against any of them.  Also, the ruling in *Theme Productions* only grants *Noerr-Pennington* protection from suit by the *recipient* of the demand letters, and the letters at issue here were not directed to Counter-Plaintiffs.

Counter-Plaintiffs.  As to Verizon's argument about the adequacy of Counter-Plaintiffs' pleading of an agreement, that is discussed below, starting at page 11.

**D.     The Motion to Dismiss the Business Disparagement and Injurious Falsehood Claims Should Be Denied.**

Verizon's arguments for dismissal of the business disparagement and injurious falsehood claims are legally and factually deficient.  Verizon states that the letters to the aggregators cannot constitute a basis for claims of business disparagement or injurious falsehood.  *See* Motion, p. 9.  Presumably, Verizon rests its legally flawed argument that the aggregator letters are privileged.

Verizon then says that because not all of the JAWA defendants are mentioned in its press release, the business disparagement and injurious falsehood claims of all of the other Counter-Plaintiffs must be dismissed.  To reach this result, Verizon misapplies this Court's decision in *FreeLife Int'l, Inc. v. American Educ. Music Pubs. Inc.*, 2009 WL 3241795 (D. Ariz. Oct. 1, 2009), stating that *FreeLife* supports the proposition that "[b]ecause the other defendants are not explicitly named in the press release, their restated SAC fails as a matter of law."  Motion at 9.

In *FreeLife*, as the Court already knows, the Court granted summary judgment – not a motion to dismiss – on a defamation claim because the *only* way anyone could determine that the defamatory statements were made about the complaining party was by reading the complaint in the lawsuit.  Specifically, this Court said:

> FreeLife argues that summary judgment is appropriate on Burge's counterclaim for defamation because Burge fails to show that the alleged defamation is "of or concerning" Burge. *See Boswell* [*v. Phoenix Newspapers, Inc.,* 152 Ariz. 1, 730 P.2d 178, 180 (App. 1985)]. Defamatory statements must be published in such a manner that they reasonably relate to specific individuals. *Rosenblatt v. Baer,* 383 U.S. 75, 82, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). A plaintiff must show that "the recipient of the defamatory communication understand[s] it as intended to refer to the plaintiff." Restatement (Second) Torts § 564, cmt. a (1977).

> The FreeLife response letter does not refer to Burge by name, but Defendants argue that the letter is clearly "of or concerning" Burge because it defames the owner of the www.breathe.org website and Burge was disclosed as the owner of the website in this litigation. Defendants present no other evidence as to how a reader of the letter could know that

1    Burge was the subject. In other words, Defendants rely on this lawsuit as
     the means of perfecting Burge's defamation claim.

2    *Id.* at *10.  After explaining the litigation privilege, the Court concluded its analysis:

3
     Defendants offer no non-privileged means by which a potential reader
4    could link Burge with the FreeLife response letter. For this reason,
     FreeLife is entitled to summary judgment as to Burge's counterclaim for
5    defamation.

6    *Id.*  In stark contrast to *FreeLife*, in this case there are multiple ways one can determine

7    the parties disparaged by Verizon without reference to this litigation.  The press release

8    refers readers to the website www.premiumsmsrefunds.com, and goes on to state that

9    "[t]he website provides the full names of all the Premium SMS campaigns and

10   associated short codes Verizon Wireless has been able to trace back to the defendants in

11   the lawsuit."  In addition, Verizon's letters to the aggregators identify as wrongdoers

12   Jason Hope, Wayne Destefano [sic], Quinn McCullough, Christa Stephens, Steve

13   Uhrman, Janet O'Meara, Cylon LLC, Eye Level Holdings LLC, and Jawa LLC.  Also,

14   attached to the aggregator letters was a list of short codes, so aggregators and their

15   employees could easily discern which Counter-Plaintiffs were associated with each short

16   code.  Also, each aggregator letter attached a copy of the Complaint, so all of the

17   disparaged individuals and entities were readily discernable to anyone who saw the

18   letters.  Verizon conveniently forgets that in *Green Acres*, a defamation claim was

19   grounded on a complaint that was given to a reporter.  *Green Acres*, 141 Ariz. at 612.

20       Finally, Verizon argues that these claims fail because "each and every statement

21   made in the press release is facially true."  This statement is itself untrue.  The press

22   release states that "Customers [were] Affected By Text Messaging Fraud," and refers to

23   an "ongoing scheme" to "defraud Verizon Wireless and its customers."  An allegation of

24   fraud is per se defamatory.  In fact, in paragraph 83 of its Complaint, Verizon admits

25   that it cannot identify a single defrauded customer.  The press release also states that the

26   Texas Attorney General has been Verizon's "strong partner."  The Attorney General has

27   denied that claim.  The press release asserts that JAWA "misappropriated" short codes

28   and used them in "shadow" PSMS campaigns.  These statements not only are false, but

8

Verizon's Complaint says nothing about "misappropriated" short codes or "shadow" campaigns.  A statement to the press about a judicial proceeding must be entirely truthful in order for the speaker to escape liability; false statements about litigation are actionable.  *See Matta v. May*, 118 F.3d 410, 415 (5th Cir. 1997).

"Generally, injurious falsehood 'consist[s] of the publication of matter derogatory to the plaintiff's ... business in general ..., of a kind calculated to prevent others from dealing with him or otherwise to interfere with his relations with others to his disadvantage.'"  *Western Technologies, Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 4, 739 P.2d 1318, 1321 (App. 1986) (ellipses in original, quoting W. Prosser and W. Keeton, THE LAW OF TORTS § 128 at 963 (5th ed. 1984)).  The press release accuses JAWA of establishing an "intricate fraudulent enterprise" and "urge[s] [Verizon's] competitors to quickly follow and put a stop to this fraud[.]"  Such statements quite plainly are "derogatory to the [counter-]plaintiff's ... business in general ..., of a kind calculated to prevent others from dealing with [them] or otherwise to interfere with [their] relations with others to his disadvantage."

**E.    The Motion to Dismiss the Breach of Contract Claim Should Be Denied.**

Verizon's argument about Counter-Plaintiffs' breach of contract claim boils down to the contention that JAWA was not an intended third-party beneficiary of Verizon's contracts with multiple aggregators.  In fact, when one reads the Verizon/aggregator contracts (Def. Ex. 575-580), it is obvious that the contracts require Verizon and the aggregators to cooperate with any necessary third parties.  *See* ¶ 5.2 of Def. Exs. 575-80) (the "Agreements").  Contrary to Verizon's protestations, JAWA is a necessary third party to the Agreement.[3]  By purposefully interfering with JAWA's contractual

---

[3] Although the Agreement does not refer to JAWA by name, it demonstrates the parties' intent to benefit a class of persons such as JAWA, which is sufficient to establish Counter-Plaintiffs' right to enforce the Agreements.  *Nahom v. Blue Cross Blue Shield of Arizona, Inc.*, 180 Ariz. 548, 552, 885 P.2d 1113, 1117 (Ct. App. 1994).  In the Recitals, the parties' stated purpose for the Agreements is to provide a conduit for the distribution of PSMS to and from Verizon's customers.  The Agreements reflect the parties' understanding that third parties play a critical role in the development and distribution of data.  *See* Agreements, pp. 1-4.  The contract's treatment of data (¶1.10, at p. 2) shows that the parties understand that PSMS content may originate with program sponsors,

relationships with the SMS Aggregators and the wireless customers who had subscribed to JAWA's products and services, Verizon has reneged on its promise to cooperate. Instead of suspending or terminating only those JAWA campaigns Verizon could prove to be non-compliant, Verizon opted instead to cut off *all* of JAWA's messaging campaigns in their entirety (even those Verizon admits were compliant with the MMA) and to further extinguish JAWA's source of revenue by instructing the aggregators to cease doing business with JAWA and to withhold funds for content and services JAWA already provided to customers.  Counter-Plaintiffs have properly pleaded ways in which Verizon has breached its aggregator contracts by exerting "rights" to terminate JAWA's SMS products and short codes far beyond any actual rights allowed in any contract.

**F.      The Motion to Dismiss the Constructive Trust Claim Should Be Denied.**

Verizon cites *Burch & Cracchiolo, P.A. v. Pugliani*, 144 Ariz. 281, 697 P.2d 674 (1985), for the proposition that the funds that are owed to Counter-Plaintiffs by Verizon are not "property" for which a constructive trust may be imposed.  In *Burch* the Arizona Supreme Court discussed one of its earlier decisions, *Markel v. Transamerica Title Insurance Co.,* 103 Ariz. 353, 442 P.2d 97 (1968), *cert. denied, sub nom. Phoenix Title & Trust Co. v. Markel,* 393 U.S. 999 (1968), at length – and overruled it.  The *Burch* court overruled *Markel* because in *Markel* the court had endorsed the imposition of a constructive trust on a party, Stewart Title, which (a) was not accused of any wrongdoing, and (b) had already disbursed all of the funds at issue (the proceeds from the sale of private property).  *See id*. at 144 Ariz. at 286-87, 697 P.2d at 679-80.  In discussing the second ground for reversal, the *Burch* court recognized that identifiable funds can be the object of a constructive trust:

---

which are defined (¶1.19, p. 2) as third parties with which each aggregator has agreements authorizing it to serve as an interface with Verizon for purposes of implementing SMS programs – in other words, parties like JAWA.  Also, the definition of the term "SMS Program" demonstrates that the parties recognized that the connection as established by and through their contract was for benefit of third parties like JAWA because the aggregators implement and manage SMS programs on behalf of a program sponsor.  Agreements ¶1.24, p. 3.

Stewart disbursed the entire trust before any assignment by operation of law. To allow imposition of a constructive trust on Stewart now, based on the clients' unjust enrichment, seems folly. *It is the clients, not Stewart, that now possess the trust res*; it was the clients that may have been unjustly enriched; and if so, *it is upon the clients that a constructive trust might be imposed.*

*Id.* (emphasis added). Since Stewart had distributed money to its clients, and the clients were unjustly enriched by that transfer of money, that money was the proper subject of a constructive trust. Here, Verizon is wrongfully withholding, and ordering others to withhold, specific funds paid by customers for Counter-Plaintiffs' services.

Contrary to Verizon's view, JAWA does not have to plead fraud in order to state a claim for a constructive trust:

A constructive trust is an equitable remedial device generally used to prevent unjust enrichment. A constructive trust arises by operation of law when the circumstances under which property was acquired make it inequitable for the one who holds legal title to the property to retain ownership. Thus, through the constructive trust remedy, a court has jurisdiction to reach property in the hands of a "wrongdoer." . . . However, *there is no set or unyielding formula in decreeing a constructive trust and courts will do so when a party is under an equitable duty to give another the benefit of property to which he has acquired legal title.*

*Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1134 (D. Ariz. 2006) (citations omitted; emphasis added). "Actual fraud is not always necessary, but such a trust will arise whenever the circumstances under which the property was acquired make it inequitable that it should be retained by the one who holds the legal title." *Honk v. Karlsson*, 80 Ariz. 30, 34, 292 P.2d 455, 457 (1957).

## G.   The Motion to Dismiss the Antitrust Claims Should Be Denied.

Verizon misconstrues the law when it argues that neither the letters it sent to the aggregators, combined with their simultaneous acceptance of those letters' terms, nor its public call for other carriers to boycott, along with the fact that JAWA has been cut off from all domestic wireless carriers, is evidence of an agreement under the antitrust laws. Verizon's position ignores over 70 years of antitrust law on the topic.

In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), the Supreme Court relied on circumstantial evidence in finding an agreement from eight film

distributors' positive responses to a major film exhibitor's letter suggesting that they all impose price and exhibition restrictions which were inconsistent with profit maximization unless there had been an agreement among the distributors.

> While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.

*Id.* at 226. Similarly, in *American Tobacco Co. v. United States*, 328 U.S. 721 (1946), the Court found that sudden, simultaneous price changes among the three major manufacturers of tobacco products was sufficient "circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition[.]"

> No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

*Id.* at 809-10 (citation omitted).

Courts did not stop using circumstantial evidence to find illegal agreements back in the 1940s. In *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.Supp.2d 1348 (N.D. Ga. 2010), there was no allegation of a formal agreement among competitors to change business practices; there were public statements followed by parallel behavior – and that was enough to overcome the defendants' motion to dismiss on the ground that there was no allegation or evidence of an express agreement:

> . . . Plaintiffs need not allege the existence of collusive communications in "smoke-filled rooms" in order to state a § 1 Sherman Act claim. Rather, such collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways. *See In re Valassis Commc'ns, Inc.*, FTC File No. 051-0008 , 2006 WL 1367833

1
2
3
4
5
6
7

(Apr. 19, 2006) ("[I]t is clear that anticompetitive coordination can also be arranged through public signals and public communications, including speeches, press releases, trade association meetings and the like"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir.1990) ("the form of the exchange—whether through a trade association, through private exchange ... or through public announcements of price changes—should not be determinative of its legality.") (quoting R. Posner, *Antitrust Law: An Economic Perspective* 146 (1976)); *Standard Iron Works v. Arcelor-Mittal*, 639 F.Supp.2d 877, 892-95 (N.D. Ill. 2009) (statements at industry conferences supported an antitrust conspiracy claim); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F.Supp. 685, 690 (D. Minn.1995) (denying summary judgment to the defendants in the face of allegations that they exchanged messages through public speeches, press releases, and meetings).

8    *Id.* at 136.  *See also United States v. Masonite Corp.,* 316 U.S. 265, 275, 62 S.Ct. 1070

9    (1942) ("Here, as in *Interstate Circuit*, ... [i]t was enough that, knowing that concerted

10   action was contemplated and invited, the distributors gave their adherence to the scheme

11   and participated in it.").

12          In this case, the allegations of collusion swamp that asserted in the cases just

13   cited:   Verizon is in industry associations with all of the aggregators; Verizon has

14   contracts with all of the aggregators; Verizon sent letters to all of the aggregators telling

15   them to tear down JAWA's short codes with all wireless carriers; Verizon issued a press

16   release calling on the other wireless carriers to boycott JAWA – and, voilà, the

17   aggregators tore down all of JAWA's short codes and JAWA's business with all of the

18   wireless carriers has been terminated.

19          Verizon, citing *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1092

20   (9th Cir. 2000), argues that the per se rule for group boycotts is confined to cases

21   involving agreements among direct competitors.  Mot. p. 12.  The courts recognize a

22   variation of the classic horizontal boycott,[4] for which the evidence here is compelling:  a

23   refusal to deal that is orchestrated through a series of vertical agreements in

24   circumstances where the participants expect that their competitors also will participate.

25   In the leading case on hub and spoke horizontal boycott law, *Toys "R" Us v. F.T.C.*, 221

26

27

28

---

[4] A classic horizontal boycott which is per se illegal involves the participation of at least two competitors (which need not be competitors of the target). *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 293 (1985); *Spectators' Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001).

F.3d 928 (7th Cir. 2000), the Seventh Circuit analyzed what type of circumstantial evidence permits such an inference of a horizontal boycott orchestrated through vertical arrangements. In that case, Toys "R" Us (TRU) convinced toy makers to limit sales to warehouse clubs, which TRU saw as a threat to its position as a leading low-price toy retailer. *See id.* at 931-932.

The court ultimately found that TRU's orchestrated boycott was per se unlawful. *Id.* In reaching this conclusion, the *TRU* court noted that an illegal horizontal agreement may be proven by circumstantial evidence including shifts from prior practices and decisions that deprive entities of previously profitable business. *See id.* at 934-36. "When circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted). This does not mean, however, that one must exclude all possibility that the manufacturers acted independently because "that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." *Id.* at 934-35. "The test states only that there must be *some* evidence which, if believed, would support a finding of concerted action." *Id.* (emphasis original).

Here, as alleged, evidence of the conspiracy includes the contracts between the aggregators and Verizon, letters Verizon sent to each of the aggregators, in which Verizon instructed that "*all* message campaigns *associated in any way with any of the defendants* must be terminated immediately" and that each of the aggregators "must terminate *all* of the short codes on its platform to ensure that *all* messaging and premium charges are stopped[.]  Moreover, the assurance that all aggregators were subject to the same Verizon demand was very publicly delivered in Verizon's press release vowing to bring a stop to the alleged "fraud" and calling on its wireless carrier competitors to follow suit, which announcement eliminated any actual need for direct communications by competitors at either the wireless carrier or aggregator level.

Another case showing that JAWA has sufficiently pleaded a horizontal agreement is *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F.Supp.2d 1257

14

(D. Kan. 2007), in which the court found that a showing that the parties are acting against their own individual business interests is sufficient to infer an agreement. *Id.* at 1296. Already discussed at length, but (like *Heartland*) ignored by Verizon save for one sentence in a footnote (Mot. fn 12, at 16), is *McCreery Angus Farms v. American Angus Ass'n*, 379 F.Supp. 1008 (S.D. Ill.), *aff'd*, 506 F.2d 1404 (7th Cir. 1974), a Sherman Act case in which the court enjoined the perpetrators of a group boycott that otherwise would have driven the plaintiff out of business. The parallels between *McCreery* and this case are many (*see* JAWA's Reply Brief in Support of its Motion for Preliminary Injunction (Doc. #128), at 6-8), and JAWA will not now repeat them.

Verizon cites two cases – *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), and *Brunson Comm'n, Inc. v. Arbitron, Inc.*, 239 F.Supp.2d 550 (E.D. Pa. 2002) – for the proposition that a "hub-and-spoke" conspiracy requires evidence of a horizontal agreement to be actionable as a per se horizontal conspiracy. Here, as we have discussed, there is ample assertion of circumstantial evidence of such an agreement: the contracts between the aggregators and Verizon, the letters from Verizon to each aggregator telling them to tear down JAWA, the aggregators' simultaneous agreement to do so, and Verizon's press release. The aggregators' concerted action against JAWA is "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement" – precisely the conduct the Supreme Court has held does state a § 1 Sherman Act claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 n.4 (2007).[5]

---

[5] Verizon's assertion that "each aggregator acted in its own self-interest by accepting Verizon's unilateral demand" is simply not plausible. Even assuming that it was in each aggregator's self-interest to "tear down" JAWA's short codes with respect to Verizon (which it was not), it plainly was not in their self-interest to accede to Verizon's demand to cut JAWA off from AT&T, T-Mobile and Sprint, and lose revenue from those carriers.

1    In *Dickson*, the plaintiff "alleged discrete conspiracies between Microsoft and

2 two original equipment manufacturers (OEMs): Dell and Compaq. *Dickson*, 309 F.3d

3 at 210. The Fourth Circuit affirmed the district court's determination "that it could not

4 consider the cumulative harm of Microsoft's agreements with *all OEMs* but instead was

5 required to consider – individually – Microsoft's agreements with Compaq and Dell"

6 because the complaint "did not allege a conspiracy among Microsoft and *all OEMs*; it

7 alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell."

8 *Id.* (emphases added). In other words, because the plaintiff did not allege the cumulative

9 effect of Microsoft's agreements with all OEMs in the complaint, the Fourth Circuit

10 declined considering their aggregate effects. *Dickson* is distinguishable from this case,

11 as Counter-Plaintiffs do expressly allege that Verizon's agreements with all of the

12 aggregators, and their concerted action, constitutes a group boycott.

13    *Brunson* also is easily distinguishable because in that case, the plaintiff

14 "identified none of the entities which allegedly conspired with Defendant. . . . [T]he

15 cases . . . require an antitrust plaintiff to supply more detail to make out a Section One

16 claim. The facts alleged in the Amended Complaint are extremely vague and do not

17 sufficiently describe any contract, combination or conspiracy between Arbitron and the

18 larger TV stations." *Brunson*, 239 F.Supp.2d at 562. The plaintiff in *Brunson* did not

19 plead any sort of conspiracy; Counter-Plaintiffs have.

20    In addition, *Dickson* and *Brunson* both relied on *Kotteakos v. United States,* 328

21 U.S. 750, 755, 66 S.Ct. 1239 (1946), a case that is easily distinguishable. In *Kotteakos,*

22 the underlying crime was a conspiracy to obtain loans under the National Housing Act

23 by fraud. The center of the conspiracy was a man named Brown, who was in the

24 business of brokering fraudulently obtained loans for his co-conspirator clients. *See id*,

25 328 U.S. at 753, 66 S.Ct. 1239. All of the clients used Brown to obtain the loans, but

26 each client's use of Brown's services was independent of every other client's use. *See*

27 *id. Kotteakos* involved not one, but multiple conspiracies. Not only did Brown's co-

28 conspirators have no express agreements among themselves, their participation was also

in no way dependent on the participation of other users of Brown's services.    The *Kotteakos* Court used an analogy from the court of appeals to explain the point: "Thieves who dispose of their loot to a single receiver – a single 'fence'— do not by that fact alone become confederates:  they may, but it takes more than knowledge that he is a 'fence' to make them such."  *Id.* at 755, 66 S.Ct. 1239.  Here, the aggregators not only knew that Verizon was the "fence," they each had contracts with Verizon, each received a letter from Verizon telling them what to do and when to do it, and they each did as they were told – tear down JAWA.

### III.    CONCLUSION

For the reasons stated above, Counter-Plaintiffs respectfully request that Verizon's Motion to Strike and Motion to Dismiss each be denied in its entirety.  In the event the Court grants either Motion, in whole or in part, Counter-Plaintiffs request leave to replead.

Respectfully submitted this 5th day of May 2011.

DOUGLAS F. BEHM, PLLC

By____/s/ Douglas F. Behm_____
Douglas F. Behm
14362 N. Frank Lloyd Wright Blvd. Suite 1000
Scottsdale, Arizona 85260

JACKSON WALKER L.L.P.

By:____/s/ Charles L. Babcock_____
Charles L. Babcock
Richard E. Griffin
1401 McKinney, Suite 1900
Houston, Texas 77010

*Attorneys for JAWA, Defendants, and Counter-Plaintiffs*

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2011, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Kipp Charlton, Esq.          paul.charlton@gknet.com, gjk@gknet.com

Lindsi Michelle Weber, Esq.       lindsi.weber@gknet.com, jk@gknet.com

Marcos D. Jimenez, Esq.           mjimenez@kasowitz.com, ymorales@kasowitz.com

Scott B. Cosgrove, Esq.           scosgrove@kasowitz.com, anoonan@kasowitz.com

Ann M. St Peter-Griffith, Esq.    astpetergriffith@kasowitz.com

Sandra J. Millor, Esq.            smillor@kasowitz.com


By:    /s/ Richard E. Griffin

6109464v.1