**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cellco Partnership doing business as Verizon Wireless, | No. CV11-0432-PHX-DGC |
| Plaintiff, | **ORDER AND PRELIMINARY INJUNCTION** |
| vs. | |
| Jason Hope, et al., | |
| Defendants. | |

      Plaintiff Cellco Partnership, doing business as Verizon Wireless ("Verizon"), has filed a motion for preliminary injunctive relief against Defendant Jason Hope and others. Defendants oppose the motion (Doc. 68) and have filed their own request for a preliminary injunction (Doc. 90). The Court held an evidentiary hearing on both motions on April 13 and 14, 2011, and has received additional briefing from the parties on Defendants' motion. For reasons explained below, the Court will grant Plaintiff's motion and deny Defendants' motion.

## I.    Legal Standard.

      To obtain a preliminary injunction, a plaintiff must show that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365,

1   374 (2008).  The test includes a sliding scale.  If the plaintiff shows that the balance of

2   hardships will tip sharply in his favor, he need not make as strong a showing of

3   likelihood of success on the merits – the existence of serious questions will suffice.

4   *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049-53 (9th Cir. 2010).

5   **II.**   **Verizon's Motion for Preliminary Injunction.**

6          **A.**   **Factual Findings.**

7          The following factual findings are based on evidence presented at the hearing on

8   April 14, 2011, exhibits submitted at the hearing and by the parties in their preliminary

9   injunction briefing, and the Court's credibility determinations made during the hearing.

10   Exhibits cited in this order are exhibits received during the hearing.

11          Verizon operates a wireless telephone network.  Defendants are engaged in the

12   business of providing premium text message service ("PSMS") on wireless networks.

13   PSMS is content, delivered for a fee, to wireless customers' handsets through five or six

14   digit numbers known as "short codes."  PSMS content such as ring tones, horoscopes,

15   recipes, celebrity gossip, and news alerts typically are advertised through websites on the

16   internet and ordered by wireless customers on these websites.  When a customer orders a

17   PSMS service on Defendants' website, the service is delivered to the customer's phone

18   over the Verizon network and Verizon includes the monthly charge for the PSMS service

19   on the customer's wireless bill.

20          To market and sell PSMS over the Verizon wireless network, Verizon requires

21   Defendants and other content providers to abide by the industry guidelines for marketing

22   practices developed by the Mobile Marketing Association ("MMA Best Practices").

23   These guidelines protect wireless customers from misleading and deceptive PSMS

24   marketing practices.

25          Communication between network providers such as Verizon and content providers

26   such as Defendants generally occurs through third-party entities known as "aggregators."

27   Content providers are required to submit an application to Verizon, through an

28

1   aggregator, for each PSMS marketing campaign the content providers propose to provide
2   on Verizon's network.   Verizon reviews these proposed marketing campaigns for
3   compliance with the MMA Best Practices before access to its network is granted.   When
4   a campaign is approved, Verizon authorizes the provider to use a specific short code on
5   its network.

6           After Verizon approves a campaign, it monitors the internet and other advertising
7   to ensure that unauthorized and unapproved practices are not used to market PSMS
8   content to its customers. Verizon employs a third-party auditor, Aegis Mobile, to conduct
9   this monitoring.

10          Defendants Jason Hope and Wayne Destefano previously did business as Cylon
11   LLC.  In March of 2009, Verizon suspended Cylon's short codes on the Verizon network.
12   The suspension occurred because Cylon was using an opt-in procedure for its sites that
13   allowed customers to sign up for services directly on the internet, rather than using a
14   double opt-in procedure required by the MMA Best Practices and mandated by Verizon
15   for sale of PSMS to its customers.  Verizon's termination letter stated that Verizon would
16   not consider reactivation of the suspended short codes or any new program from Cylon,
17   and that all future programs would require disclosure of the content providers' identities.
18   Ex. 54.

19          In response to Verizon's suspension, Jason Hope sent an email to Verizon seeking
20   to regain access to the Verizon network and attributing the incorrect opt-in procedures to
21   a rogue employee at Cylon who did not have management approval to violate MMA Best
22   Practices. Ex. 13.  This explanation was false.  As Mr. Destefano admitted at the hearing,
23   the rogue employee explanation was a lie.  In July of 2009, Verizon stated that Hope and
24   Destefano could again do business on the Verizon network, but the requirement that they
25   identify themselves when doing business remained in place.  Doc. 132 at 3-4.

26          Defendants Hope and Destefano created Defendant Eye Level Holdings, LLC in
27   2009.  Eye Level does business as "JAWA," which represents the first two letters of

28

Hope and Destefano's first names.  In applying for permission to do business on the Verizon network thereafter, however, Defendants created separate limited liability companies ("LLCs") to hold each of the short codes and to apply for access to the network.  These LLCs were created in the names of JAWA employees other than Mr. Hope and Mr. Destefano, and the principal places of business listed for the LLCs were addresses that actually were UPS stores in various parts of the country, not Defendants' principal place of business in Scottsdale, Arizona.  The creation of the LLCs and their false principal places of business appear designed to prevent Verizon from associating the LLCs and their applications with Defendants Hope and Destefano.

Defendants sell their PSMS services on the internet.  When prospective customers seek information about Defendants' services on the internet, they first see a web page referred to by the parties as the "landing page."  MMA Best Practices provide detailed specifications concerning the form of landing pages, including (1) required disclosures concerning the price of the service, the terms and conditions of the service, the short code affiliated with the service, and how to cancel the service; (2) font size, location, and colors for price disclosures; and (3) requirements about what disclosures must be "above the fold," meaning on the first computer screen the customer sees.

Verizon requires Defendants and other content providers to comply with MMA Best Practices when selling product and providing services on the Verizon network, and to submit proposed landing pages to aggregators for compliance review.  Landing pages submitted for such reviews were referred to in the hearing as "carrier facing URLs."

Defendants submitted carrier facing URLs to aggregators for possible use on the Verizon network.  The carrier facing URLs complied with MMA Best Practices, but once those URLs were approved and a short code was assigned, Defendants used landing pages in connection with the short code that did not comply with MMA Best Practices.  Some of these landing pages dropped the price disclosures from the locations required by the Best Practices, reduced the font size or color of the prices disclosures, failed to advise

viewers of how services could be discontinued, failed to identify the short code affiliated with the service, and failed to include the required terms and conditions above the fold. These landing pages were not submitted to or approved by Verizon or any aggregator. Defendants used numerous non-compliant landing pages to sell their services to Verizon customers after obtaining short codes and access to the Verizon network by submitting compliant carrier facing URLs.

Aegis monitors compliance for Verizon by viewing a content provider's landing pages on the internet and determining whether the pages comply with MMA Best Practices.  Defendants knew that Verizon retained such auditors, that Verizon's primary auditor was Aegis, that Aegis sought to audit Defendants' compliance with MMA Best Practices, and generally how Aegis conducted its auditing activities.

Defendants used a software program, referred to by Defendants as a "firewall" and by Verizon as "cloaking software," to prevent Aegis and other auditors from viewing their non-compliant landing pages.  Internet Protocol ("IP") addresses for Aegis and other auditors were maintained by Defendants in a "blacklist."  Whenever an attempt was made to view Defendants' landing pages from an IP address on the blacklist, Defendants' software would direct the attempt away from the landing page to a generic website offering similar services.  Defendants understood that this was the effect of the software. A flowchart of the software prepared by Defendants stated that it "filters out known auditors."  Ex. 5 at 8.  It further states that if a visitor to Defendants' landing pages is "considered a known auditor," "they will be redirected to [another] website" such as a generic website for the same services or even to a search site such as Google.  *Id*.  The flowchart also states that auditors may be redirected to a "super compliant" landing page. *Id*. at 14.

Defendants limited knowledge of the auditor-blocking software to a small number of employees within the company.  Ex. 45.  Defendants monitored the software's effectiveness in directing auditors away from their landing pages.  Ex. 43.  Defendants

also monitored which auditors sought to look at which landing pages on which days. Ex. 38.  After this lawsuit was filed, Defendants disabled the portion of their software that redirected auditors away from Defendants' landing pages.

Aegis was able to discover the use of this cloaking software and to avoid it by making inquiries through other IP addresses.  Through this means, Aegis was able to view numerous landing pages that were not compliant with MMA Best Practices and that were being used by Defendants to sell their services to Verizon network customers.

Verizon contends that Defendants' actions have misled Verizon customers into signing up for Defendants' services.  David Burmester testified that Verizon has received customer complaints and threats to leave the Verizon network due to Defendants' actions. Other customers have requested that their phones be blocked from all PSMS services due to Defendants' conduct.  California regulators have contacted Verizon about Defendants' conduct.

The Court finds that Verizon is likely to succeed at trial in establishing that Defendants used deceptive practices to gain access to the Verizon network, including (1) using carrier facing URLs that were compliant with MMA Best Practices to obtain approval and short codes, followed by the undisclosed use of non-compliant landing pages to sell services via the short codes; (2) using blocking software to prevent Verizon's auditors from monitoring the non-compliant landing pages; and (3) using individual LLCs with fictitious places of business to acquire short codes and conceal the involvement of Mr. Hope and Mr. Destefano – content providers who previously had been barred from the Verizon network.  The Court also finds that Verizon is likely to establish that Verizon customers have been misled by Defendants' landing sites.

**B.     Verizon's Legal Claims.**

Verizon asserts several claims for relief in its complaint, but bases its request for a preliminary injunction on three:  the Arizona Consumer Fraud Act ("ACFA"), tortious interference with contract, and unjust enrichment.  The Court will address each claim.

1

### 1.   Arizona Consumer Fraud Act.

Verizon argues that Defendants violated the ACFA by (1) gaining access to the Verizon network through false representations and omissions of material facts, and (2) selling services to Verizon customers through "unauthorized advertisements that violated the MMA Best Practices."   Doc. 6 at 10.   Defendants respond in part that Verizon lacks standing to sue under ACFA.   Doc. 68 at 13.   The Court concludes, for purposes of this preliminary injunction motion, that Verizon is not likely to succeed in establishing a claim under the ACFA.

The ACFA prohibits "[t]he act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby[.]"   A.R.S. § 44-1522(A).   In *Sellinger v. Freeway Mobile Home Sales, Inc.*, 521 P.2d 1119, 1122 (Ariz. 1974), the Arizona Supreme Court held that ACFA implies a private right of action.

In construing the scope of the statute in private suits, *Enyart v. Transamerica Ins. Co.* noted that "[t]he purpose of the Arizona Consumer Fraud Act is to eliminate unlawful practices in merchant-consumer transactions."   985 P.2d 556, 563 (Ariz. App. 1998) (citing *Madsen v. W. Am. Mortg. Co.*, 694 P.2d 1228 (Ariz. App. 1985)).   "The elements of a private cause of action under the act are a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury."   *Dunlap v. Jimmy GMC of Tucson, Inc.*, 666 P.2d 83, 87 (Ariz. App. 1983) (citing *Parks v. Macro-Dynamics*, 591 P.2d 1005 (Ariz. App. 1979)).   Although cases have held that "consumers" need not be natural persons, *e.g., Waste Mfg. & Leasing Corp. v. Hambicki*, 900 P.2d 1220, 1224-25 (Ariz. App. 1995), Arizona courts have also clearly suggested that the ACFA protects only

- 7 -

those who are actually consumers in the transaction, *e.g., Waste Mfg.*, 900 P.2d at 1224 ("The purpose of the Act is to provide *injured consumers* with a remedy"); *Dunlap*, 666 P.2d at 87 ("The Consumer Fraud Act provides *an injured consumer* with an implied private right of action against a violator of the act."); *Correa v. Pecos Valley Dev. Corp.*, 617 P.2d 767, 771 (Ariz. App.  1980) ("Injury occurs when the *consumer* relies on the misrepresentation, even though reliance need not be reasonable." (citation omitted)); *Parks*, 591 P.2d at 1008 (elements of claim under the Act include "the *hearer's* consequent and proximate injury") (emphasis added in all quotes).

The Ninth Circuit has specifically held that a plaintiff may not make a claim under the ACFA for fraudulent statements made in connection with the sale of merchandise to another person.  *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401 (9th Cir. 1992).  As the Ninth Circuit explained:

> ACFA makes it illegal to commit fraud or deception "in connection with the sale or advertisement of any merchandise." . . . The clear intent of this provision is to protect unwary buyers from unscrupulous sellers.  The basis for Vintage's claim, however, is that Sutter Home deceived it by secretly selling to another distributor the exclusive rights to distribute its wine.  Under this scenario, Vintage is not a buyer, nor is it the target of deceptive advertising.  Consequently, it cannot maintain an action under [ACFA].

*Id.* at 407.

To the extent Defendants misled Verizon in obtaining access to the Verizon network, the fraud did not occur "in connection with" Verizon's purchase of merchandise.  One could argue that the fraud was committed for the purpose of selling merchandise (PSMS) to Verizon customers, and therefore was "in connection with" the sale of merchandise, but Arizona cases strongly suggest and *Sutter* holds that the plaintiff under the ACFA must be the buyer in the merchandise transaction.  Because Verizon has not shown that it purchased merchandise from Defendants in connection with their alleged misrepresentations, Verizon has not shown that it is likely to establish a valid claim under the ACFA.

1

### 2.      Tortious Interference with Contractual Relations.

Verizon asserts that Defendants' actions constitute tortious interference with contractual relations.   When asked during oral argument to identify the breach Defendants allegedly induced, Verizon argued that a breach is not required – that mere burdening of an existing contract satisfies the requirements of the tort.  Verizon argued that Defendants' actions have forced it to spend more money and time in mollifying unhappy customers than otherwise would have been required, thereby burdening Verizon's contractual relations with its customers.  Defendants reply that Arizona law requires a breach of the contract before liability arises for tortious interference with contract, and that Verizon has shown no breach.

"In analyzing state law in a diversity case, [federal courts] are bound by the decisions of the state's highest court."  *U.S. Fidelity and Guar. Co. v. Lee Investments LLC,* ___ F.3d ____, 2011 WL 1458793, *5 (9th Cir. 2011).  If a state's highest court has not ruled on an issue, a federal court is "required to ascertain from all the available data what the state law is and apply it."  *Id.* (quoting *Soltani v. Western & Southern Life Ins. Co.*, 258 F.3d 1038, 1045 (9th Cir. 2001)).  In determining how the state's highest court would rule, a federal court "look[s] to existing state law without predicting potential changes in that law."  *Id.* (citation omitted).

The question before this Court is whether, under Arizona law, a civil defendant can be held liable for tortious interference with contractual relations by making the plaintiff's compliance with a contract more expensive.  The answer is yes.

Verizon cites *Carey v. Maricopa County*, a case in which this district summarized the cause of action for tortious interference with contract as requiring:

> the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach.

CV-05-2500-PHX-ROS, 2009 WL 750220, *7 (D. Ariz. Mar. 10, 2009) (quoting *Neonatology Assocs. v. Phoenix Perinatal Assocs.*, 164 P.3d 691, 693 (Ariz. App. 2007)). The District Court also noted, however, that under the Restatement (Second) of Torts § 766A (1979), liability can arise even when a defendant "caus[es] [plaintiff's] performance to be more expensive or burdensome" – the interfering act need "not . . . actually have the effect of terminating the contract in and of itself." *Carey*, 2009 WL 750220, *8. In *Carey*, however, the plaintiff's contract was actually terminated and any suggestion that the interference need not cause a breach was therefore dictum. *Id.* at *7.

Verizon also cites to *Brands v. Lakeside Fire Dist.*, CV-08-8143-PHX-NVW, 2010 WL 2079712 (D. Ariz. May 24, 2010), where the court cited to the Restatement (Second) of Torts § 767 cmt. a (1979). In *Brands*, however, the plaintiff's employment contract was actually terminated by harassment. *Id.* at *3.

In sum, the cases cited by Verizon are not directly on point. The Court notes, however, that Arizona courts have cited § 766A of the Restatement as good law. *See, e.g., Plattner v. State Farm Mut. Auto. Ins. Co.*, 812 P.2d 1129, 1134 (Ariz. App. 1991) (citing cases). The Court will therefore apply this section.

Section § 766A recognizes liability for a defendant's interference which makes a plaintiff's performance of its own contract more burdensome or expensive. Comment c explains that when performance is made more expensive, the plaintiff's benefit from the contract diminishes, thereby entitling the plaintiff to recover the loss from the interfering defendant. The Court concludes that Verizon is likely to succeed in showing that Defendants' promotion of services to Verizon's customers has resulted in increased costs to Verizon: refunding subscription fees to Verizon customers after Defendants were shut out of the Verizon system, and increasing the costs of monitoring Defendants' activities. Verizon estimates these costs at several million dollars. Doc. 6 at 12:6.

For liability to attach under § 766A, the interference must be intentional. Conduct is intentional "if the actor desires to bring it about or if he knows that the interference is

certain or substantially certain to occur as a result of his action." § 766A cmt. e. The Court finds that Verizon is likely to succeed in showing that Defendants knew their actions would cause substantial difficulties between Verizon and its customers, burdening Verizon's contractual relationship with those customers and increasing Verizon's expenses. Specifically, Verizon is likely to show Defendants knew they would be blocked from the Verizon network if they failed to comply with MMA Best Practices, as demonstrated by their "firewall" designed to redirect auditors away from their non-compliant landing pages. Moreover, Defendants knew that Verizon would refund subscription fees after they were blocked in order to retain its customers and avoid customer lawsuits.

The intentional acts of interference must also be improper. In deciding impropriety, a court must consider the following factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference[,] and (g) the relations between the parties.

Restatement § 767.

Wrongful conduct includes fraudulent misrepresentations and violation of established business customs or practices. Restatement § 767 cmt. c. Verizon is likely to succeed in showing that Defendants engaged in such misrepresentations and violations. Defendants concealed the fact that Hope and Destefano were in control of the entities doing business with Verizon. The entities through which Defendants engaged Verizon used the names of employees other than Hope and Destefano and listed UPS store locations for principal places of business despite the fact that JAWA's main office is located in Scottsdale, Arizona. Defendants presented carrier facing URLs that complied with MMA Best Practices in order to obtain access to the Verizon network, and then did not use the carrier facing URLs to sell their services, instead using landing pages that

- 11 -

were not compliant with MMA Best Practices.  That Defendants knew they were doing so is shown by their use of a "firewall" to redirect Verizon auditors away from the non-compliant landing pages and to generic sites or "super compliant" pages.

In sum, the Court concludes that Verizon is likely to succeed on the merits of its tortious interference claim.

### 3.  Unjust Enrichment.

A claim of unjust enrichment under Arizona law has five elements: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law."  *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. App. 2011) (citing *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 131-32 (Ariz. App. 1984)).

Verizon argues that Defendants are liable for unjust enrichment because they gained access to the Verizon network through fraud, circumvented Verizon's monitoring of compliance with MMA Best Practices, and provided deceptive advertising to Verizon's customers.  Doc. 6 at 11-12.  Verizon asserts that it will "incur millions of dollars in losses in connection with investigating defendants' fraudulent activity, reimbursing customers, and attempting to preserve its reputation."  *Id.* at 12.

The Court notes that Verizon gained from Defendants' actions, a gain that Defendants estimate at 30% of $80 million, or $24 million.  Verizon has not shown that its expenses would be greater than its gain, and therefore is not likely to establish the impoverishment element of the unjust enrichment claim.  *See City of Sierra Vista*, 697 P.2d at 1132 (finding no impoverishment where defendant's acts enhanced the value of plaintiff's assets).  Nor has Verizon established unjust enrichment in the traditional sense: Verizon does not claim to have paid money to Defendants for their services.

Given these issues, the Court cannot conclude that Verizon is likely to succeed on the merits of its unjust enrichment claim.

1

**C.    Defendants' Arguments.**

2       Defendants argue that all of Verizon's claims will fail for several reasons.  The

3  Court will address them separately.

4                  **1.    Mootness of Injunctive Relief.**

5       Defendants argue that the injunction request is moot because Verizon has already

6  shut them out of the Verizon network.  "An injunction can issue only after the plaintiff

7  has established that the conduct sought to be enjoined is illegal and that the defendant, if

8  not enjoined, will engage in such conduct."  *United Transportation Union v. Michigan*

9  *Bar*, 401 U.S. 576, 584 (1971).  The Court finds above that Defendants Hope and

10 Destefano previously engaged in conduct that caused Verizon to shut them out of its

11 network, and proceeded to regain access to the network by false statements.  The Court

12 also finds that Defendants used subsidiary entities with false addresses to gain access to

13 the Verizon network.  Verizon has made a reasonable showing that Defendants, if not

14 enjoined, might well employ similar tactics to again gain access to the Verizon network.

15 Injunctive relief is not moot.

16                  **2.    Dormant Commerce Clause.**

17      Defendants argue that "[f]acially neutral [state] regulations that excessively

18 burden commerce are invalid," and that Verizon's attempt to impose marketing

19 requirements on Defendants through the ACFA violates the dormant Commerce Clause

20 of the United States Constitution.  Doc. 68 at 8-9.  The Commerce Clause "denies States

21 the power unjustifiably to discriminate against or burden the interstate flow of articles of

22 commerce."  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994).  A

23 state statute may violate the dormant Commerce Clause in two ways: (1) by facially or in

24 effect discriminating against interstate commerce; or (2) by incidentally imposing

25 burdens on interstate trade that are "clearly excessive in relation to the putative local

26 benefits."  *Maine v. Taylor*, 477 U.S. 131, 138 (1986).  "The party challenging the statute

27 bears the burden of showing discrimination."  *Black Star Farms, LLC v. Oliver*, 600 F.3d

28

1225, 1230 (9th Cir. 2010).   In the context of the dormant Commerce Clause, discrimination simply means "*differential treatment* of in-state and out-of-state economic interests" that benefits the former and burdens the latter."   *Id.* (emphasis in original).

Defendants make no showing from which the Court can conclude that the ACFA discriminates against out-of-state economic interests either facially or in effect, or that burdens imposed by the ACFA are clearly excessive in light of local benefits.   Nor can the Court equate this lawsuit between private parties to unlawful state interference with interstate commerce,

### 3.   Primary Jurisdiction Doctrine.

Defendants rely upon the doctrine of primary jurisdiction to argue that this Court should refrain from deciding what content or presentation standards should apply to the parties' industry in light of the fact that the Federal Communications Commission and the Federal Trade Commission have primary administrative authority over this domain. Doc. 68 at 9-11.   The Court need not and does not hold in this order that MMA Best Practices are *de facto* industry standards or superior to other standards.   The Court merely finds that the MMA Best Practices were the standard Defendants were obligated to follow as a result of their contracts with aggregators and, by extension, Verizon.   The primary jurisdiction doctrine does not apply.

### 4.   Unclean Hands.

In Arizona, "the doctrine of unclean hands is an equitable defense to a claim seeking equitable relief."   *Neeme Sys. Solutions, Inc. v. Spectrum Aeronautical, LLC*, ___ P.3d ___, 2011 WL 1086766, *6 (Ariz. Ct. App. 2011).   "To prevail on a claim of unclean hands, a party must prove that '[t]he dirt upon [the opposing party's] hands [is] his bad conduct in the transaction complained of.   If he is not guilty of inequitable conduct toward the [party asserting unclean hands] in that transaction, his hands are as clean as the court can require.'"   *Id.* (alterations in original) (quoting *Smith v. Neely*, 380 P.2d 148, 149 (Ariz. 1963)).

Defendants argue that Verizon has unclean because it misrepresented Defendants' web pages to the Court.  Doc. 68 at 17.  The errors Defendants identify in Verizon's assertions, however, do not rise to the level of fraud.  Although Defendants identified some portions of particular web pages that were compliant with MMA Best Practices when Verizon claimed they were not, Defendants did not make this showing with respect to most of the pages and items of non-compliance Verizon has established.  The Court cannot conclude that Verizon has engaged in a fraud upon the Court.

Defendants argue that Verizon issued press releases falsely accusing them of defrauding customers and committing crimes, misrepresenting a non-existent partnership with the Texas Attorney General, and alleging that Defendants' corporate structure evinces a criminal conspiracy despite a more complex structure on the part of Verizon. Doc. 68 at 17-18.  The Court does not find the press release false or fraudulent, nor that Verizon's corporate structure is akin to Defendants' use of individual LLCs with false principal places of business to hide the involvement of Defendants Hope and Destefano. Nor does the Court find Verizon's statement regarding a partnership with the Texas Attorney General to be materially false or misleading.  Defendants themselves note that the Texas authorities commenced an action against them based on the same basic allegations of this case at about the same time this lawsuit was filed.

### D. Preliminary Injunction Conclusions.

Verizon has shown a likelihood of success on the merits of its tortious interference claim.

Verizon is likely to suffer irreparable harm if Defendants are not enjoined from again deceptively accessing Verizon's network and engaging in the kinds of actions established in this case.  Damage to Verizon's reputation and customer goodwill constitutes irreparable harm.  *See MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.").

The balance of equities tips in Verizon's favor.  Verizon has a legitimate interest in protecting its established customer relationships.  Defendants have no legitimate interest in again accessing the Verizon network through deceptive means – the conduct that will be enjoined.

Finally, a preliminary injunction is in the public interest.  The law protects contractual relationships.  The public interest does not favor those who would exploit those relationships through improper means.

The Court will grant Verizon's request for a preliminary injunction as described below.  This injunction will take effect upon Verizon's posting a $25,000 bond.  This bond is in addition to the $10,000 bond posted by Verizon for its TRO.  Doc. 26.

**III.    Defendants' Motion for Preliminary Injunction.**

When Verizon filed this lawsuit, it issued letters directing the four primary aggregators to stop doing business with Defendants on the Verizon network, and a press release calling for other major network providers to stop doing business with Defendants. Defendants presented evidence that the aggregators have followed Verizon's directions and have cut Defendants off from the Verizon network.  Defendants presented additional evidence that Verizon and the aggregators are holding some $19 million owed to Defendants, and that these actions by Verizon will put Defendants out of business unless enjoined.  Defendants have filed a counterclaim against Verizon and ask the Court to require Verizon to distribute Defendants' money, reactivate all of Defendants' short codes, not cause or require others to cause Defendants' PSMS customers to "opt out" of Defendants' services, not contact wireless customers and invite them to seek refunds for Defendants' services, and similar injunctive relief.   Doc. 90 at 16-17.   In short, Defendants ask the Court to order Verizon to return Defendants to the position they were in before this lawsuit was filed and Verizon acted on the basis of its fraud allegations.

**A.    Legal Standards.**

The legal standards for Defendants' preliminary injunction request are the same as

those for Verizon's request.  Defendants bear the burden of proving their entitlement to injunctive relief.

### B.    Defendants' Legal Claims.

Defendants seek a preliminary injunction on the basis of two general categories of counterclaims:  tortious interference with contracts and business expectancies, including conspiracy to tortiously interfere, and violation of federal and New Jersey antitrust laws.

### 1.    Tortious Interference.

As noted above, tortious interference with contract requires proof of improper conduct.  *Carey*, 2009 WL 750220 at *7; *Neonatology Assocs.*, 164 P.3d at 693. Defendants contend that Verizon's conduct was improper because its allegations of wrongdoing against Defendants are false.  Doc. 90 at 4.  As explained above, however, the Court finds that Verizon is likely to succeed in establishing that Defendants engaged in deceptive conduct to gain access to the Verizon network and sell their services to Verizon's customers.  Defendants also claim that Verizon failed to afford Defendants a ten-day cure period for violations of MMA Best Practices and otherwise sprung this lawsuit on Defendants in an effort to drive them out of business as a direct competitor. Given the extensive evidence of deceptive conduct by Defendants, however, the Court cannot conclude that Defendants are likely to succeed in showing that Verizon acted wrongfully by electing to terminate its business relationship with them, particularly in light of its having done so once before with respect to Defendants Hope and Destefano. Nor can the Court conclude from the evidence Defendants have presented that Defendants are likely to succeed in showing that Verizon is a direct competitor of Defendants.

In short, the Court concludes that Defendants have not presented sufficient evidence to show that they are likely to succeed on the merits of the "improper conduct" element of their tortious interference with contract claim.  Nor have they presented sufficient evidence to establish the existence of serious questions.  Serious questions exist

when a plaintiff shows a "'fair chance of success on the merits.'"  *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc) (quoting *Nat'l Wildlife Fed'n v. Coston,* 773 F.2d 1513, 1517 (9th Cir. 1985)).  Defendants have not shown that they have a fair chance of success on the improper conduct requirement.

Defendants do not specify the business expectancies with which Verizon has interfered.  The Court assumes they are the same business relationships addressed in Defendants' tortious interference with contract claim – relationships with aggregators, customers, and other network providers.  Nor do Defendants contend that a claim for tortious interference with business expectancies lacks the "improper conduct" requirement for tortious interference with contract.  Arizona courts speak of the two torts as though they include the same requirements.  *See Neonatology Assocs.*, 164 P.3d at 693 (quoting *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors,* 909 P.2d 486, 494 (Ariz. Ct. App. 1995)) (setting forth same elements of tortious for interference with "contractual relationship or business expectancy").  As noted above, Defendants have failed to show a likelihood of success or serious questions on the "improper conduct" elements of this tort claim.

Defendants also claim that Verizon conspired to tortiously interfere.  Their inability to show improper conduct on the part of Verizon defeats this claim as well.

### 2.    Antitrust Claims.

Rule 15 of the Federal Rules of Civil Procedure provides that a party "may amend its pleading once as a matter of course[.]"  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).

Defendants have filed four different versions of their counterclaim in this case:  a counterclaim that accompanied their first request for a preliminary injunction (Doc. 31), a first amended counterclaim (Doc. 52), a second amended counterclaim (Doc. 78), and a restated second amended counterclaim (Doc. 89).  Defendants did not obtain the written

consent of Verizon or leave of court before filing any of these pleadings.  The first amended counterclaim was properly filed as a matter of course under Rule 15(a)(1) and had the effect of superseding the original counterclaim, but the second amended counterclaim and restated second amended counterclaim were filed in violation of Rule 15 and are not properly before the Court.

Defendants make no antitrust claims in their first amended counterclaim.  Doc. 52.  As a result, Defendants' antitrust counterclaims are not properly before the Court and cannot form the basis for injunctive relief.  The Court notes, however, that it would deny Defendants' request for injunctive relief even if the antitrust claims were properly pleaded.

The restated second amended counterclaim alleges that Verizon violated the Sherman Act.  If a plaintiff in an antitrust case argues only a per se violation of the Sherman Act, a court need not perform a rule of reason analysis.  *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1090-91 (9th Cir. 2000).  Defendants argue only that Verizon's conduct was per se unlawful.  *See* Doc. 90 at 12 ("Group boycotts . . . have long been held to be *per se* illegal."); Doc. 128 at 3 ("Verizon's assault on JAWA is a per se violation[.]").  Because Defendants do not make a rule-of-reason argument, the Court will determine only whether Defendants are likely to establish that Verizon's conduct was a per se violation of § 1 the Sherman Act.

Section 1 of the Sherman Act, codified at 15 U.S.C. § 1, "makes illegal every contract, combination or conspiracy in restraint of trade or commerce[.]"  *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 465 (1941).  In *Standard Oil Co. v. United States*, the Supreme Court defined the "rule of reason" as being the standard against which alleged antitrust violations are measured.  221 U.S. 1 (1911).  Under the rule of reason, only conduct that "unduly restrict[s] competition or unduly obstruct[s] the course of trade" violates the Sherman Act.  *E.g.*, *Appalachian Coals v. United States*, 288 U.S. 344, 360 (1933) (citation omitted), *overruled in part on other grounds by Copperweld*

*Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).  Relevant to the inquiry are industry conditions and practices, the alleged violator's purpose, the probable consequences of the conduct on the market, whether the conduct reasonably protects commerce from destructive or injurious practices, and other factors affecting interstate commerce in the service at issue.  *E.g.*, *Id.* at 361; *Sugar Institute v. United States*, 297 U.S. 553, 598 (1936).

The Supreme Court subsequently identified conduct that may be deemed per se unlawful without an inquiry into whether the practices satisfy the rule of reason. In *Fashion Originators' Guild*, for example, the Court held that a boycott of competitors by an association whose aim "was the intentional destruction of one type of manufacture and sale which competed with [the defendants]" can be per se unlawful.  312 U.S. at 467. The Court noted that "[t]he purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts."  *Id.* at 467-68.

In *Silver v. New York Stock Exchange*, the Court further recognized that a group boycott depriving a specific petitioner of a "valuable business service which [it] needed in order to compete effectively" in the marketplace can "constitute a per se violation of § 1 of the Sherman Act . . . absent any justification derived from the policy of another statute or otherwise."  373 U.S. 341, 347-49 (1963).  The boycott in *Silver* occurred when the NYSE called on its member firms to discontinue providing wire-based information and transaction services to a specific non-member firm that was a NASD-registered broker-dealer.  *Id.* at 344-45.  NYSE's constitution and rules made the NYSE directive obligatory for member firms, and the firms complied.  *Id.* at 344, 348.  The Court noted that "[a] valuable service germane to petitioners' business and important to their effective competition with others was withheld from them by collective action," and that this "was enough to create a violation of the Sherman Act."  *Id.* at 349 n.5.  It appears that the

following factors were critical to the Court's holding: NYSE's status as an association and stock exchange; its "immense economic power," as exemplified by processing 86% of the total dollar volume of transactions passing through the 14 registered exchanges at the time; and the fact that "[n]otwithstanding their prompt and repeated requests, petitioners were not informed of the charges underlying the decision to invoke the Exchange rules and were not afforded an appropriate opportunity to explain or refute the charges against them," circumstances that the Court deemed "totally unjustifiable." *See id.* at 350-51, 359, 361, 367 nn. 17, 18.

Twenty two years later, the Court decided *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985). The Court noted that the rule of reason controls the anticompetitive inquiry unless "the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Id.* at 289 (quoting *N. Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958)). "The decision to apply the per se rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." *Id.* at 289-90 (citation and internal quotation marks omitted). The Court further explained that "[c]ases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id.* at 294. The Court also observed that considerable inquiry into market conditions is necessary before a per se presumption of anticompetitive effect would be triggered. *Id.* at 296 ("Unless the [defendant] possesses market power or exclusive access to an element essential to effective competition, the

conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted.").

In construing *Pacific Stationery*, the Ninth Circuit has held that "[w]hen a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies." *Paladin Associates, Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003). Whether an agreement was a horizontal agreement between competitors is not the critical question in choosing whether to apply the per se rule. *Id.* at 1155 ("[N]ot all horizontal agreements between competitors are per se invalid."). The critical inquiry, instead, is whether the type of agreement is one that will "always or almost always tend to restrict competition." *Id.* (quoting *Pacific Stationery*, 472 U.S. at 289).

Applying these principles, Defendants have not shown a per se rule is likely to apply here. The Court will assume for purposes of this analysis that the agreements between Verizon and the aggregators – agreements Verizon invoked to shut out Defendants from its network – meet the concerted action requirement of the Sherman Act. Even with this assumption, the Court concludes that Defendants have not shown they are likely to succeed in their claim that these agreements are illegal per se.

First, Defendants have not established Verizon's market share or whether it is the overwhelmingly-predominant carrier in the marketplace akin to NYSE's 86% in *Silver*. In fact, Defendants assert that Verizon, AT&T, T-Mobile, and Sprint together comprise approximately 90% of the U.S. wireless market. Doc. 128 at 8. Nor have Defendants established that the other carriers have shut them out summarily after Verizon's press release – in fact, Defendants' motion appears to imply that AT&T and Sprint did not do so (Doc. 90 at 5).[1]

---

[1] Defendants argue that the four aggregators who control virtually all of the market have, at Verizon's direction, ceased doing business with Defendants not only on the Verizon network, but on all of the major wireless networks. Defendants' evidence in support of this argument is ambiguous. Verizon's letters to aggregators concern Defendants' business on the Verizon network. Doc. 32-1 at 2-4. At least one of the

Second, Defendants have not established that the type of agreement between Verizon and the aggregators will "always or almost always tend to restrict competition." *Paladin Associates,* 328 F.3d at 1155.  Verizon has argued persuasively that enforcing compliance with MMA Best Practices and reducing fraud on wireless networks promotes the interest of consumers and furthers competitive commerce.

Third, Defendants argue that they were not accorded procedural safeguards such as notice, an opportunity to be heard, and an opportunity to cure.  The Court cannot conclude, however, that this fact will be sufficient to establish per se illegality in the absence of other factors that were present in *Silver*.  Not every denial of corporate due process constitutes an antitrust violation.  Indeed, *Pacific Stationery* specifically held that the per se rule does not apply to all group boycotts refusing to deal, even if the refusal is without notice or other procedural safeguards.  472 U.S. at 290-91.

In sum, Defendants have not shown that they are likely to succeed on the merits of their claim that Verizon has committed a per se violation of the Sherman Act. Defendants have not argued that Verizon's conduct is illegal under a rule of reason analysis.  The Court would therefore deny injunctive relief on this ground even if it was asserted in Defendants first amended counterclaim.[2]

---

letters of suspension from the aggregators to Defendants concerns only the Verizon network (Doc. 32-2 at 2), another also refers to Verizon's allegations but is unclear on the extent of its suspension (Doc. 32-2 at 6-9), and a third appears to suspend all of Defendants' business with aggregators (Doc. 32-2 at 3-4), but it is not clear from the third letter that the aggregator's actions are being taken at the direction of Verizon. Defendants briefing suggests that other major wireless carriers have *not* suspended Defendants' business on their networks.  Doc. 90 at 5-6.  Emmett Mitchell testified at the hearing that some of the major carriers had "jumped on the bandwagon" and "started" cancelling Defendants' business, but did not specify the extent of their actions.  He also testified that the four aggregators were boycotting Defendants, but did not specify whether this was with respect to all carriers or only the Verizon network.  In short, Defendants have not presented evidence from which the Court can conclude they are likely to succeed in showing that the aggregators, at Verizon's direction, have shut Defendants out of all of the major wireless networks.

[2]  Because Defendants argue that the New Jersey Antitrust Act is functionally identical to § 1 of the Sherman Act (Doc. 90 at 13), the Court's Sherman Act analysis is sufficient to address both statutes.

**IV.     Other Matters.**

The Court will deny the following motions as moot because they have been effectively resolved by the preliminary injunction proceedings and this order:  Verizon's motion to expedite discovery (Doc. 11), Defendants' motion to strike paragraph 76 of Verizon's complaint (Doc. 53), Verizon's motion to strike the amended counterclaim (Doc. 62), Verizon's motion to compel (Doc. 74), Verizon's motion for protective order (Doc. 85), Verizon's motion to strike a supplemental brief (Doc. 94), and Verizon's motion to strike the second amended counterclaim (Doc. 129).

**IT IS ORDERED:**

1.     Verizon's motion for a preliminary injunction (Doc. 6) is **granted**.

2.     Defendants' motion for a preliminary injunction (Doc. 90) is **denied**.

3.     Verizon's motion to expedite discovery (Doc. 11), Defendants' motion to strike paragraph 76 of Verizon's complaint (Doc. 53), Verizon's motion to strike the amended counterclaim (Doc. 62), Verizon's motion to compel (Doc. 74), Verizon's motion for a protective order (Doc. 85), Verizon's motion to strike a supplemental brief (Doc. 94), and Verizon's motion to strike the second amended counterclaim (Doc. 129) are **denied**.

4.     The Court will set a Rule 16 scheduling conference by separate order.

5.     <u>Preliminary Injunction</u>.

a.     Defendants and their officers and agents are hereby enjoined from (i) failing to disclose the relationships of any entities or individuals to Defendants Hope or Destefano or their companies, and providing false addresses or other information as part of any effort to access the Verizon Wireless network for the purpose of delivering PSMS to customers; (ii) using marketing practices that fail to comply with MMA Best Practices (as defined in the complaint) when selling or attempting to sell PSMS through the Verizon Wireless network to customers; (iii) selling, or attempting to sell, PSMS to Verizon Wireless customers over the Verizon Wireless network; and (iv) blocking, or

attempting to block, Verizon Wireless' efforts to monitor and access the internet webpages (URLs) used to market PSMS to Verizon Wireless customers.

        b.     This injunction will take effect upon Verizon's posting a $25,000 bond and will remain in effect until the conclusion of trial or until further order of this Court.  This bond is in addition to the $10,000 bond posted by Verizon for its TRO.

     Dated this 11th day of May, 2011.

_____
David G. Campbell
United States District Judge