Paul K. Charlton (Bar No. 012449)
Lindsi M. Weber (Bar No. 025820)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:  (602) 530-8000
Facsimile:  (602) 530-8500
Email:  paul.charlton@gknet.com
        lindsi.weber@gknet.com

Marcos Jiménez (admitted pro hac vice)
Scott Cosgrove (admitted pro hac vice)
Ann M. St. Peter-Griffith (admitted pro hac vice)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1441 Brickell Avenue, Suite 1420
Miami, Florida 33131
Telephone:  (786) 587-1077
Facsimile:  (305) 675-7970
Email:  MJimenez@kasowitz.com
        SCosgrove@kasowitz.com
        AStpetergriffith@kasowitz.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JASON HOPE; et al.,<br><br>　　　　Defendants. | Case No. 2:11-cv-00432-DGC<br><br>**REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS RESTATED SECOND AMENDED COUNTERCLAIM FOR FAILURE TO STATE A CLAIM** |

Plaintiff Verizon Wireless files this Reply in Further Support of its motion to dismiss the Restated Second Amended Counterclaim ("Second Counterclaim") (Dkt. #89).

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Second Counterclaim is based on two documents: the letters sent to the aggregators through which Verizon Wireless exercised its contractual right to terminate defendants' access to its network, and the Verizon Wireless press release that accompanied the filing of the complaint. Both followed defendants' elaborate fraud to gain access to the Verizon Wireless network.

Defendants do not identify *any* specific statements in either the press release or the

letters that are either defamatory or constitute impermissible interference with defendants' contracts with the aggregators. Defendants also do not allege any enforceable contract between them and Verizon Wireless, or any wrongful or improper conduct, to support the imposition of a constructive trust. *Id.* at 10-14. Finally, defendants have not alleged a horizontal conspiracy to create *per se* liability under the antitrust laws. *Id.* at 14-17. Accordingly, the Restated Counterclaim fails to state any viable claim, and it should be dismissed.

### a. The Tortious Interference Claim Should be Dismissed (Count 1).

In responding to Verizon Wireless' argument that the letters to the aggregators are privileged, defendants contend that because "the aggregators are not parties to this lawsuit, … no privilege attaches to the letters [sent to them] falsely disparaging Counter-Plaintiffs and their business operations." Response, p. 3. To reach this conclusion, defendants misapply the law.

A party is privileged to communicate with another about matters concerning a pending judicial proceeding, even if the communication is false. Contrary to defendants' suggestion, it is not necessary that the communication be directed toward a party. *See* Response, p. 3. Indeed, the privilege will apply so long as the recipient of the communication has a close relationship to the litigation in terms of "a practical interest in the litigation's outcome." *See Hall v. Smith,* 214 Ariz. 309, 313, 315, 152 P.2d 1192, 1196, 1198 (App. 2007) ("the recipient must have had a close or direct relationship to the proceeding for the privilege to apply.").

The Restated Counterclaim's allegations show the aggregators' "practical interest" in and "close relationship" to this litigation. According to defendants' *own* allegations, the aggregators play a "critical role" as the middleman between defendants and Verizon Wireless and defendants, the aggregators, and Verizon Wireless are involved in a "business relationship." *See* Restated Counterclaim, ¶¶ 40-43.[1]

---

[1] Hypocritically, Defendants emphasize their contractual "close relationship" with the Aggregators in support of their breach of contract claim but then claim that Verizon Wireless' contractual relationship with the aggregators is insufficient for the privilege to

2

Defendants also argue that the letter should not be privileged because it was sent to the aggregators by David Burmester, a non-attorney. *See* Response, p. 4. The privilege applies to statements made by parties, as well as their attorneys, during the course of a judicial proceeding. *See, e.g., Hall,* 214 Ariz. at 312-13. That Mr. Burmester does not have a law degree makes not a shred of difference. *See id.* at 7 (stating it is appropriate for court to decide preliminary issues regarding absolute privileges, such as the privilege at issue here, in considering a motion to dismiss).

Even if the letter to the aggregators was not protected by a privilege, there is nothing improper about the communication. Defendants concede that Verizon Wireless had a contractual right to communicate with the aggregators regarding their business relationship (*e.g.,* the relationship between Verizon Wireless and the aggregators), but argue that Verizon Wireless exceeded its rights by interfering with "JAWA's relationship with other wireless carriers and with JAWA's customers who use those other carrier's networks." *See* Response, p. 6. Defendants make this argument by citing to the letter Verizon Wireless sent to the aggregators and selectively reading parts of a sentence to create a false reality. When each aggregator letter is read as a whole, it is plain that the letter demands compliance with Verizon Wireless' contractual rights, and defendants' interpretation is destroyed. *See* Restated Counterclaim, at Ex. 1. Any purported "interference" resulting from the letter is simply not actionable.

**b. The Conspiracy to Interfere Claim Should be Dismissed (Count 2).**

Verizon Wireless also showed (Motion, pp. 8-9) that defendants' tortious interference conspiracy claim fails because the aggregators cannot conspire to interfere with their own contracts. Without a response, defendants conjure up a new theory that Verizon Wireless conspired with Robert Alpert, defendants' former employee. (Response p. 6). However, Alpert is mentioned only in two paragraphs of the Restated Counterclaim (¶¶ 8-9), and neither paragraph alleges any *agreement* or *conspiracy*

---

attach to Verizon Wireless' communications with them. *Compare* Response pp. 9-10 *with* Response pp. 3-5. Defendants cannot have it both ways.

3

between Verizon Wireless and Alpert.  To the contrary, defendants allege that Alpert conveyed false information to Verizon Wireless.  (*Id*. at ¶ 9).  Absent any allegation of agreement between Alpert and Verizon Wireless, defendants' newly concocted conspiracy theory fails.

### c. The Press Release Cannot Not Serve as a Basis for Liability (Count 3).

A "factual statement need only be substantially true in order to be protected from a suit for defamation."  *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057 (9th Cir. 1990) (citing *Fendler v. Phoenix Newspapers, Inc.,* 130 Ariz. 475, 636 P.2d 1257, 1261 (Ct. App. 1981)).  The party pursuing a defamation claim must allege that the subject statements were false, and substantial truth is a complete defense to such claims.  *See Read v. Phoenix Newspapers, Inc.,* 169 Ariz. 353, 355, 819 P.2d 939, 941 (1991) (upholding dismissal of libel claim where statements made in the press were "substantially true" and holding that "[w]hen the underlying facts are undisputed, the determination of substantial truth is a matter for the court").

Defendants identify the following statements in the press release as purportedly defamatory: (i) that "'Customers [were] Affected By Text Messaging Fraud' and refers to an 'ongoing scheme' to 'defraud Verizon Wireless and its customers'"; (ii) that the Texas Attorney General has been Verizon Wireless' strong partner; and (iii) that "JAWA 'misappropriated' short codes and used them in 'shadow' PSMS campaigns."  *See* Response, p. 8 (brackets in original).  None of these statements can support defendants' defamation claims.

The first purported defamatory statements demonstrate defendants' efforts to create an issue where none exists.  By deleting and adding words, defendants create sentences that do not exist in the press release, and place them out of context, to claim the press release is defamatory.  For example, defendants use the following excerpt as a purported defamatory statement: "Customers [were] Affected By Text Messaging Fraud."  *See* Response, p. 8.  The statement actually reads: "Customers Affected by Text Messaging Fraud Can Visit www.premiumsmsrefunds.com for Information on Filing

4

Claim for Refund." *See* Press Release, p. 1. This is an instructional statement that advises Verizon Wireless customers how to pursue a refund claim and is patently true.

Next defendants offer the following phrases as further evidence of a defamatory statement: "The press release … refers to 'an ongoing scheme' to 'defraud Verizon Wireless and its customers.'" Response, p. 8. The full sentence in the press release actually reads: "Verizon Wireless said that it filed a lawsuit Monday in federal district court in Phoenix outlining an ongoing scheme that used Premium SMS campaigns to defraud Verizon Wireless and its customers, and asked the Court for an injunction to put an immediate stop to the activities." Press Release, p. 1. This statement summarizes the lawsuit that Verizon Wireless filed and, again, is undeniably true.[2]

Defendants further claim that Verizon Wireless defamed defendants because the "press release also states that the Texas Attorney General has been Verizon's 'strong partner.' The Texas Attorney General has denied that claim." Response, p. 8. The Texas Attorney General sued defendants for their fraud and deceptive practices. *See* Restated Counterclaim, ¶¶ 1, 8, 13, 44(b). Therefore, it seems that defendants object to Verizon Wireless' characterization of the Texas Attorney General as its "strong partner," but the statement is merely Verizon Wireless' opinion of its relationship with the Texas Attorney General. Moreover, the statement concerns a relationship between Verizon Wireless and *another party* (*e.g.,* the Texas Attorney General), and cannot serve as the basis for any defamation cause of action by these defendants.

Finally, defendants suggest that press release is defamatory by stating "JAWA 'misappropriated' short codes and used them in 'shadow' PSMS campaigns." Again, defendants chop up two different sentences in their attempt to create something that does not exist. The full sentences state: "Among the things the company discovered and that

---

[2] Defendants also attempt to "prove" that this statement must be false because Verizon Wireless purportedly "admits that it cannot identify a single defrauded customer." Response, p. 8. This is inaccurate and a gross distortion of Verizon Wireless' allegations. As Verizon Wireless has shown previously at the preliminary injunction hearing (and in other matters of record), Verizon Wireless has identified and refunded customers victimized by defendants.

5

are explained in detail in the lawsuit include the fact that the defendants defrauded Verizon Wireless by misappropriating approved short codes for unapproved 'shadow' campaigns that did not comply with Verizon Wireless' consumer protection and disclosure policies," and "The lawsuit further shows the defendants were blocking certain IP addresses from accessing the websites associated with these shadow campaigns or were re-directing visitors to shell websites, preventing Verizon Wireless and its auditors from finding the shadow campaign websites in the normal course of monitoring Premium SMS campaigns for compliance." Press Release, p. 1.

These sentences describe the lawsuit and undeniably reference the Complaint. The best defendants can offer is that the Complaint does not actually use the word "misappropriated" or "shadow." *See* Response, p. 9. This boils down to silly semantics. The entire focus of the Complaint is on defendants' use of cloaking software and misleading sites to end-run Verizon Wireless' security and employ short codes improperly on its network. Minor differences in terminology or legal expression between the alleged defamatory statements and the underlying lawsuit do not give rise to a claim for defamation. *Unelko*, 819 P.2d at 942.

Defendants also argue that Verizon Wireless' citation to *FreeLife Int'l v. Am. Educ. Music Publ'ns, Inc.*, 2009 U.S. Dist. LEXIS 97680, 26-28 (D. Ariz. Oct. 1, 2009), is misplaced because there are non-privileged ways to learn the names of the other defendants, such as the website and the letter to the aggregators. Defendants' argument fails for two reasons. First, the Restated Counterclaim does not allege that you can learn of other defendants through the website. In fact, a visit to the website reveals only the names of Cylon, Jawa and Eye Level Holdings, defendants the press release named. With respect to the letter to the aggregators, the communication is privileged. *See Hall,* 214 Ariz. at 313. Therefore, because there are *no* non-privileged ways of ascertaining who the other defendants are, defendants' claim should be dismissed.

### d. Defendants Are Not Third-Party Beneficiaries Under the Aggregator Agreements (Count 4).

Defendants persist in the argument that they are third-party beneficiaries of the Aggregator Agreements (Response pp. 9-10), but fail to respond to Verizon Wireless' argument – and this Court's dispositive holding in *Sunshine Media Group, Inc. v. Goldberg*, No. CV-10-0761-PHX, 2010 WL 2899081 (D. Ariz. July 22, 2010) (Campbell, J.) – that the subject contract must make clear that the parties intended the proposed third-party beneficiary to be the "real promisee."[3]

Defendants ignore the express language in the subject agreements stating that there is no intent to create a third party beneficiary relationship. *See* Aggregator Agreement, §11.3. The best defendants can muster is a clause in the Aggregator Agreement that states "[b]oth parties agree to cooperate with each other, as well as any other necessary Third Party other than competitors, in the performance of their respective obligations under this Agreement." Response, p. 9 (citing § 5.2 of Aggregator Agreements). The phrase "Third Party" is a defined term, and means: "*any and all* Persons not a party to this Agreement." Aggregator Agreement, § 1.27 (emphasis supplied). This broad cooperation language, addressed to all persons other than the contracting parties, does not establish a specific intent to benefit defendants as third-party beneficiaries under the Aggregator Agreements and does not conflict with §11.3.

### e. Defendants Allege no Facts to Support the Imposition of a Constructive Trust (Count 5).[4]

In responding to Verizon Wireless' showing that no constructive trust has arisen in their favor, defendants misunderstand (or misconstrue) Verizon Wireless' argument. Verizon Wireless did *not* argue that defendants must plead and/or prove each and every element of common law "actual fraud" in order to state a claim for constructive trust.

---

[3] *See also In re Mortgages Ltd.*, 427 B.R. 780, 785 (D. Ariz. 2010) (granting motion to dismiss for failure to state a claim and noting that "for a person to recover as a third-party beneficiary of a contract, an intention to benefit that person must be indicated in the contract itself") (internal quotations omitted).

[4] The Restated Counterclaim labels two causes of action "Count 5" - The Constructive Trust count and the Sherman Act count.

7

Response, p. 11.  Rather, it argued, and defendants have not refuted, that defendants "have not articulated *any* general facts or circumstances – *let alone pled facts with particularity* – to support a claim for actual *or* constructive fraud."  Motion, p. 13 (emphasis supplied).  As the Arizona Supreme Court made clear in *Honk v. Karlsson,* 80 Ariz. 30, 292 P.2d 455 (1957), constructive trusts "are raised by courts of equity whenever it becomes necessary under the particular circumstances of the case to prevent a failure of justice, *but the element of fraud, either actual or implied must always be present*."  *Id.*, 80 Ariz. at 34, 292 P.2d at 457 (emphasis supplied) (internal citation and quotations omitted).  In other words, there must be plausible allegations of *some* fraud – either actual or constructive – to support a constructive trust, even if, as defendants contend (Response, p. 11), "actual fraud" is not always necessary.  Because defendants' counterclaim does not allege adequately *any* fraud, their constructive trust claims fail.

Further, even assuming, contrary to the facts alleged in the counterclaim, that there was any identifiable "fund" to support a constructive trust, defendants still could not prevail.  Put simply, there is a difference between a constructive trust and a general claim for damages.  As this Court has noted, to recover against a constructive trust: "[T]he claimant is required to demonstrate that the assets in question are themselves the result of ill-gotten gains from the claimant.  It is this tracing requirement which distinguishes a constructive trust from a general claim for damages."  *In re Allied General Agency,* 229 B.R. 190, 196-97 (D. Ariz. 1998).  Defendants, however, have not alleged, and cannot show, that any specifically identifiable funds can be traced to any "ill-gotten gains."  Accordingly, the Second Amended Counterclaim fails to state a claim for constructive trust.

> **f.   Defendants Fail to State a Claim Under Antitrust Laws (Counts 5 and 6).**

JAWA lastly alleges that Verizon Wireless instructed the aggregators to terminate all JAWA short codes for text messages delivered over Verizon's wireless network, and that the aggregators did so.  Consistent with this Court's opinion denying JAWA's motion for a preliminary injunction [Dkt. #133] ("PI Op."), those allegations do not state

a claim under Section 1 of the Sherman Act. As the Court noted, JAWA has "argue[d] only that Verizon [Wireless'] conduct was per se unlawful." PI Op. at p. 19. JAWA's complaint, however, does not state a per se claim: JAWA alleges nothing about Verizon Wireless' market share, *see id.* 22; *see generally Silver v. New York Stock Exchange*, 373 U.S. 341, 359 (1963) (NYSE's nearly 90% share exemplified its 'immense economic power'); it does not allege that the "type of agreement between Verizon Wireless and the aggregators will 'always or almost always tend to restrict competition,'" *id.* 23, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003); and the allegation that JAWA was "not accorded procedural safeguards" does not implicate the per se rule, *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985). None of the arguments in JAWA's brief lead to any different result.

*First* – although the Court found it unnecessary to resolve the issue, *see* PI Op. at p. 22 – when an agent or contractor carries out the instructions of a principal, there is no concerted action for purposes of Section 1. Aggregators act as middlemen; when aggregators implement Verizon Wireless' unilateral business decision to do (or not to do) business with a particular company, there is no combination of "entities that previously pursued their own interests separately." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). Any other rule would lead to absurd results.[5] JAWA does not respond to this point in its opposition, and for this reason alone the motion to dismiss the Section 1 claim should be granted.

*Second*, even if alleged agreements between Verizon Wireless and the aggregators were subject to scrutiny under Section 1, JAWA has failed to allege that the agreements were unlawful – as this Court has already indicated. JAWA does not contest that its

---

[5] For example, a customer might request that a service provider use a particular product when providing a service. If the service provider follows that instruction, there is no concerted action for purposes of Section 1, just a unilateral purchasing decision by the customer: it does not matter whether the customer purchases the product and gives it to the service provider or the service provider makes the purchase at the customer's direction.

9

claim can proceed only if it has alleged a horizontal agreement among competitors;[6] it does not contest that there are no allegations in the complaint directly alleging any agreement among aggregators; it does not contest that Verizon Wireless is not a competitor of any of the aggregators and therefore may lawfully agree with any or all of them not to deal with JAWA.

Instead, JAWA argues that what it has alleged is sufficient to establish the existence of an agreement among the aggregators. *See* JAWA Br. 15.[7] That is incorrect. What JAWA alleges is that there were "contracts between the aggregators and Verizon [Wireless]"; that Verizon Wireless sent "letters . . . to each aggregator telling them to tear down JAWA"; and "the aggregators' simultaneous agreement to do so." *Id.* But JAWA offers no basis for any assertion that the aggregators' actions were the result of prior agreement *among the aggregators*, and that is what is required to state a claim under Section 1. Each aggregator was under a contractual obligation to block JAWA's short codes at Verizon Wireless' direction; each would have had ample reason to comply with their contractual obligations even if one or more of its competitors took the self-destructive step of defying Verizon Wireless' legitimate request.[8] In such circumstances, allegedly parallel behavior is not suggestive of any agreement. *See* 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1411, at 75-76 (3d ed. 2010) (where "[t]he challenged action" of defendants is "explicable in terms of its own self-interest" it "requires no other explanation, such as conspiracy").

---

[6] As this Court recognized, even if JAWA had alleged the existence of an agreement among horizontal competitors, that would not suffice to establish the existence of an unlawful agreement. *See* PI Op. 22; *see also Paladin Assocs.*, 328 F.3d at 1155. But there is *no* case – and JAWA does not cite any – where a court held a supposed boycott to be unlawful per se in the absence of a horizontal agreement.

[7] JAWA refers in passing to "the fact that JAWA has been cut off from all domestic wireless carriers," JAWA Br. 11, but the complaint contains no such allegation and, in any event, JAWA does not even argue that the wireless carriers reached any agreement.

[8] JAWA claims that it was not in the aggregators' "self-interest to accede to Verizon's demand to cut JAWA off from" other wireless carriers. JAWA Br. 15 n.5. But the (facially implausible) allegation that any aggregator breached its obligation with other carriers by blocking traffic destined for their networks at Verizon Wireless' say-so does not appear in the amended complaint. *See also* PI Op. at p. 22-23 & n.1 (noting that "Defendants' motion appears to imply that AT&T and Sprint did not" shut JAWA out).

The cases cited by JAWA are not on point; each involves allegations or evidence of horizontal agreement based on communications among the defendants and parallel conduct that would have been against the self-interest of the defendants absent agreement. For example, in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), a movie theater chain sent a letter that listed eight competing distributors as addressees, demanding adherence to an increase in prices for second-run movie theater admissions; that letter was "uncontested evidence that each distributor knew about the involvement of the others and constituted persuasive evidence of conspiracy" among the distributors, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906 (6th Cir. 2009). That each distributor acceded to the request was evidence of agreement, because a unilateral price increase by any distributor would have cost the distributor the business of second-run theaters and therefore would have been against its interest absent a price increase by competitors. *See Interstate Circuit*, 306 U.S. at 223. In *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), there was evidence that each toy manufacturer preferred to sell to warehouse stores and would not have agreed to the petitioner's demands without assurances that its competitors would do so as well. *See id.* at 936. And in *Delta/Air Tran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010), the defendants used earnings calls to communicate their intentions with respect to increased fees and decreased capacity, and each abruptly altered behavior in ways that would have been against its self-interest without assurance that its competitor would follow suit. *See also* Verizon Mot. Dismiss. at 17 n.7 (distinguishing *Heartland Surgical Specialty Hosp. v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257 (D. Kan. 2007) and *McCreery Angus Farms v. American Angus Ass'n*, 379 F. Supp. 1008 (S.D. Ill. 1974). Such allegations are absent from JAWA's complaint.

For all of these reasons, as well as those set forth in the Motion, Verizon Wireless respectfully requests that the Court dismiss the Restated Second Amended Counterclaim.

11

RESPECTFULLY SUBMITTED this 14th day of July, 2011.

GALLAGHER & KENNEDY, P.A.

By */s/ Lindsi M. Weber*
   Paul K. Charlton
   Lindsi M. Weber
   2575 East Camelback Road
   Phoenix, Arizona 85016-9225

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

   Marcos Jiménez
   Scott Cosgrove
   Ann M. St. Peter-Griffith
   1441 Brickell Avenue, Suite 1420
   Miami, Florida 33131

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July, 2011, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants and non-registered parties.

                                  */s/ Jeanette Burkey*