**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone: 602-606-2810       Facsimile: 602-606-2811

Dennis I. Wilenchik, #005350
admin@wb-law.com
*Attorneys for Defendants*
*Jason Hope and Wayne P. Destefano, et al.*

J. Grant Woods, Esq. #006106
Grant Woods Law P.C.
Two Renaissance Square
40 N. Central Ave., Ste 2250
Phoenix, Arizona 85004
gw@grantwoodspc.net
*Co-Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Cellco Partnership d/b/a/ Verizon Wireless,<br><br>Plaintiff,<br><br>v.<br><br>Jason R. Hope, et al.,<br><br>Defendants.<br><br>And Related Counterclaims. | Case No. CV 11-00432-DGC<br><br>**RESPONSE TO PLAINTIFF'S MOTION TO DISMISS**<br><br>**Assigned to the Honorable David G. Campbell**<br><br>**(Oral Argument Requested)** |

Defendants/Counterclaimants Eye Level Holdings, LLC, New Economic Order, LLC, Saguaro Media, LLC, Green Door Trust, Cylon, LLC, SMS City, LLC, Standard Plan, LLC, Worldtxts.com, LLC, Mytxtsms.com, LLC, Text Charge, LLC, Fyisms.com, LLC, News Alerts, LLC, Message Plan, LLC, Standard Message, LLC, City-O-Games.com, LLC, All-Game-Cheats.org, LLC, Hot-Hot-News.com, LLC, Topictext.com, LLC, Yellow Ball Holdings, LLC, New EIN, LLC, and Ink Sign Holdings, LLC (identified herein collectively as "JAWA"), by and through undersigned counsel, hereby respond to Plaintiff's Motion to Dismiss

Counterclaimants' Third Amended Counterclaim (the "Motion") and respectfully request that the Court deny the Motion on the basis that it is without merit.  JAWA has clearly stated claims in each count of its Third Amended Counterclaim upon which relief can be granted. The following Memorandum of Points and Authorities supports this Response.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

JAWA has alleged and can show that Verizon disrupted JAWA's business on *all* wireless networks, including those of its competitors (i.e., AT&T,[1] Sprint, and T-Mobile) solely for improper and unlawful reasons.  JAWA has also alleged sufficient facts to show that Verizon has waged an ongoing campaign of disparaging public statements to damage JAWA's reputation and its ability to continue doing business.  Furthermore, Verizon withheld and is still holding millions of dollars in revenue earned by JAWA through sales of JAWA's PSMS services to Verizon wireless customers. Verizon has no legal right to withhold this money and refuses to explain why it has not distributed those funds to JAWA or its aggregators.  JAWA has suffered and continues to suffer damages due to Verizon's anticompetitive agreements targeted to the PSMS market.  JAWA has properly and adequately alleged all of its causes of action against Verizon in the Third Amended Counterclaim ("TAC").

Despite this, Verizon asks the Court to accept the fallacy that it is merely acting out of self-defense and only for the benefit of its customers.   In truth, Verizon took affirmative actions to completely disrupt JAWA's business on *all* wireless networks and has employed a strategy to abuse the judicial system to kill JAWA's business.  JAWA has suffered enormous damages due to Verizon's anticompetitive agreements targeted to the PSMS market. Thus, there is no merit to Verizon's contention that JAWA does not have any claims in law or equity.

---

[1]  JAWA has only been able to convince AT&T to allow it to continue serving their mutual, existing customer base.

## II.   FACTS ALLEGED

JAWA's claims are fully supported by the allegations contained in its Third Amended Counterclaim ("TAC"), the most relevant of which are set forth in Exhibit 1 hereto.   It is axiomatic that the Court, in considering the Motion, must take as true all allegations of material fact and construe them in the light most favorable to JAWA.  *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008).

## III.   ARGUMENT

### A.   Verizon's Motion Fails Under The Standard of Review For Rule 12(b)(6)

JAWA rejects Verizon's contention that the TAC fails to meet the standard of review set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).   The Supreme Court in *Twombly* and *Iqbal* noted that the expense of discovery can lead to defendants settling frivolous suits, and therefore a "plausible" standard for pleadings should established.  However, in establishing that standard, the Supreme Court also made it clear that "detailed factual allegations" are not required.  *Id.*  Plausibility does not equate with a probability, but is more than a mere possibility.  *Id.*  Nevertheless, since *Iqbal*, litigants have reflexively filed motions to dismiss.  *See Cortez v. Hawthorne*, 2010 WL 2232133 (D. Ariz. Jan. 28, 2010) <u>report and recommendation adopted</u>, 2010 WL 2232139 (D. Ariz. June 3, 2010).  Verizon is no exception.

Verizon's Motion presents the specter of "exactly the opposite abuse" noted in *Twombly* and *Iqbal*.   *See, e.g.*, *Cortez v. Hawthorne,* 2010 WL 2232133, 3 (D.Ariz., 2010).   Here, Counterclaimants "provided factual development in the original [counter]claim and further development though a supplement. [Yet Verizon] reflexively relied on *Iqbal* and filed this pending motion to dismiss because the facts are not all contained within the four corners of the amended complaint."  *Id.*  In *Iqbal,* "the purpose was to improve the justice system, not encourage gamesmanship."  *Id.*   Reflexive reliance on *Iqbal* greatly disserves the interests of justice. *Id.*  Such disservice is dramatically displayed in this case where Verizon complains that

inadequate facts are pleaded, while actively resisting disclosing facts and documents and acting as if facts already disclosed by Verizon should be ignored by the Court. *Id.* This kind of conduct cannot be what the Supreme Court envisioned when deciding *Iqbal.* Nothing in *Iqbal* justifies these attempts to block JAWA from the courthouse door. *Id.*

Simply put, JAWA has provided a sufficient factual basis for its claims. The TAC contains more than enough facts to state claims for relief, *See Id.; see also*, C*lemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). Each of JAWA'S claims has facial plausibility because JAWA has pled factual content which allows this Court to draw the reasonable inference that Verizon is liable for the misconduct alleged. *See, e.g., Twombly*, 550 U.S. at 556. The plausibility standard simply asks for more than a mere possibility that the party has acted unlawfully. *Id.* JAWA meets and exceeds the plausibility standard by reciting specific facts related to Verizon's conduct. Moreover, there are no legal conclusions couched as factual allegations. JAWA's TAC exceeds the standard for entitlement to relief.

### B.    JAWA Has Alleged Viable Antitrust Claims

JAWA's TAC alleges facts which, if shown to be true, would prove that Verizon and the other Wireless Carriers—AT&T, T-Mobile, Sprint, and U.S. Cellular—entered into a conspiracy to drive a successful downstream competitor out of the PSMS market,[2] and that this conspiracy has succeeded in reducing competition in that market.

As JAWA's TAC makes clear, Verizon and the other Wireless Carriers had both the ability and incentive to enter into a conspiracy to restrain trade in the PSMS market. The market is a highly profitable, and growing. [TAC, ¶ 29]. Prior to March 2011, JAWA was a leading PSMS provider, with daily revenues of $900,000, and an estimate value of $1.6 billion. [TAC, ¶ 92]. Like all PSMS providers, JAWA distributes content to its subscribers via the networks of

---

[2] The PSMS market consists of firms, including Verizon, that provide textual content, delivered over wireless mobile networks, to subscribers.

Verizon and the other Wireless Carriers, who collectively control nearly 90% of the wireless market.  [TAC, ¶¶ 37, 158].  At the same time, Verizon and other Wireless Carriers directly compete against JAWA in the PSMS market.  [TAC, ¶ 28].  Thus, independent PSMS providers, such as JAWA, must rely on their competitors, including Verizon and the other co-conspirators, in order to reach their customers.

Verizon is the largest provider of wireless telecommunications services.  [TAC, ¶ 55]. As a result, by denying access to its network, Verizon had the ability to unilaterally exclude JAWA from a substantial portion of the PSMS market.  Such unilateral behavior by a company that lacks monopoly power is permissible, but each of the other Wireless Carriers also conspired with Verizon to prevent JAWA from reaching its customers. The Wireless Carriers were incentivized to conspire and act jointly because they shared the same interest in eliminating JAWA as a competitor.  If less than all Wireless Carriers stopped allowing their customers to access JAWA's service over their networks, those customers might switch to a rival Wireless Carrier that had not joined the conspiracy.  Only by collectively foreclosing access to all five networks, could Verizon and the other Wireless Providers drive JAWA from the PSMS market, thereby substantially reducing competition, to the ultimate detriment of consumers.

Contrary to Verizon's assertion, JAWA's TAC alleges the specific means by which Verizon and the Wireless Carriers entered into the conspiracy to restrain trade in the PSMS market and how effective and successful that conspiracy has been.  [*See* Exhibit 1].[3]  JAWA's allegation of this anti-competitive conduct plainly states a claim under Section 1 of the Sherman Antitrust Act.

---

[3]  If the Court denies Verizon's Motion to Dismiss, JAWA expects to learn additional facts through the discovery process.  For example, since filing its current Counterclaim, JAWA has learned that, during the week of March 9, 2011, Verizon and the other Wireless Carrier participated in a teleconference at which the JAWA situation was discussed.  The occurrence of this meeting, followed by the identical actions taken by the Wireless Carriers in contravention of their short-term financial interest, provides as further basis for interfering that the Wireless Carriers entered in conspiracy to drive JAWA from the market.

### 1.   Verizon's group boycott is per se illegal.

The horizontal agreement between the Wireless Carriers and the hub and spoke agreement between the Aggregators and Verizon are per se illegal. The Supreme Court has found that "certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 290; *see also A.H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302, 1305 (9th Cir. 1981) (finding four categories of restraints held to be per se violations: (1) horizontal and vertical price fixing; (2) horizontal market division; (3) group boycotts and concerted refusals to deal; and (4) tie-in sales).

The agreement between the Aggregators and Verizon, as alleged by JAWA, is similarly per se illegal under the hub and spoke theory. Courts recognize a variation of the classic horizontal boycott, for which the evidence here is compelling (i.e., a refusal to deal that is orchestrated through a series of vertical agreements in circumstances where the participants expect that their competitors also will participate). In the leading case on hub and spoke horizontal boycott law, *Toys "R" Us v. F.T.C.,* 221 F.3d 928 (7th Cir. 2000), the Seventh Circuit analyzed what type of circumstantial evidence permits an inference of a horizontal boycott orchestrated through vertical arrangements. In that case, Toys "R" Us (TRU) convinced toy makers to limit sales to warehouse clubs, which TRU saw as a threat to its position as a leading low-price toy retailer. *Id.* at 931-932.

The court ultimately found that TRU's orchestrated boycott was per se unlawful. *Id.* In reaching this conclusion, the court noted that an illegal horizontal agreement may be proven by circumstantial evidence including shifts from prior practices and decisions that deprive entities of previously profitable business. *Id.* at 934-36. "When circumstantial evidence is used, there must be some evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted). This does not mean, however, that one must exclude all possibility that the manufacturers acted independently because "that would amount to an absurd

1    and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred."

2    *Id.* at 934-35. "The test states only that there must be *some* evidence which, if believed, would

3    support a finding of concerted action." *Id.* (emphasis original).

4    　　　Here, JAWA has alleged that Verizon sent multiple letters to the Aggregators that

5    controlled the PSMS market and demanded that the Aggregators not only terminate JAWA's

6    services with Verizon, but terminate service with JAWA completely. [TAC, ¶¶ 60 – 62]. Also,

7    Verizon took its complaints to the media with its Press Release regarding the lawsuit and based

8    on that Press Release, each Aggregator was aware that Verizon was encouraging its competitors

9    to also terminate their business relationship with JAWA. [TAC, ¶ 76]. Additionally, terminating

10   service with JAWA was not a legitimate business plan for the Aggregators, but, as in *Toys R'*

11   *US*, Verizon controlled the market power, which is evidenced by its subsequent success in

12   causing the Aggregators to boycott JAWA. [TAC, ¶¶ 55, 60, 62, 64 – 65, 80]. Thus, JAWA has

13   sufficiently alleged a *per se* illegal horizontal boycott and "hub-and-spoke" boycott.

14   　　　Moreover, JAWA has sufficiently alleged through direct and circumstantial evidence an

15   agreement between the Wireless Carriers and an agreement between Verizon and the

16   Aggregators. [TAC, ¶¶ 60–66, 69, 77–79, 139–144, 158–159, 183–184]. Also, JAWA continues

17   to uncover details of the illegal agreements through discovery. For example, it has been

18   discovered that Verizon representatives participated in a telephonic conference with other

19   Wireless Carriers during the week of March 7, 2011, in which JAWA was discussed.

20

21   　　　　　2.　　**JAWA will be entitled to use direct and circumstantial**
　　　　　　　　**evidence to prove that the agreements existed.**

22   　　　Verizon misconstrues the law when it argues that neither the letters it sent to the

23   Aggregators, combined with their simultaneous acceptance of those letters' terms, nor its public

24   call for and private meetings with other carriers to boycott is evidence of an agreement under the

25   antitrust laws, even though JAWA undeniably has been cut off from all domestic wireless

26   carriers. Verizon's position ignores over 70 years of antitrust law on the topic.

In *Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939), the Supreme Court relied on circumstantial evidence in finding an agreement from eight film distributors' positive responses to a major film exhibitor's letter suggesting that they all impose price and exhibition restrictions which were inconsistent with profit maximization unless there had been an agreement among the distributors.

> While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. **It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it**.

*Id.* at 226 (emphasis added).  Similarly, in *American Tobacco Co. v. United States,* 328 U.S. 721 (1946), the Court found that sudden, simultaneous price changes among the three major manufacturers of tobacco products was sufficient "circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition[.]"

> No formal agreement is necessary to constitute an unlawful conspiracy. ... The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design ... in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

*Id.* at 809-10 (citation omitted).  Courts did not stop using circumstantial evidence to find illegal agreements back in the 1940s. In the case of *In re Delta/AirTran Baggage Fee Antitrust Litig.,* 733 F.Supp.2d 1348 (N.D. Ga. 2010), there was no allegation of a formal agreement among competitors to change business practices; there were public statements followed by parallel behavior—and that was enough to overcome the defendants' motion to dismiss on the ground that there was no allegation or evidence of an express agreement:

> . . . Plaintiffs need not allege the existence of collusive communications in "smoke-filled rooms" in order to state a § 1 Sherman Act claim. Rather, such collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other

WILENCHIK & BARTNESS

public ways. *See In re Valassis Commc'ns, Inc.*, FTC File No. 051-0008 ,2006 WL 1367833 (Apr. 19, 2006) ("[I]t is clear that anticompetitive coordination can also be arranged through public signals and public communications, including speeches, press releases, trade association meetings and the like"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir.1990) ("the form of the exchange—whether through a trade association, through private exchange ... or through public announcements of price changes— should not be determinative of its legality.") (quoting R. Posner, Antitrust Law: An Economic Perspective 146 (1976)); *Standard Iron Works v. Arcelor-Mittal*, 639 F.Supp.2d 877, 892-95 (N.D. Ill. 2009) (statements at industry conferences supported an antitrust conspiracy claim); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F.Supp. 685, 690 (D. Minn.1995) (denying summary judgment to the defendants in the face of allegations that they exchanged messages through public speeches, press releases, and meetings).

*Id.* at 136. *See also United States v. Masonite Corp.,* 316 U.S. 265, 275, 62 S.Ct. 1070 (1942) (holding "[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.").

In this case, the specific allegations of collusive acts by Verizon and its co-conspirators go far beyond those asserted (and found sufficient) in the cases above. Verizon is in industry associations with all of the aggregators; Verizon has contracts with all of the aggregators; Verizon sent letters to all of the aggregators telling them to tear down JAWA's short codes with all wireless carriers; Verizon issued a press release calling on the other wireless carriers to boycott JAWA; Verizon held private meetings with the wireless carriers to discuss its plan against JAWA in March of 2011; and, voilá, the aggregators tore down all of JAWA's short codes and JAWA's business with all of the wireless carriers was terminated.  This is not a coincidence, nor is it just "business" as Verizon wants the Court to believe.

### 3.     JAWA is entitled to a Rule-of-Reason analysis.

The rule-of-reason analysis consists of three components: (1) the persons or entities to the agreement intend to harm or restrain competition; (2) an actual injury to competition occurs; and (3) the restraint is unreasonable as determined by balancing the restraint and any justifications or pro-competitive effects of the restraint. *California Dental Ass'n v. F.T.C.*, 224 F.3d 942, 947 (9th Cir. 2000) (citing *American Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir.1996)).

There is no requirement that these elements of the antitrust claim be pled with specificity. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir.1996)). An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. *Id*. However, since the validity of the "relevant market" is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial. *Id.* (citing *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir.1993) (holding that the market definition depends on "a factual inquiry into the 'commercial realities' faced by consumers") (quotations omitted)).  Moreover, whether there is actual harm to competition is subject to discovery. Verizon argues that exclusion of single competitor is not harm to competition. Yet the case cited was decided on a motion for summary judgment, after discovery was conducted, and it was found there was no issue of material fact. *See Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992).

Presently, JAWA has properly alleged: (i) the relevant product market by reference to wireless networks of Verizon, AT&T, T-Mobile, Sprint, and U.S. Cellular [TAC ¶¶ 37, 39, 147]; (ii) that Verizon had intent to restrain competition by putting a competitor, JAWA, out of business [TAC ¶¶ 27–29, 137, 138]; (iii) that actual injury to competition has occurred in that output and quality of PSMS products has decreased in the market while prices have increased [TAC ¶¶ 54, 60–66, 76-80, 88, 92, 93–95, 148–150, 175]; and (iv) the harm of the aforementioned consequences and the destruction of a business valued at $1.6 billion, [TAC ¶¶, 91-91], far outweighs any of Verizon's justification and any pro-competitive effects of Verizon's actions, which were nil. [TAC ¶¶ 146, 151 – 153].  This is particularly true given that JAWA would have agreed to implement whatever safeguards were necessary or desired by Verizon to assure MMA compliance. [TAC ¶¶ 154 – 155]. Thus, Verizon's concerns could have been addressed without harm to competition and the PSMS market.

## C.     JAWA Has Stated a Valid Claim For Tortious Interference

Contrary to Verizon's assertions, JAWA has alleged that Verizon's interference with JAWA's contracts and business expectancies with each carrier and aggregator was "improper" as required to state a claim for relief. *See Neonatology Associates, Ltd. v. Phoenix Perinatal Associates Inc.*, 216 Ariz. 185, 187, 164 P.3d 691, 693 (Ct. App. 2007). Verizon's tortious interference has damaged JAWA's contracts and business expectancies with each carrier and aggregator. Verizon's interference was "improper," as Verizon went far beyond asserting a right to protect its own contractual interest as it argues. Specifically, Verizon sought out each wireless carrier and disrupted JAWA's expectancies with each. *See* [TAC, ¶¶ 60, 62, 64, 69, 78]. Verizon does not have a contractual interest in JAWA's business on networks of other wireless carriers. And Verizon demanded that aggregators terminate JAWA on networks of *all* wireless carriers – not merely on Verizon's network. [TAC, ¶¶ 62 – 65].

Moreover, Arizona law through the Restatement condemns conduct such as Verizon's as "improper." The nature of Verizon's conduct is improper because it is tortious, as Verizon employs defamation rather than persuasion, restraint of trade and antitrust, and improper economic pressure. [TAC, ¶¶ 60–66 (improper economic pressure), 76–80, 110–113 (defamation), 136–161 (antitrust)]. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (nature of actor's conduct to determine impropriety). Also, Verizon has an improper motive to interfere with JAWA's business. [TAC ¶ 54–55, 61]. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. d (actor's motive to determine impropriety). Also, Verizon interfered with JAWA's existing contracts, which deserves more protection. [TAC ¶ 39, 42]. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. e (interests of the other to determine impropriety). Last, the interference here is direct consequence of Verizon's conduct; thus, Verizon's conduct does not have to be independently tortious to be held improper. [TAC ¶¶ 60–64]. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. h (proximity to determine impropriety). It is apparent from the examples cited above that JAWA has stated multiple reasons why the Court should deem Verizon's interference

"improper" as required to state a claim for tortious interference.   Further, Verizon's communications are not privileged as argued below in the section concerning JAWA's business disparagement claim. In sum, Verizon has not articulated any convincing reason why JAWA's tortious interference claim should be dismissed.

### D.    JAWA Has Stated a Valid Claim for Conspiracy to Tortiously Interfere.

For the reasons stated above, JAWA has properly pled a tortious interference claim. Therefore, Verizon cannot argue that the conspiracy claim fails based on the underlying claim. Additionally, JAWA alleged an agreement between Verizon and the aggregators. [TAC ¶¶ 60–69]. Whether an agreement between Verizon and the aggregators existed is a fact issue that cannot be decided on a motion to dismiss. *Hogan v. Washington Mutual Bank*, 261 P.3d 445, 448, ¶ 12 (9th Cir. 2011)(citing *Fidelity Sec. Life Ins. Co. v. State*, 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998)). Thus, JAWA has stated a claim for conspiracy to tortiously interfere.

### E.    JAWA's Claim for Business Disparagement Must Stand.

Disparaging statements to third parties are not absolutely privileged, and a privilege does not apply here. The legal determination of a privilege is a case-by-case analysis. The general principle is that "the tendency and policy of the courts is to not extend the number or instances of absolute privilege unless the policy upon which privilege is based is found to exist in the new situations." *See Hall v. Smith*, 214 Ariz. 309, 315, 152 P.3d 1192, 1198 (Ct. App. 2007). Thus, the Court should not extend the privilege to a party as tangentially related as the aggregators. Privilege is applied to promote candid and honest communication between the parties and their counsel in order to resolve disputes. *Id*.

Here, the aggregators do not have significant or special relationship with Verizon as was found in other cases. *See Hall v. Smith*, 214 Ariz. at 315, 152 P.3d at 1198 (citing examples of communications with a litigant's insurer or litigant's parent company). Here, unlike an insurer or parent company, the aggregators do not have a financial interest in Verizon or any decision-making power concerning this litigation.

Additionally, Verizon made disparaging statements to its customers about JAWA. This was alleged generally in the TAC, ¶ 111, and was uncovered more specifically in discovery. Specifically, Verizon has told customers in response to customer complaints that JAWA was engaged in massive fraud.  There is no privilege for those communications.  Likewise, no privilege applies to Verizon's press release.  *Green Acres Trust v. London*, 141 Ariz. 609, 614, 688 P.2d 617, 622 (1984) (publication to the news media lacks a sufficient relationship to judicial proceedings, it should not be protected by an absolute privilege).  Last, on a motion to dismiss there is no basis to even address Verizon's argument that none of its statements were false. *See Fendler v. Phoenix Newspapers Inc.*, 130 Ariz. 475, 636 P.2d 1257 (App. Div.1 1981) (It is function of jury to determine factually whether allegedly defamatory statement is true).

**F.      JAWA Can Prove its Claim For Conversion.**

JAWA is correct party to bring conversion claim, and JAWA has alleged a sufficient property interest in the money that Verizon unlawfully retains.  First, the aggregators do not have any interest in the money; thus, JAWA is correct party to bring conversion claim. For example, Verizon contracted with Mblox to be responsible for billing and collecting fees from subscribers.  *See* Verizon/MBlox contract at ¶ 7.1.  To the extent that Mblox was in material breach of the contract, Verizon was entitled to charge a .02 cent fee for each message sent during the period that Mblox was in material breach.  Verizon was also entitled to charge a penalty of $1,000 dollars for every message that was in excess of the contractual flow rate requirement.  However, other than those two contractual penalties Verizon was required to make payment as outlined in Exhibit F of the contractual agreement of the premium message fee within 30 days of each SMPP messages report.  *See* Verizon/MBlox contract at ¶ 6.6.  JAWA contracted with Mblox to have direct billing from the network provider, i.e. Verizon, for a monthly fee.  The funds, however, were not due from Mblox to JAWA until Mblox collected the fund from Verizon and the contract clarified that Mblox had no control over the timing or the amount of the Verizon payments.

Second, JAWA has alleged a sufficient property interest. The money received from Verizon is chattel to establish a claim for conversion. [TAC ¶¶ 117–118 (JAWA has alleged that the money can be described, identified, and segregated)]. *See Universal Mktg. & Entm't, Inc.,* 203 Ariz. at 269, ¶¶ 9-11, 53 P.3d at 194. Because the chattel is money that Verizon collected specifically designated for JAWA on behalf of the Aggregators, the facts establish a relationship that is more than a mere creditor-debtor. *See Case Corp.*, 208 Ariz. at 144, ¶¶ 17-18, 22-24, 91 P.3d at 366-68 (holding the plaintiff had a possessory interest in the chattel because the defendants were required to pay a specifically secured amount from a definite source). Additionally, although the money was controlled by Verizon, these payments from subscribers were made based on the services received from JAWA, and accordingly, the funds were received for a separate account that was established for a specific purpose and with an obligation to treat the funds in a specific manner.

Even if the funds collected by Verizon were not kept in a segregated account, the funds are easily traceable from the payments received from the subscribers. Because the funds can be traced by reviewing the billing statements there is an additional method of identifying the specific proceeds at issue that does not preclude recovery based on the comingling of the funds. *See Case Corp.*, 208 Ariz. at 145, ¶ 22, 91 P.3d at 367 (citing A.R.S. § 47-3195(2)).

Moreover, to the extent there remains any accounts receivable that Verizon failed to collect from subscribers, the amount of those receivables is being converted as well. [TAC ¶ 119 (JAWA has alleged a conversion claim for accounts receivable)]. Accounts receivable can be the subject of a conversion action because they represent "tangible marketable assets which can be sold, secured, or traded." *See Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 884 (S.D.N.Y. 1991); *Sires v. Luke*, 544 F. Supp. 1155, 1165 (S.D. Georgia 1982). Accordingly, any account receivables in Verizon's possession are also being converted and should be returned to JAWA.

### G.   JAWA Has a Viable Claim For Unjust Enrichment.

JAWA specifically alleged facts concerning its unjust enrichment claim. [TAC ¶¶ 67–68, 72, 74–75, 124–130]. Verizon's Motion ignores all of the foregoing paragraphs, but the Court must accept them as true for purposes of evaluating Verizon's Motion. *Hogan*, 261 P.3d at 448, ¶ 12.  Those allegations are sufficient to state a claim for unjust enrichment.

### H.   JAWA Has Set Forth a Valid Claim For a Constructive Trust.

Generally, because a constructive trust is an equitable remedy, "[t]here is no set or unyielding formula" courts use to impose them.  *Turley v. Ethington*, 213 Ariz. 640, 643, ¶ 9, 146 P.3d 1282, 1285 (Ct. App. 2006). Thus, the Court may provide equitable relief, and Verizon's arguments concerning specific elements of this claim may be disregarded.

First, JAWA requests a constructive trust over specific property.  If, as here, the money can be traced to a special fund or to other property, a constructive trust claim is proper.  *Johnson v. American Nat. Ins. Co.*, 126 Ariz. 219, 223-24, 613 P.2d 1275, 1279-80 (App. 1980) (citing *Amtitle Trust Co. v. Fitch*, 25 Ariz.App. 182, 184, 541 P.2d 1166, 1168 (1975)). Here, JAWA has pointed to specific funds belonging to JAWA that Verizon obtained and is asking the Court to impose a constructive trust on those funds. [TAC, ¶¶ 67–68].

Second, Verizon misstates the legal standard when it argues that fraud is an element required for a constructive trust.  Actually, a constructive trust may be imposed "whenever title to property has been obtained through actual fraud, undue influence, duress or **through any other means which render it unconscionable for the holder of legal title to continue to retain and enjoy its beneficial interest**." *Turley*, 213 Ariz. at 643, ¶ 9, 146 P.3d at 1285 (emphasis added). Here, JAWA alleges that Verizon obtained the money through wrongful means and unjustifiably refuses to distribute it. [TAC, ¶¶ 60 – 75, 133]. Verizon used improper economic pressure on the aggregators to obtain the money in question and continues to do so to prevent any aggregators from requesting the money from Verizon on JAWA's behalf. *Id*. It would be unconscionable for the Court to allow Verizon to retain this money.

## I.      JAWA's TAC States a Claim For Abuse Of Process.

A cause of action for abuse of process exists were a person has committed: [1] A willful act in the use of the judicial process [2] for an ulterior purpose not proper in the regular conduct of the proceedings. *See Crackel v. Allstate Ins.*, 208 Ariz. 252, 257, 92 P.3d 882, 887 (Ct. App. 2004) (quoting *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (Ct. App. 1982)). JAWA has stated a valid cause of action under this standard. Verizon brought its complaint for damages and requested injunctive relief against JAWA for improper ulterior purposes. Indeed, Verizon itself alleges that it has a legal right to terminate JAWA from its network and prevent future access; and Verizon purportedly has authority to direct the aggregators to cease doing business with JAWA. Thus, by Verizon's own admission, it doesn't need the injunction to keep JAWA off its network. Therefore, the injunctive relief sought was superfluous and intended to harass and not to achieve any legitimate legal purpose. [*See* TAC, ¶¶ 57, 59, 60-66].

Verizon incorrectly suggests that JAWA has only made a general allegation without alleging a specific act beyond initiation of the lawsuit.  JAWA has stated specifically that the request for injunctive relief is a willful act made for an ulterior purpose, since its purported purpose is moot.  Verizon cites *GRK Holdings, LLC v. First American Title Ins. Co.* (2010 WL 3940575) for the position that abuse of process refers to conduct occurring "after proceedings have been initiated."  In *GRK*, the court cited to *Joseph v. Markovitz* (27 Ariz.App. 122 (1976)) for this position, but this is a misstatement of the holding of *Joseph*.  The court does not make any distinction as to the timing of when an act must occur in relation to the filing, it only states that proof of abuse of process requires "some act *beyond* the initiation of a lawsuit" [emphasis added].  *Joseph*, at 575.  The word beyond, in this context, does not indicate any relevance of time, but rather something in addition to initiation of a suit.  In fact, the court states that "[t]he purpose for which the process is used, once it is issued, is the only thing of importance." *Joseph*, at 574.  As Verizon did not need the intervention of the court in order to prevent JAWA from accessing its network, the purpose of requesting injunctive relief could only have been for

another purpose.  Whether Verizon's intentions were bad or good is of no consequence and is not the basis of JAWA's claim.  Rather, the very reason for seeking injunctive relief is not that for which the remedy is intended.  Instead, Verizon seeks such relief only to harass JAWA, which is not a legitimate use of the process.

Additionally, Verizon's claim for money damages is similarly improper. Verizon doesn't need money damages from JAWA because Verizon already holds enough of JAWA's earned revenue to cover any alleged damages and, as alleged by JAWA, Verizon has not had to expend any of its own money to pay refunds to its customers; it has used JAWA's money.  [TAC, ¶¶ 59, 67–68, 72, 75].  Furthermore, as the Court has already noted, Verizon actually **profited** to the tune of approximately $30 million from the "enterprise" and conduct which it is now claiming was illegal, fraudulent and/or unlawful.  Thus, for purposes of JAWA's abuse of process claim, it is apparent that Verizon has an ulterior purpose not proper in the regular conduct of the proceedings and has commenced this action for a wrongful purpose and not to obtain any actual monetary damages.

### J.     JAWA's RICO Claim is Well Pled.

Verizon is incorrect in its assertion that JAWA did not allege the existence of an enterprise or properly allege a pattern of racketeering activity.

#### 1.     <u>JAWA has identified the enterprise.</u>

The statutory definition of "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise. *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007). In detail, an associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528 (1981)). To establish the existence of such

an enterprise, a plaintiff must provide both "evidence of an ongoing organization, formal or informal," and "evidence that the various associates function as a continuing unit." *Id*.

### 2.    JAWA has alleged the enterprise's common purpose.

Verizon and the aggregators had the common purpose of maximizing Verizon's profit and Verizon's market share in the PSMS industry and to put JAWA out of business, and doing so with illegal means. [TAC ¶¶ 27–30, 39, 42–43, 54, 94–95, 191, 193]. Verizon furthered this common purpose by withholding JAWA's earned revenue (*Id.*, ¶¶ 194–201), issuing sham refunds to customers [*Id.*, ¶¶ 202–209], and soliciting the aggregators help to cease JAWA's business across all wireless carrier networks [*Id.*, ¶¶ 27, 60–64, 69]. The aggregators indeed cooperated by withholding payments to JAWA [*Id.*, ¶¶ 196–197] and terminating business with JAWA across all wireless carrier networks [*Id.*, ¶¶ 27, 60–64, 69]. These allegations are more than adequate to establish that Verizon and the aggregators had a common purpose of maximizing Verizon's profit and Verizon's market share in the PSMS industry by putting JAWA out of business.

### 3.    JAWA has alleged the enterprise's ongoing organization.

An ongoing organization is "a vehicle for the commission of two or more predicate crimes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (quoting *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983)). Here, JAWA properly alleges that Verizon and the aggregators have an on-going organization because they have jointly committed two or more predicate crimes. [TAC ¶¶ 194–209].

### 4.    JAWA has alleged that the enterprise is a continuing unit.

JAWA has alleged that Verizon and the aggregators function as a continuing unit. *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. The continuity requirement does not, in itself, require that every member "be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552-53 (9th Cir. 2007) (quoting *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985)). Instead, the

1   continuity requirement focuses on whether the associates' behavior was "ongoing" rather than

2   isolated activity. *Odom*, 486 F.3d at 552-53 (citing *United States v. Patrick*, 248 F.3d 11, 19 (1st

3   Cir. 2001)). Here, JAWA does more than allege an isolated incident. Verizon and the

4   aggregators have been jointly withholding JAWA's earned revenue and preventing JAWA from

5   access to wireless networks from March 2011 through the present. [TAC ¶¶ 60–69].

6           **5.      JAWA properly alleged the enterprise's racketeering activity.**

7           To allege a violation of mail fraud under 18 U.S.C. § 1341, a party must show that: "(1)

8   the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States

9   mails or caused a use of the United States mails in furtherance of the scheme; and (3) the

10  defendants did so with the specific intent to deceive or defraud." *Miller v. Yokohama Tire Corp.,*

11  358 F.3d 616, 620 (9th Cir.2004) (citation omitted). Using the mail to execute or attempt to

12  execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering

13  under RICO, even if no one relied on any misrepresentation. *Bridge v. Phoenix Bond & Indem.*

14  *Co.*, 553 U.S. 639, 648-49, (2008) (citing *Neder v. United States,* 527 U.S. 1, 24–25 (1999).

15  One can conduct the affairs of a qualifying enterprise through a pattern of such acts without

16  anyone relying on a fraudulent misrepresentation. *Bridge*, 553 U.S. at 648-49, 128 S. Ct. at

17  2138-39. Here, no allegation of fraud or misrepresentation is required pursuant to *Bridge*.

18  JAWA properly alleged racketeering activity with particularity. [TAC ¶¶ 194–209].

19  **IV.     CONCLUSION**

20          Verizon's mantra of consumer protection and self-defense is a smokescreen. This

21  corporation aggressively pursued JAWA's share of the PSMS market through illegal means.

22  Due to the damage Verizon has intentionally inflicted, JAWA is entitled to maintain its claims in

23  law and equity for relief.  Rule 12 does not require JAWA to prove up each of its claims at this

24  juncture of the case. It is sufficient that JAWA has articulated the legal theories and factual basis

25  that underlie each cause of action. Consequently, JAWA asks the Court to deny Verizon's

26  Motion to Dismiss.

**RESPECTFULLY SUBMITTED** this 12th day of December, 2011

**WILENCHIK & BARTNESS, P.C.**

/s/ Dennis I. Wilenchik

Dennis I. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com
*Attorneys for Defendants Jason Hope*
*and Wayne P. Destefano, et al.*

**GRANT WOODS LAW P.C.**

/s/ Grant Woods, Esq.

Grant Woods, Esq.
Two Renaissance Square
40 N. Central Ave, Suite 2250
Phoenix, Arizona 85004
gw@grantwoodspc.net
*Co-counsel for Defendants Jason Hope*
*and Wayne P. Destefano, et al.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 12th day of December, 2011, I electronically transmitted the attached document to the Clerk's office of the United States District Court, District of Arizona, using a Clerk of Court hosted electronic filing system for filing and the transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

  /s/ Tyler Q. Swensen