1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    Cellco Partnership d/b/a Verizon Wireless,        No. CV11-0432-PHX-DGC

10                          Plaintiff,                   **ORDER**

11   vs.

12   Jason Hope; et al.,

13                          Defendants.

14          Pending before the Court are Defendants' motion for an accounting and for

15   Plaintiff to release funds (Doc. 211), Defendants' motion to dismiss Plaintiff's first

16   amended complaint (Doc. 232), and Plaintiff's motion to dismiss Defendants' third

17   amended counterclaims (Doc. 235).  Each motion has been fully briefed (Docs. 229, 236;

18   241, 260; 242, 261).  For the reasons that follow, the Court will deny Defendants' motion

19   for an accounting and release of funds, grant in part and deny in part Defendants' motion

20   to dismiss Plaintiff's first amended complaint, and grant in part and deny in part

21   Plaintiff's motion to dismiss Defendants' third amended counterclaims.[1]

22   **I.     Factual Background.**

23          Verizon operates a wireless telephone network.  Part of Verizon's service involves

24   providing premium text message service ("PSMS"), which offers Verizon customers such

25   _____

26          [1] The parties' requests for oral argument are denied.  The issues have been fully
     briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b);
27   *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

28

applications as ring tones, horoscopes, recipes, celebrity gossip, and news alerts. Verizon contracts with third-party companies, known as "aggregators," who, in turn, contract with Verizon-approved PSMS providers. The providers supply PSMS services to wireless customers, typically by marketing them on the internet. When a Verizon customer orders a PSMS service, the service is delivered to the customer's phone over the Verizon network and Verizon includes the charge for the PSMS on the customer's monthly wireless bill. Verizon keeps part of the payment for these services and forwards the remaining amount to the aggregators, who collect their respective fees and pass the rest on to the PSMS providers. Verizon requires its providers to adhere to the Consumer Best Practices Guidelines for Cross Carrier Mobile Content Services promulgated by the Mobile Marketing Association ("MMA Best Practices"). Defendants, who did business under the name "Cylon," and later "JAWA," are in the business of providing PSMS services directly over the internet and through aggregators. Defendants acted as PSMS providers under contract with Verizon aggregators.

Verizon brought this action against Defendants, alleging that they fraudulently obtained access to the Verizon network, violated MMA Best Practices in soliciting business from Verizon customers, and deceived Verizon customers, resulting in Verizon incurring costs to remedy customer complaints and stop Defendants' conduct. Verizon's first amended complaint asserts seven causes of action: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) violation of RICO, 18 U.S.C. § 1962(d); (3) violation of the Arizona Organized Crime, Fraud, and Terrorism Act ("ACFTA"), A.R.S. § 13-2310(A); (4) violation of ACFTA, A.R.S.§ 13-2312(B); (5) common law fraud; (6) violation of Arizona's Consumer Fraud Act, A.R.S. § 44-1522 (A), and (7) tortious interference.

## II.   Defendants' Motion for an Accounting/Release of Funds.

Defendants claim that prior to filing the instant lawsuit, Verizon launched an attack on JAWA that included terminating JAWA's service to Verizon customers, instructing aggregators not to pay JAWA, refunding customers who had not complained,

and "withholding money rightfully due to both the Aggregators and JAWA for services already provided that were not refunded to customers." Doc. 211 at 3. Defendants move the Court to order an accounting from Verizon of money it is currently withholding from its aggregators, and, indirectly, from JAWA. Defendants further move the Court to order Verizon to release these funds. *Id.* at 2, 6. Defendants claim that from the start of this litigation, "it has been undisputed that Verizon was holding money that does not legally belong to it." *Id.* Defendants claim that Verizon counsel has been aware of the retained funds since August, 2011, and that they recently estimated the amount to be $8 million. *Id.* Defendants state that they informed Verizon, through counsel, that their own accounting determined the amount to be $9 million. *Id.* Defendants argue that regardless of the exact amount, it is undisputed that Verizon is withholding money to which it is not legally entitled and that the Court should order an accounting from Verizon because JAWA lacks any other remedy at law to require Verizon to state the exact amount withheld. *Id.* at 4. Defendants further argue that the Court should order Verizon to release these funds because withholding them amounts to impermissible self-help and the proper legal avenue for holding such funds is to seek a pre-judgment order or garnishment, which Verizon has not done. *Id.*

Verizon opposes Defendants' motion, characterizing it as "an attempt to obtain final relief based upon unsubstantiated allegations" that have no basis in law. Doc. 229 at 1. Verizon disputes Plaintiffs' assertion that it has admitted to withholding funds and states that there is no evidence on the record to support Defendants' facts. *Id.* at 2. Verizon also argues that Defendants' request has no basis in law. *Id.* Verizon argues that the only basis for Defendants' request under the Federal Rules of Civil Procedure is a request for pre-judgment relief, and that an injunction cannot issue on the basis of unverified allegations. *Id.* at 3. Verizon also argues, on the basis of this Court's opinion in *Wolf v. Martin*, No. CV 10-8163 PCT DGC, 2010 WL 3984826 (D. Ariz. Oct. 12, 2010), that an accounting request is not a proper basis for an injunction. *Id.* Verizon asserts that Defendants' request for pre-judgment payment amounts to a "mandatory

injunction" and that Defendants' motion falls far short of meeting the exacting standards of proof and serious harm required for such an order. *Id.* at 3-4 (citing *Tinsley v. Schriro*, No. CV 07-1676-NVW-CRP, 2008 WL 2783279, at **9-10 (D. Ariz. June 26, 2008) and *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.* , 571 F.3d 873, 879 (9th Cir. 2009)). Finally, Verizon argues that *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), the only case Defendants cite as a legal basis for relief, does not support the pre-judgment relief that Defendants request. Doc. 229 at 4-5.

Defendants have failed to establish that they are entitled to the requested relief. Defendants would have the Court rule in their favor merely because Verizon does not provide evidence to controvert Defendants' claim that Verizon is in possession of funds owing to Defendants. Doc. 236 at 2. Defendants also argue that because Plaintiff's counsel has made multiple representations to Defense counsel that it is withholding funds, and Defendants have direct knowledge of these representations, verification of this fact is unnecessary. *Id.* The Court does not agree that these allegations provide sufficient grounds for the Court to grant Defendants' motion.

Defendants previously petitioned the Court for a preliminary injunction, claiming, among other things, that Verizon and the aggregators were withholding approximately $19 million for services they had provided, and asking the Court to order Verizon not to withhold payments owed to JAWA for its messaging services. Doc. 60, ¶¶ 6, 38(b)(4). The Court denied Defendants' motion because they had not shown a likelihood of success on the merits of their counterclaims. *See* Doc. 133 at 17-23. Here, also, Defendants state that Verizon's actions amount to conversion (Doc. 236 at 3), but Defendants make no attempt to establish the four factors required for injunctive relief, including a showing that they are "likely to succeed on the merits" (*see, e.g.*, *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365 374 (2008)), or a showing that the balance of hardships tips sharply in their favor and the existence of "serious questions" that go to the merits of their claim (*see Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049-53 (9th Cir. 2010)).

Defendants argue that their motion is not a request for injunctive relief and that Verizon's obligation to turn over the withheld funds does not depend on the success of its counterclaims because it is Verizon, not Defendants, that has improperly "helped itself" to pre-judgment relief by withholding the funds.  Doc. 236 at 3-4.  But regardless of whether Defendants have styled their motion as one for injunctive relief, Defendants have provided no other legal basis for the relief sought.   As the Court stated in *Wolf*, Defendants' request for an accounting "is not a proper request for equitable relief."  2010 WL 3984826, at *2 (declining Plaintiff's request for an accounting from Defendants because "[t]he Federal Rules of Civil Procedure provide ample tools for Plaintiff to conduct discovery and present evidence of profits to which he is entitled)).  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), which Defendants cite, is not to the contrary.  In that case, the Supreme Court stated that the prerequisite to an equitable accounting, like any other equitable remedy, is an inadequate remedy at law.  *Dairy Queen*, 369 U.S. at 478. The Court went on to reason that a cause of action cognizable at law may require an equitable accounting in rare cases where the accounts are too complicated for a jury to handle, but that "[t]he legal remedy cannot be characterized as inadequate merely because the measure of damages may necessitate a look into petitioner's business records." *Id.*

Defendants have made no showing that legal remedies are insufficient to address their claims that Verizon improperly converted funds owing to the aggregators and JAWA.  Defendants argue for the first time in their reply that discovery is not a sufficient route for determining the amount Verizon has wrongfully withheld because Verizon has failed to uphold its discovery obligations.  Doc. 236 at 5.  Defendants' allegations to this effect are general and conclusory.  *Id.* ("Direct requests . . . and even conversations with counsel . . . have also not been successful in convincing Verizon to uphold its discovery obligations.").   Absent a showing of specific discovery violations, the Court is not persuaded that Defendants are left without adequate legal remedies for pursuing the requested relief.   Moreover, as noted above, Defendants have not shown, apart from

1  unsubstantiated and directly disputed allegations, that Plaintiffs are impermissibly

2  withholding payments.  The Court will deny Defendants' motion for an accounting and

3  release of funds.

4  **III.    Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.**

5        When analyzing a complaint for failure to state a claim to relief under

6  Rule 12(b)(6), the factual allegations "'are taken as true and construed in the light most

7  favorable to the nonmoving party.'"  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

8  2009) (citation omitted).  To avoid a Rule 12(b)(6) dismissal, the complaint must plead

9  "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

10 *Twombly*, 550 U.S. 544, 570 (2007).  This plausibility standard requires sufficient factual

11 allegations to allow "the court to draw the reasonable inference that the defendant is

12 liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

13 "[W]here the well-pleaded facts do not permit the court to infer more than the mere

14 possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the

15 pleader is entitled to relief.'"  *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2)).  A claim may be

16 dismissed where the complaint lacks a cognizable legal theory, lacks sufficient facts

17 alleged under a cognizable legal theory, or contains allegations disclosing some absolute

18 defense or bar to recovery.  *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699

19 (9th Cir. 1988); *Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n.1 (9th Cir. 1997).

20       **A.    Counts 1 and 2: RICO.**

21       Defendants argue that Verizon's claim under 18 U.S.C. § 1962(c) is based only on

22 conclusory statements and fails as a matter of law.  Defendants' arguments – contained in

23 multiple overlapping bullet-points and supported mainly by footnotes – boil down to two

24 core arguments: (1) that Verizon lacks standing because only Verizon customers, not

25 Verizon, itself, can claim direct injury from Defendants' alleged fraud, and (2) that

26 Verizon has failed to allege the necessary elements, including intent to obtain money

27 from Verizon, for the predicate crimes of mail and wire fraud.  *See* Doc. 232 at 10-12.

28       Verizon argues that Defendants already made, and the Court already rejected,

most of Defendants' arguments in its order responding to Defendants' original motion to dismiss. Doc. 241 at 3, *see* Docs. 117, 164. The Court agrees that it has already addressed – and rejected – Defendants' lack of standing and lack of direct injury arguments. The Court ruled that Verizon was a proper plaintiff under RICO because it satisfied the proximate cause requirement, as described in *Holmes v. Securities Investor Protection Corp*, of showing "some direct relation between the injury asserted and the injurious conduct alleged." Doc. 164 at 2-3; *see* 503 U.S. 258, 265-66 (1992). The Court found that Verizon had sufficiently alleged conduct on the part of Defendants – including making false representations to Verizon to obtain access to Verizon's customer network and using "cloaking" software to hide from Verizon its sales and services on unauthorized and misleading webpages – that caused Verizon injury in the form of damage to its business reputation, loss of customers, and expenses incurred in reimbursing customers and addressing thousands of complaints. Doc. 164 at 3. The Court also stated that factual questions regarding proximate cause are to be decided at summary judgment or trial, not on a motion to dismiss. *Id.* (citing *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1055 (9th Cir. 2008)).

The first amended complaint realleges the same conduct (*see, e.g.*, *id.*, ¶¶ 76-84) and the same damages (*see, e.g.*, *id.*, ¶¶ 93-98). Defendants again argue that Verizon is only a derivative victim of the alleged harms against its customers and that a derivative victim is not entitled to bring RICO claims. Doc. 232 at 10-12; 10, n. 17, 11, n. 21. The cases upon with Defendants rely involve third-party victims who had no direct relation to the parties sued. *See Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (9th Cir. 2008) (dismissing claims brought by a county bearing the healthcare costs of illegal immigrants against employers for helping their employees violate immigration laws); *Laborers & Operating Eng'rs' Util. Agreement Health & Welfare Trust Fund v. Philip Morris, Inc.,* 42 F. Supp. 2d 943, 948 (D. Ariz. 1999) (dismissing claims brought by trust funds paying members' medical expenses against a tobacco company for harms to their members' health). In contrast to these injuries that the courts have found "too

attenuated" or lacking in "direct relation" to the defendants' actions to support a claim, Verizon has alleged a direct relationship between itself and Defendants.  Verizon has alleged that Defendants engaged in deceptive sales practices while fraudulently operating as an approved vendor for Verizon, causing customers to incur disputed charges, all billed and collected by Verizon.  Verizon previously argued, and the Court agrees, that Verizon's alleged injuries of harm to its reputation and customer base and its expenses incurred resolving customer complaints are not too attenuated from Defendants' alleged conduct to support a claim.  *See* Doc. 117 at 5-6 (contrasting *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008)).  The Court will reject Defendants' arguments that Verizon does not have standing to bring a RICO claim because it is not an aggrieved customer and it has not alleged a sufficient causal connection between Defendants' alleged actions and its alleged harm.

Defendants also argue that Verizon has not pled sufficient facts to support a claim for the predicate crimes of mail and wire fraud.  Doc. 232 at 10-12.  Defendants first argue on the basis of *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989), and *Williams v. Dow Chemical Co.,* 255 F. Supp. 2d 219, 225-26 (S.D.N.Y. 2003), that RICO requires a defendant to have the intent to obtain money or property from the one deceived and that Verizon's claim fails because Verizon has only alleged that Defendants sought to obtain money from Verizon customers, not Verizon, itself.  Doc. 232 at 11; 11, n. 19.

Verizon responds that both *Lew* and *Dow Chemical* are distinguishable from the current case because in those cases defendants did not receive money from the person deceived, but Defendants in this case regularly received money from Verizon out of the payments Verizon collected from its customers.  Doc. 241 at 5; 5, n. 4.  The Court agrees that the outcomes in *Lew* and *Dow Chemical* do not control this case.  In *Lew*, the Ninth Circuit reversed convictions of mail fraud against an immigration attorney who sent fraudulent documents on behalf of his clients to the Department of Labor ("DOL") because there was no evidence that the clients, from whom the defendant received payment, had been deceived.  875 F. 2d at 221-22 (9th Cir. 1989).  In *Dow Chemical*, the

court found that defendant's misrepresentations about a product to the Environmental Protection Agency ("EPA") did not constitute wire or mail fraud because, though intended to deceive the EPA, they were not made with the intent to obtain money, but only with the intent to obtain regulatory approval.  Neither case speaks to the alleged deception against Verizon in this complaint.

Verizon argues that *United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988), a bank fraud case cited by the Ninth Circuit in the mail and wire fraud context (*see, e.g., Lew*, 875 F. 2d at 221; *United States v. Dowie*, 411 Fed. Appx., 21, 28 (9th Cir. 2010)), is directly on point.  In *Bonallo*, the Ninth Circuit rejected a former bank employee's argument that he had not defrauded the bank, but only its customers, when he allegedly withdrew money from his own account and falsified ATM records to have the funds deducted from the accounts of other customers.  858 F. 2d at 1429, 1434, n. 9.  The court reasoned that defendant's misrepresentation of the records was directed at the bank and that defendant was "effectively harming the bank which was obliged to reimburse customers" for erroneously charged withdrawals.  *Id.*  As Verizon notes, the court in *Lew* cited to *Bonallo* as providing the element missing in *Lew*: "an intent to obtain money . . . from the victim of the deceit."  875 F. 2d at 222, *see* Doc. 242 at 6.  Verizon argues that *Bonallo* is analogous to the instant case because Verizon likewise reimbursed customers wrongfully charged by Defendants' deceptive sales practices.  Doc. 242 at 6.

Defendants reply that *Bonallo* is inapposite because Verizon does not allege that it had a legal obligation to reimburse customers; rather, it simply made a "unilateral decision" to do so.  Doc. 260 at 5.  This argument is not persuasive.  In rejecting the argument that removing money from customer accounts did not amount to an intent to obtain money from the bank, the court in *Bonallo* reasoned that it is "common knowledge that banks reimburse the accounts of wrongly charged customers."  858 F. 2d at 1234, n. 9.  The relevant question is whether Verizon has alleged facts to show that Defendants were aware or had "common knowledge" that Verizon refunded customer accounts.  Defendants also argue that *Bonallo* is distinguishable because, unlike a bank which

obtains title interest in depositors' funds while its customers receive a contract-claim against the bank, Verizon had no legal interest, apart from its own share, of customer payments. This argument is also unpersuasive because it is not clear how, under the facts alleged, Verizon does not take title interest to funds paid directly to Verizon, even if Verizon is contractually obligated to pay portions of those funds to aggregators who, in turn, are contractually obligated to pay PSMS providers, including Defendants.

The Court concludes that Verizon has alleged an intent on the part of Defendants to obtain money from Verizon. First, unlike the cases Defendants cite in which defendants did not seek money from those deceived (the DOL and the EPA), the facts in this case portray a scheme in which Defendants sought to obtain money from Verizon. The FAC alleges that Defendants submitted applications to operate as an approved vender within Verizon's provider network as a way to receive payments from Verizon while Verizon bore the responsibility of billing customers, collecting payments, and responding to customer complaints. *See* Doc. 222, ¶¶ 41, 60-61, 66-68. Second, the facts pled lead to the reasonable inference that Defendants anticipated that Verizon would bear the cost associated with its fraudulent sales once Defendants' deceptive marketing practices generated a large number of complaints. The FAC alleges that Defendants set up a number of "silo" companies that they could quickly shut down if Verizon detected that they were deceiving customers, enabling Defendants to continue their unauthorized marketing practices, implicitly leaving Verizon, like the bank in *Bonallo*, with the responsibility of making refunds while Defendants escaped detection. *Id.*, ¶¶ at 41, 69-70. Verizon alleges that Defendants' schemes caused Verizon to field more than 3,300 customer complaints and to issue more than $375,000 in reimbursements. *Id.*, ¶¶ 94-96. Defendants raise a factual issue, arguing that Verizon did not reimburse customers from its own profits, but only from money that it withheld from Defendants and aggregators. Doc. 232 at 11, n. 19. Verizon responds, and the Court agrees, that this assertion rests on facts outside the complaint and that, in any case, Defendants do not dispute that they received money from Verizon during the fraud scheme. Doc. 241 at 5, n. 4. The Court

finds that for purposes of withstanding a motion to dismiss, Verizon has alleged sufficient facts to show that Defendants acted with an intent to obtain money from Verizon.

Defendants next argue that Verizon has not alleged sufficient facts to support specific acts of mail fraud or wire fraud.  Doc. 232 at 10, 12.  Defendants argue that Verizon's use of the mails to bill its customers occurred only after customers incurred charges and is therefore not sufficiently related to Defendants' allegedly fraudulent sales schemes.  Defendants also argue that Verizon has not alleged sufficient facts to support wire fraud because no e-mails, including the March 2009 e-mail which Defendant Jason Hope sent to regain access to Verizon's network, were sent from JAWA to Verizon.  Doc. 232 at 12.

### 1. Mail Fraud.

Verizon responds that it has alleged sufficient facts to support mail fraud.  Doc. 241 at 7.  Verizon first argues that the FAC alleges that Defendants sent applications to the Cellular Telecommunications & Internet Association ("CTIA") to lease short codes, enabling them to act as PSMS providers over the Internet.  *Id.*, *see* FAC, Doc. 222, ¶ 89.  Verizon argues that these applications contained false addresses and contact information in order to mask Defendants' identities, and that this deception, passed along to Verizon when it approved each short code campaign, was "an essential element of [Defendants'] scheme" to hide their identities from Verizon and market their PSMS to its customers.  *Id.*; s*ee* FAC, Doc. 222, ¶¶ 66(e), 71.  Verizon also argues that the FAC alleges that Defendants knew and depended upon Verizon's use of the mails to bill its customers.  *Id.* at 7-8 (*see* Doc. 222, ¶ 91).  Verizon argues that these facts are sufficient to support mail fraud because the mailings of both the short code applications and the bills to Verizon customers were "for the purpose of, and essential to, the scheme's success."  *Id.* at 7.  Verizon relies on the Ninth Circuit's opinion in *United States v. Hubbard*, 96 F. 3d 1223, 1228 (9th Cir. 1996) ("In order for the mailing to be 'sufficiently closely related,' it must be for the 'purpose of executing the scheme,' or 'incident to an essential part of the scheme'") (internal citations omitted), and the

Supreme Court's opinion in *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) ("[T]he use of the mails need not be an essential element of the scheme. . . . It is sufficient for the mailing to be incident to an essential part of the scheme . . . or a step in the plot.") (internal citations omitted).

Defendants reply that Verizon's alleged mail fraud violations are not "sufficiently closely related" to the alleged fraudulent scheme.  Doc. 260 at 6.  Defendants first argue that Verizon never alleged that Defendants used the mails to send applications to CTIA.  *Id.* at 7.  Defendants are correct that the FAC does not expressly say that Defendants used the U.S. mail to send its short code applications.  *See* Doc. 222, ¶ 89.  The FAC begins its section entitled "Defendants' Violations of Federal Criminal law" with the over-arching allegation that Defendants used "the U.S. mail and/or interstate wires" as part of their conspiracy to defraud Verizon.  *See id.* at ¶ 87.  When, two paragraphs later, the FAC cites Defendants' short code applications to CTIA and Verizon, it designates these as a violation of the mail fraud statute, with the words "mail fraud" in parentheses, just as it designates other violations in the same section as either mail fraud or wire fraud.  *See id.* at ¶¶ 89-91.  Taken in the light most favorable to the non-moving party, the Court finds that the allegation that Defendants used the U.S. mail/and or interstate wire to commit fraud applies to the allegations related to Defendants' short code applications and that the parenthetical reference to mail fraud is meant to distinguish which was used, mail or wire.  Thus construed, Verizon has made sufficient allegations at this stage to support a mail fraud claim.  Defendants' factual assertion that "no applications were **ever** sent via U.S. mail to CTIA or Verizon" (Doc. 260 at 6. (emphasis in original)) is a factual issue; Verizon will bear the responsibility of proving use of the mails at trial.  Defendants make no additional arguments for why the short code applications were not sufficiently related to the alleged fraud scheme to constitute mail fraud.  The Court is persuaded that Verizon has alleged sufficient facts showing that Defendants' applications for short code leases – a preliminary step required for Defendants to do business over the internet – were essential for carrying out the alleged fraud scheme against Verizon.

- 12 -

Defendants next argue that the mailing of bills to Verizon customers is not sufficiently related to the alleged fraud scheme.  Doc. 260 at 7.  Defendants repeat the argument that the alleged fraud scheme was simply to obtain access to Verizon's network; therefore, any customer bills sent after Defendants accessed the network were unrelated to the alleged fraud.  *Id.*  The Court rejects this argument for the reasons stated above.  Verizon has alleged sufficient facts to show that Defendants' scheme was not only to gain access to Verizon's network of customers, but also to obtain money from Verizon.  Because a jury could reasonably conclude that billing Verizon's customers was necessary to the success of Defendants' scheme, or "incident to an essential part of the scheme," the Court finds that Verizon has alleged sufficient facts to support a mail fraud claim.  *See Schmuck*, 489 U.S. at 710-11.

### 2.      Wire Fraud.

Verizon argues that it has alleged sufficient predicate acts of wire fraud to support its RICO claims.  Doc. 241 at 8.  The Court agrees.  As shown above, the mail or wire communication need not be with the plaintiff directly, as long as it is connected in some way to the success of the overall scheme.  Verizon has alleged multiple acts of wire fraud involving the use of fake URL's meant to direct Verizon away from the actual sites where they conducted their sales, the use of cloaking software to keep Verizon from discovering the actual URL sites, and the use of these sites and text messaging to conduct deceptive sales transactions.  *See* FAC, Doc. 222, ¶¶ 76-79, 90.  Defendants' principal argument is that these wire communications were not part of a scheme to defraud Verizon because the facts alleged do not establish an intent to obtain money from Verizon.  Doc. 260 at 4.  For the reasons already stated, the Court rejects this argument.  Because a jury could reasonably conclude that Defendants engaged in wire transactions as part of an overall scheme to obtain money from Verizon, the Court finds that Verizon has alleged sufficient facts to support a wire fraud claim.

### 3.      Individual Defendants.

Defendants also argue that Verizon has failed to state a RICO claim against four

specific defendants, Christa Johnson (Stephens), Quinn McCullough, Steve Urhman, and Rick Perry, because Verizon has failed to allege facts showing that these individuals took an "operation or management" role in the alleged enterprise as required under *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Doc. 222 at 12.

Verizon argues that the Court already rejected this argument in its prior order, stating that Verizon had alleged the roles of the co-conspirators with sufficient detail and that whether Verizon had sufficient evidence to back up its allegations must be determined after discovery.  Doc. 241 (citing Doc. 164 at 4).  Verizon also argues that Defendants' reliance on *Reves* is misplaced, both because that case dealt with a motion for summary judgment, not a motion to dismiss, and because the "operation and management" issue in that case pertained to an outside accounting firm that acted merely as an instrument of a corporation's fraudulent scheme rather than someone directly involved in the alleged fraudulent conduct.  Doc. 241 at 4, n. 2 (citing to *Marceau v. IBEW, Local 1269*, 618 F. Supp. 2d 1127, 1170 (D. Ariz. 2009) (distinguishing the role of the outside accounting firm in *Reves* from that of a defendant corporation that did not merely provide outside services, but was "directly involved" in its unlawful acts and thus "clearly had some part in directing the enterprise's affairs.")).

The Court's prior order is not dispositive of Defendants' argument because that order pertained to whether Verizon's pleadings had satisfied the particularity requirement of Rule 9(b) for the purpose of giving Defendants' notice of the alleged fraud claims against them; it did not discuss the sufficiency of the allegations to make a RICO claim against each individual co-defendant.  *See* Doc. 164 at 4.  The Court must look to whether Verizon has alleged sufficient facts to state a claim under 18 U.S.C. § 1962(c) as to each of the four defendants named in Defendants' motion to dismiss.

Under § 1962(c), it is unlawful for a person employed by or associated with an enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The Court agrees that *Reves* is the controlling authority on this statute, and that *Reves'*

approach applies equally on a motion to dismiss.  *See Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008).  *Reves* interpreted this section to require that the employee or associate have "some part in directing [the enterprise's] affairs."  507 U.S. at 179.  *Reves* went on to explain that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required."  *Id.* (emphasis in original).

The Court concludes that Verizon has not alleged sufficient facts to meet this requirement with respect to Defendant Quinn McCullough, but that Verizon has alleged sufficient facts with respect to the remaining three Defendants.  The FAC names all four individuals as being "employed by" and working "in concert with" defendants Hope and DeStefano to further the scheme described in the complaint.  *See* FAC, Doc. 222, ¶¶ 9-11, 13.  The FAC alleges that after Verizon suspended Cylon's access to its network and required defendants Hope and DeStefano to disclose their association with any short codes, Hope and DeStefano designated these defendants "to lease the short codes from the CTIA and activate short code campaigns on the Verizon Wireless network."  *Id.*, ¶¶ 59, 71.  The FAC also alleges that all four Defendants were named as contact persons for the "silo" companies, created to carry out the scheme.  *Id.* at 111-115.  The FAC does not allege that these Defendants took any actions, themselves, to set up these "silo" companies; nor does it allege that the listing of these individuals as the contact persons was anything more than a nominal listing, like that of the false addresses, or that it led to any actions related to the direction of the "silo" companies or of the overall enterprise.  *See Id.*, ¶¶ 66, 68, 71, 73, 75.  The FAC does allege that Stephens, Perry, and Urhman participated in a meeting in September, 2009, to discuss setting up the "silo" companies, the use of URLs, and the concealment of these URLs from Verizon.  *Id.*, ¶¶ 68, 113, 115.  The FAC also alleges that all three of these Defendants were involved in discussions regarding the development of cloaking software, and that Defendant Perry tested the

software and knew it would deflect Verizon's auditors.  *Id.*, ¶¶ 80, 115.  The Court finds that a jury could reasonably conclude from the facts alleged that Defendants Stephens, Perry, and Urhman, through their participation in meetings discussing actions essential to the operation of Defendants' scheme, played "*some* part in directing the enterprise's affairs."  *See Reves*, 507 U.S. at 179 (emphasis in original).  By contrast, the FAC does not allege any facts to show that Defendant McCullough was even aware of the "silo" companies or the use of his name.  The Court will grant Defendants' request to dismiss defendant McCullough from Verizon's RICO claims and deny Defendants' request to dismiss Defendants Stephens, Perry, and Urhman.

### 4.    Verizon's 18 U.S.C. § 1962(d) Claim.

Defendants also argue that the Court should dismiss Verizon's § 1962(d) claim because it has failed to state a predicate claim under 18 U.S.C. § 1962(c).  Doc.  232 at 13.  For the reasons stated above, the Court finds that Verizon has alleged sufficient facts to make a claim under § 1962(c).  With the exception of Defendant McCullough, the Court will deny Defendants' request to dismiss either of Verizon's RICO claims.

### B.    Counts 3 and 4: A.R.S. §§ 13-2310(A) & 13-2312(B).

Defendants ask the Court to dismiss the claims brought under Arizona's civil racketeering law for the same reasons it asks the Court to dismiss the federal RICO claims.  For the reasons stated above, the Court will grant Defendants request with respect to Defendant McCullough and will deny Defendants' request for all other Defendants.

### C.    Count 5: Common Law Fraud.

Defendants argue that Verizon has failed to allege sufficient facts to show the elements of common law fraud.  Defendants note that under Arizona law, common law fraud consists of nine elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon;

and (9) his consequent and proximate injury."  Doc. 232 at 13-14 (citing *Nielson v. Flashberg*, 419 P.2d 514, 517-18 (Ariz. 1966)).

Defendants argue that Verizon's alleged false representations are based entirely on a March 2009 e-mail from Jason Hope to an entity called "Open Market."[2]  Doc. 232 at 14, Exh. 1.  Defendants argue that Verizon's claim fails because Defendants made no representations to Verizon itself; Defendants could not have known that information indirectly transmitted to Verizon was false or have intended for it to induce action on Verizon's part; Defendants cannot be held liable for Verizon's reliance on information that did not come directly from Defendants; and Verizon has suffered no damages because it profited from Defendant's sales.  *Id.* at 14.

The Court finds that Verizon has alleged sufficient facts in the FAC to show all the elements of a common law fraud claim.[3]  Even discounting the 2009 e-mail because, as Defendants argue, it did not make any representations directly to Verizon and none of its allegedly false representations was material (*Id.* at 14-15, 14-15 ns. 23-25), the Court is not persuaded that Verizon's claim rests on this e-mail.  Verizon alleges that Defendants made false representations to Verizon itself by pointing Verizon auditors to MMA-compliant webpages and concealing from Verizon the actual, non-compliant web pages.  Doc. 222, ¶¶ 168, 170.  Verizon alleges that its reliance on the false web pages was reasonable because Defendants created these sites specifically to gain access to Verizon's network but then switched to non-compliant sites when soliciting customers.  *Id.*, ¶ 170.  The Court finds that Verizon has sufficiently alleged that Defendants knowingly represented facts (the use of compliant web-pages) to Verizon that were both false and material in order to induce Verizon to give Defendants access to their network and that Verizon reasonably relied on these false representations to do so.  Verizon has

---

[2] Defendants elsewhere identify Open Market as one of the aggregators with whom Verizon did business.  *See* Doc. 220, ¶ 27.

[3] Verizon has not responded to Defendants' fraud arguments.  Because the Court may dismiss a claim under Rule 12(b)(6) only if it is satisfied that the claim is legally unsound, it has considered Defendants' arguments in light of the allegations in the FAC.

also alleged that it incurred substantial expenses due to Defendants' actions. *Id.*, ¶¶ 172-73. Defendants' argument that Verizon incurred no damages because it made a net profit from Defendants' sales is a factual issue on which Verizon will bear the burden of proof at trial. The Court will deny Defendants' motion to dismiss the common law fraud claim.

### D.   Count 6: Arizona's Consumer Fraud Act, A.R.S. § 44-1522.

Defendants argue that the Court dismissed Verizon's claims under A.R.S. § 44-1522 in its prior order and request the Court to state that this claim remains dismissed. Doc. 232 at 15. In its prior order, the Court found that Arizona courts required, and the Ninth Circuit agreed, that a plaintiff be a consumer in a transaction to come under the protection of Arizona's Consumer Fraud Act. Doc. 164 at 6-7 (citing, e.g., *Waste Mfg. & Leasing Corp. v. Hambicki*, 900 P. 2d 1220, 1224 (Ariz. Ct. App. 1995) ("The purpose of the Act is to provide *injured consumers* with a remedy"); *Dunlap v. Jimmy GMC of Tucson, Inc*., 666 P. 2d 83, 87 (Ariz. Ct. App. 1983) ("The Consumer Fraud Act provides *an injured consumer* with an implied private right of action against a violator of the act."); *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F. 2d 401, 407 (9th Cir. 1992) ("The clear intent of this provision is to protect unwary buyers from unscrupulous sellers)). The Court dismissed this claim because the alleged fraud in the complaint "did not occur 'in connection with' Verizon's purchase of merchandise." Doc. 164 at 7. Verizon has reasserted its Consumer Fraud Act claim in the FAC to preserve it for appeal (Doc. 222 at 45, 45 n. 2), but offers no further response to Defendants' argument or to the Court's prior finding. The Court will grant Defendants' request to dismiss this claim.

### E.   Tortious Interference.

Defendants argue that the Court should dismiss Verizon's tortious interference claim because Verizon fails to make a valid claim under Arizona law based on Restatement (Second) of Torts ("Restatement") §§ 766 or 766A. Doc. 232 at 7-8, 8-9. Restatement § 766 pertains to the intentional and improper interference with the performance of another's contract with a third party "by inducing or otherwise causing the third person not to perform the contract." Restatement § 766. Restatement § 766A

pertains to the intentional and improper interference with the performance of another's contract with a third party "by preventing the other from performing the contract or causing his performance to be more expensive or burdensome." *Id.* at § 766A. Thus, § 766 would pertain only to allegations that Defendants' actions caused Verizon customers not to perform their contracts with Verizon, and § 766A would pertain only to allegations that Defendants' actions made it more expensive or burdensome for Verizon to perform on its contracts with customers. Defendants argue for a further distinction: that § 766 requires that the improper actions be directed at the customers, and that § 766A requires that the actions be directed at Verizon itself. On the basis of this distinction, Defendants argue that Verizon cannot make a proper claim under § 766 because Verizon has not alleged actions taken against its customers, but only against Defendants' customers. *Id.* at 7. Defendants also argue that Verizon's reliance on § 766A fails because Verizon has not alleged actions directed at Verizon. *Id.* at 6, 8-9. Defendants also argue that the claims fail under both theories because Verizon cannot prove that any customers breached their contracts with Verizon as a result of Defendants' actions, and Verizon has pointed to no particular contract obligation whose performance was made more expensive or burdensome because of Defendants' alleged conduct. *Id.*

Verizon argues that the Court has already addressed and rejected Defendants' arguments and that the only potentially new argument – that Verizon has failed to identify a particular contract provision whose performance was made more burdensome or expensive by Defendants' actions – fails because Defendants cite no basis for the proposition that the increased expense or burden be related to a specific contract provision. Doc. 241 at 9, 9, n. 8. Verizon argues that it is sufficient for a claim under § 766A that "the cost that [the plaintiff] incurs in order to *obtain the performance by the third party* has increased." *Id.* (citing Restatement § 766A, cmt. c) (emphasis added by Plaintiff). Verizon argues that the increased cost and burden of servicing its customers' complaints were directly related to its efforts to continue to obtain its customers' performance of their own contract obligations, namely payment. *Id.* Verizon also argues

that its claim is valid under § 766 because it has alleged that Defendants' conduct caused Verizon customers to cancel their contracts.  *Id.* (citing FAC, Doc. 222, ¶ 183).  Verizon states that Defendants' argument that it cannot prove that any customers, in particular, were induced to breach their contracts with Verizon attacks only the veracity, not the sufficiency of Verizon's claim.  *Id.* at 9-10.

### 1.      Restatement § 766.

The Court finds that Verizon has alleged sufficient facts to support a claim for tortious interference with contract under Arizona law on the basis of § 766.  The Court previously found Defendants' arguments that its alleged actions were not directed at Verizon's customers, but only at its own customers, unavailing because "Verizon has pled sufficient facts to show plausibly that Defendants knew the customers were common to both parties and that Verizon would be injured by Defendants' actions."  *Id.* at 8.  Defendants now argue that it would be nonsensical to suppose that Defendants "would have any reason to interfere with and destroy its own contracts with its customers."  *Id.*  The Court need not suppose a rationale on Defendants' part, however, to evaluate the sufficiency of Verizon's claims.  It is entirely plausible that a party could employ deceptive sales practices that would jeopardize its contracts with its own customers and that this would, in turn, interfere with the contractual relationship between those customers and another party.  That is exactly what Verizon alleges happened in this case.  *See* FAC, Doc. 222, ¶¶ 78-79 (alleging that Defendants deceptively sold their services to customers on URLs, using pop-up screens to hide pricing information and failing to disclose subscription information, and that they sent text messages that obscured the price of PSMS content).  Verizon has alleged that Defendants' deceptive sales practices caused Verizon customers to cancel their contracts with Verizon.  *See* FAC, Doc. 222, ¶ 183.  The question is not, as Defendants suggest, whether Defendants can be held liable for interference with their own contracts (*see* Doc. 232 at 7, n. 10); the question is whether Verizon has alleged sufficient facts to support a claim that Defendants' actions induced customers not perform on their contracts with Verizon.  The Court finds that it has.

Whether customers actually breached their contracts with Verizon as a result of Defendants' actions is a factual issue upon which Verizon will bear the burden of proof at trial, and is not dispositive of Verizon's claim at the pleading stage.

### 2. Restatement § 766A.

Defendants' argument that Verizon's claim fails under § 766A because the complaint does not allege actions Defendants took directly against Verizon is also unavailing.  First, the fact that this section applies to actions "preventing the [plaintiff] from performing the contract or causing his performance to be more expensive or burdensome" does not necessitate that these actions be expressly directed at the plaintiff.  *See, e.g.*, § 766A, cmt. g. ("if the plaintiff is under a contract to keep a highway in repair, a defendant who intentionally inflicts additional expense upon him by damaging the highway is subject to liability").  Second, the FAC alleges many acts by Defendants directed at Verizon itself, such as fraudulently gaining authorization for multiple short code campaigns without disclosing the involvement of defendants Hope and DeStefano and using cloaking software to block Verizon's access to its unauthorized URL sites.  *See* FAC, Doc. 222, ¶¶ 59, 71, 83.  The fact that Defendants claim to have had no direct contact with Verizon is immaterial for the sufficiency of this claim.  As the Court previously noted, the intent to interfere with a plaintiff's contract is met where the actor "knows that the interference is certain or substantially certain to occur as a result of his action."  *See* Doc. 164 at 8 (quoting § 766A, cmt. g).  The Court also finds that Verizon has made a plausible claim that providing wireless service was made more costly and burdensome because Defendants, whom Verizon unwittingly enlisted as PSMS providers on the basis of Defendants' deceptive short code campaigns, caused Verizon to incur a higher volume of customer complaints and requests for refunds and to suffer damage to its goodwill and reputation.  *See, e.g.*, FAC, Doc. 222, ¶¶ 93-98.  The Court need not address Verizon's argument that § 766A encompasses situations where, as here, Verizon alleges that Defendants made the cost related to securing *the other's performance* more costly and burdensome because the Court concludes that Verizon has alleged facts to

show that Defendants' actions made its own provision of wireless services – effectuated, in part, through the services of Verizon-approved venders – more costly and burdensome. Specifically, Verizon alleges that Defendants' fraud permitted a portion of its approved PSMS wireless services to be provided without standard pricing disclosures intended to minimize the incidence of improper billing leading to a high incidence of customer complaints.  *See* FAC, Doc. 222 ¶¶ 3-5, 56-57, 94-96.  The increased burden and expense of these complaints is directly related to Verizon's provision of services to its customers via its PSMS providers.

Because the Court finds that Verizon has pled sufficient facts to allege tortious interference under either §§ 766 or 766A, the Court will deny Defendants' request to dismiss these claims.

**IV.    Verizon's Motion to Dismiss Defendants' Third Amended Counterclaims.**

Defendants (collectively referred to as "JAWA") filed a second amended answer to Verizon's complaint containing JAWA's third amended counterclaims ("the TAC"). Doc. 220.  The TAC consists of ten causes of action: (1) tortious interference with contract and business expectancies; (2) conspiracy to tortiously interfere; (3) business disparagement/injurious falsehood; (4) conversion; (5) unjust enrichment; (6) constructive trust; (7) violation of the Sherman Act; (8) violation of the New Jersey Antitrust Act; (9) abuse of process; and (10) violation of RICO.  *See* Doc. 220,TAC, ¶¶ 97-209.  Verizon filed a motion to dismiss the TAC, arguing that JAWA fails to allege sufficient facts to state a claim for any of the causes of action.  Doc. 235 at 2.  The same legal standards apply here as to Defendants' motion to dismiss the FAC (dicussed in Part III, above).

**A.    Count 1: Tortious Interference.**

JAWA alleges that it has business expectancies and contracts with wireless customers and separate written contracts with four aggregators: Motricity, OpenMarket, IPX, and mBlox.  TAC, Doc. 220, ¶ 99.  JAWA alleges that Verizon knew of these business expectancies and contracts and knew that its alleged actions (filing this lawsuit

and notifying aggregators and customers not to do business with JAWA) would burden and result in the breach of these business relationships. *Id.*, ¶ 100. JAWA alleges that Verizon intentionally and improperly interfered with its contracts and business relationships, resulting in the breach of JAWA's services to its customers and adversely affecting JAWA's ability to conduct current and future business and making performance of its existing contracts more burdensome. *Id.* at ¶¶ 101-102. JAWA alleges that Verizon's actions caused it irreparable harm and estimates that the damages exceed one billion dollars. *Id.* at ¶ 102.

Verizon argues that JAWA's allegation that its interference was improper is a legal conclusion unsupported by facts because JAWA has alleged no actions that were not privileged or were not proper for Verizon to take as a matter of law. Doc. 235 at 3-4. Verizon argues that its actions filing this lawsuit and notifying those with a close relationship to the case are absolutely privileged under the *Noerr-Pennington* doctrine. *Id.* at 3. Verizon also argues that Arizona law recognizes a party's right to protect its own contractual interests even if asserting those interests causes a third party to breach or terminate an existing contract. *Id.* at 4 (citing cases).

JAWA responds that Verizon's actions interfering with its contracts and business expectations were improper because Verizon went beyond protecting its own contractual interests and included demands that its aggregators terminate JAWA on all wireless networks, not just Verizon. Doc. 242 at 11. The TAC refers to specific demands Verizon made in its letters to aggregators and incorporates by reference one of the letters. TAC, Doc. 220, ¶¶ 60, 61.[4] JAWA also responds that Verizon's actions were improper because Verizon employed economic pressure, defamation, restraint of trade, and antitrust. *Id.* at 11-12.

As the Court has previously noted, tortious interference with contract requires a

---

[4] The Motricity letter that JAWA refers to as Exhibit 1 is not attached to the TAC as JAWA indicates, but it is attached to JAWA's motion for leave to amend counterclaims. *See* Doc. 169-1 at 82-85.

showing of improper conduct. *See* Doc. 133 at 17 (citing *Carey v. Maricopa County*, 2009 WL 750220 at *7 (D. Ariz. Mar. 10, 2009); *Neonatology Assocs. v. Phoenix Perinatal Assocs.*, 164 P.3d at 693 (Ariz. App. 2007)). The Court agrees with Verizon that its demand letters to aggregators cannot serve as the basis of improper conduct because they are protected under the *Noerr-Pennington* doctrine. Verizon relies on *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F. 3d 991, 1007 (9th Cir. 2008), in which the Ninth Circuit held that this doctrine, stemming from two Supreme Court cases that held that those who petition the government are immune from liability for their petitions, protects federal constitutional rights and therefore applies in state law tort actions. 546 F. 3d at 1006-1007. *Theme Promotions* found that the doctrine protects pre-suit demand letters, provided the representations made in them are not so objectively baseless that they threaten what amounts to "sham litigation." *Id.* at 1007-1008. The Court has already found that Verizon is likely to succeed on its claims that JAWA used deceptive means to gain access to Verizon's network. *See* Doc. 133 at 17. The Court therefore cannot find that Verizon's claims are objectively baseless.

Verizon's alleged demands to its aggregators are also protected by state law privilege to the extent they are asserted for the protection of its own legally protected interests. *See Wyatt v. Ruck Const., Inc.*, 571 P.2d 683, 687 (Ariz. App. 2001) ("If a defendant has a present, existing interest to protect he is privileged to prevent the performance of a contract of another which threatens it."). The TAC alleges that Verizon demanded that its aggregators "shut off service to JAWA, not only on the Verizon network, but on the networks of all Wireless Carriers." TAC, Doc. 220, ¶ 60. The TAC goes on to cite six demands Verizon made, all of which the Court finds pertain to the aggregators' provision of services, collection of payments, or offers of refunds to customers serviced by JAWA through Verizon's own network. *See Id.*, ¶ 61, Exh. 1 ("Motricity Letter"); Doc. 169-1 at 82-85. JAWA's allegation that Verizon impermissibly interfered with contracts unrelated to Verizon is based only on its allegation that Verizon's direction to its aggregators "was so broad and intimidating and

so forceful that it effectively ensured that JAWA's services were cut off with respect to *all carriers' customers* . . . ." *Id.*, ¶ 62.  (emphasis in original).  Whatever alleged effect Verizon's demands may have had on JAWA's contracts with the aggregators on other networks, the Court finds that JAWA has failed to allege any demands that were not, themselves, within the scope of protecting Verizon's own existing interests.

The Court also finds that JAWA's allegations that Verizon employed economic pressure, defamation, restraint of trade, and antitrust are conclusory statements based entirely on the same set of allegations.  The TAC also fails to allege any improper communications from Verizon to its customers.  Absent factual allegations of improper conduct, the Court agrees that JAWA's claim that Verizon's actions were "wrongful, improper and without justification or excuse" (TAC, Doc. 220, ¶ 101) is conclusory.  The Court will grant Verizon's request to dismiss JAWA's tortious interference claim.

### B.    Count 2: Conspiracy to Tortiously Interfere.

JAWA's claim of conspiracy to tortuously interfere with JAWA's business expectancies and contracts fails for the same reason that its underlying claim fails.

### C.    Count 3: Business Disparagement/Injurious Falsehood.

JAWA claims that Verizon "knowingly (or in reckless disregard of the truth) published false statements of fact about and disparaging to JAWA to third parties with malice, without privilege, and with the intention to harm JAWA'S pecuniary interests." TAC, Doc. 220, ¶ 111.  JAWA bases this claim on allegations that Verizon made false and defamatory statements in the complaint in this case, in its press release regarding this case, in its March 8, 2011 letter to Motricity, and in other statements made to aggregators and wireless carriers.  *Id.*, ¶ 112.  JAWA identifies particular statements in the press release and letters in which Verizon claimed that JAWA was involved in an "intricate fraudulent enterprise" and a "massive fraud scheme," and JAWA alleges that Verizon made similar statements to aggregators and wireless carriers.  *Id.*

Verizon argues that none of the alleged actions support a claim of business disparagement as a matter of law.  Doc. 235 at 6.  Verizon first argues, and the Court

agrees, that allegations made in connection with a judicial proceeding are privileged. *Id.* (citing, e.g., *Sierra Madre Dev., Inc. v. Via Entrada Townhouses Assn.,* 514 P.2d 503, 510 (Ariz. Ct. App. 1973) (holding that non-frivolous statements made in a complaint cannot be the basis of a defamation claim). Verizon also argues that its letters to aggregators are privileged as long as the aggregators have a significant relationship with the lawsuit (*Id.* (citing *Hall v. Smith,* 152 P.3d 1192, 1196 (Ariz. Ct. App. 2007) (citing to the Restatement (Second) Torts § 587)) and that they are protected by the *Noerr-Pennington* doctrine. *Id.* Verizon also argues that neither the letters nor the press release, nor any other alleged communications, support a claim of disparagement because they do no more than accurately summarize the privileged information and JAWA has not alleged any statements that are purportedly false. *Id.* at 7.

JAWA responds that Verizon's claim of privilege under *Hall v. Smith* does not apply to its communications with its aggregators because, unlike the cases involving an insurer or parent company discussed in *Hall*, the aggregators do not have a financial interest in Verizon or decision-making authority in the present litigation. Doc. 242 at 12. JAWA also argues that no privilege applies to Verizon's communication with the press or Verizon customers and that whether or not the alleged statements were false is not a proper inquiry on a motion to dismiss. *Id.* at 13.

The Court is not persuaded that a judicial privilege applies to Verizon's letters to the aggregators. In *Hall*, the court cited to the general principle that courts not extend absolute privilege to new situations that do not pertain to the policy upon which the privilege is based. 152 P. 3d at 1197. The court in *Hall* reviewed Arizona case law interpreting privilege under the Restatement (Torts) § 587 and concluded that "the recipient [of the communication] must have had a close or direct relationship to the [lawsuit] for the privilege to apply." *Id.* at 1196. The Court in *Hall* found that a litigating party's communications to its parent company were protected by the privilege because the parent company had sent its own employees to conduct investigations, had helped select attorneys, and its relation to the litigation was "close and direct." *Id.* at

1197-99.  No similar facts are in evidence respecting the aggregators' role in the current litigation.  As already noted, however, Verizon's communications with its aggregators are privileged under the *Noerr-Pennington* doctrine to the extent they are based on objectively reasonable claims, and they are privileged under state privilege law to the extent they are made to protect Verizon's contractual rights.  Verizon's statements that JAWA was involved in fraud are unquestionably related to its claims that the Court has found objectively reasonable, and they directly relate to the demands Verizon made to stop JAWA's allegedly fraudulent activities on the Verizon network.  The Court finds that the allegedly false statements in the letters cannot support JAWA's business disparagement claim.

The Court is not persuaded that the press release is similarly privileged.  *See Green Acres Trust v. London*, 688 P. 2d 617, 623 (Ariz. App. 1984) (finding that no privilege attached to communications made to a newspaper by party litigants).  Verizon cites no authority for the proposition that a privilege as to one party carries over to the same communications made to another party, or, as here, to the public via the press.  JAWA has alleged specific defamatory statements.   *See* TAC, Doc. 220, ¶ 112.  Verizon's arguments that its statements were not false or defamatory and that they were made with the legitimate purpose of informing its customers of their right to refunds and not for an improper purpose are factual matters that do not defeat JAWA's claims at the pleading stage.  The Court will grant Verizon's request to dismiss this claim to the extent it relies on Verizon's statements made in the complaint and in letters to the aggregators, and will deny the request as it relates to other allegedly false statements made to third parties.

### D.   Count 4: Conversion.

The TAC alleges that Verizon holds approximately $9 million in funds from aggregators who owe these funds as payments to JAWA.  Doc. 220, ¶ 115.  The TAC also alleges that Verizon improperly refunded approximately $9 million to customers.  *Id.* The TAC alleges that all funds in question are clearly identifiable as those billed by

Verizon for JAWA's PSMS services.  *Id.*, ¶ 117.  The TAC also alleges that funds Verizon failed to collect on behalf of JAWA are subject to a claim of conversion as accounts receivable.  *Id.*, ¶ 119.

Verizon argues that the Court should dismiss JAWA's conversion claim because JAWA has failed to plead sufficient facts to show that it is entitled to immediate possession of these funds and the TAC alleges that Verizon owes these funds to its aggregators, not to JAWA.  Doc. 235 at 8.  Verizon also argues that a contractual obligation to pay is not sufficient to support a claim of conversion, which requires a possessory interest, generally in the nature of a lien.  *Id.*  (citing, e.g., *Universal Mktg. & Entm't, Inc. v. Bank One of Arizona*, 53 P. 3d 191 (Ariz. App. 2002)).  Verizon also argues that JAWA has not pled sufficient facts to show that Verizon had an obligation to treat the funds in question in a specific manner, as required for a showing of conversion under Arizona law.  *Id.* at 9.

JAWA responds that it has alleged a sufficient possessory interest in the funds at issue because the money that Verizon collected was specifically designated for JAWA.  Doc. 242 at 13.  JAWA cites to *Case Corp. v. Gehrke*, 91 P. 3d 362, 366-68 (Ariz. App. 2004), to show that a plaintiff has a possessory interest in funds deposited into a specific account for that party.  *Id.*  JAWA further argues that even if Verizon did not segregate the funds, JAWA still has a valid claim for conversion because the funds owing to it can be easily traced using Verizon's billing statements.  *Id.*

The Court finds that the TAC has failed to allege sufficient facts to support a claim of conversion under Arizona law.  *Case Corp.*, on which JAWA relies, is distinguishable from the facts alleged here because in *Case Corp.* the plaintiff had a security agreement giving it a possessory interest in defendant's equipment and in proceeds from the sales of that equipment, which were to be placed in a separate account and electronically submitted to plaintiff within seven days.  91 P. 3d at 366.  The court in *Case Corp.* specifically distinguished those facts from *Autoville, Inc. v. Friedman*, 510 P. 2d 400, 402 (Ariz. App. 1973), in which it held that a car salesman had no possessory interest, but

only that of an ordinary creditor, in the proceeds of car sales made on behalf of a dealer who had promised him commissions because "the specific sale proceeds at issue had not been set aside in a special account for [plaintiff] or otherwise segregated." *Case Corp.*, 91 P. 3d at 366.  Although JAWA argues that the funds owing to it are easily segregable on the basis of Verizon's billing statements, JAWA has not alleged facts, like those in *Case Corp.*, showing that Verizon was required to pay it "a specifically secured amount from a definite source." *See id.*  Likewise, it has not shown that it had a possessory interest in the funds refunded to customers or in Verizon's accounts receivable. *Autoville* stated that "the modern rule, in which Arizona joins, is that money can be the subject of a conversion provided that it can be described, identified or segregated, and an obligation to treat it in a specific manner is established." 510 P. 2d at 402.  JAWA has failed to allege facts to show that Verizon had an obligation to JAWA to treat the funds at issue in a specific manner or even that Verizon had any contractual obligation to pay JAWA.  The Court will grant Verizon's request to dismiss JAWA's conversion claim.

### E.   Count 5: Unjust Enrichment.

The TAC alleges that Verizon continues to hold approximately $9 million in funds it collected for JAWA's services and that it wrongfully refunded an additional $8 million to Verizon customers.  TAC, Doc. 220, ¶ 125.  The TAC alleges that Verizon has been enriched by the money it withheld and that it has been enriched in customer goodwill for the refunds it wrongfully made using money that should have been paid to JAWA. *Id.*, ¶¶ 126, 127.  The TAC also alleges that JAWA has been impoverished by the money withheld from it, by money it paid at Verizon's behest to settle an Illinois judgment, and by the operating costs it expended to offer services for which it has not been compensated. *Id.*, ¶¶ 128, 129.  The TAC alleges that in the event it is not granted relief under its other claims to compensation for these funds, it is entitled to an unjust enrichment claim. *Id.*, ¶ 130.

Verizon argues that the TAC fails to allege sufficient facts to show the elements of an unjust enrichment claim, namely: "'(1) an enrichment; (2) an impoverishment; (3) a

connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a legal remedy.'" Doc. 235 at 9 (quoting *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 48 P. 3d 485, 491 (Ariz. App. 2002)). The Court does not agree. JAWA has alleged facts to show Verizon's enrichment (TAC, Doc. 220, ¶¶ 126, 127) and its own impoverishment (*id.*, ¶¶ 128, 129). The TAC also alleges a causal connection (Verizon's holding of money owing to JAWA) that it alleges is "unlawful[]," or without justification. *See id.*, ¶ 130. To the extent that JAWA's other claims fail to provide a legal remedy to address Verizon's alleged enrichment at JAWA's expense, the Court finds that JAWA has alleged sufficient facts to state a claim for unjust enrichment.

### F.    Count 6: Constructive Trust.

The TAC asks the Court to impose a constructive trust on the funds it alleges Verizon has unlawfully withheld from JAWA. TAC, Doc. 220, ¶¶ 126. Verizon argues that the TAC fails to allege a sufficient basis for a constructive trust because "[t]here is no 'specific,' identifiable property over which the Court could impose a constructive trust." Doc. 235 at 10. For the reasons already stated above with regard to JAWA's conversion claim, the Court agrees. *See Burch & Cracchiolo, P.A. v. Pugliani*, 697 P. 2d 674, 679 (Ariz. App. 1985) ("A prerequisite to the imposition of a constructive trust is the identification of a specific property belonging to the claimant. . . . A general claim for money damages will not give rise to a constructive trust.") (internal cites omitted). The Court is not persuaded that *Turley v. Ethington*, 146 P. 3d 1282, 1285 (Ariz. Ct. App. 2006), which JAWA cites for the proposition that courts are not required to use an "unyielding formula" when granting a constructive trust, is to the contrary. *See* Doc. 242 at 15. *Turley* dealt with a constructive trust over real property and did not address whether a claim for money damages provides an adequate basis for a constructive trust where the claimant has stated that funds owing to it are traceable but has not identified a secured interest or contractual entitlement to specific funds. The Court will grant Verizon's request to dismiss JAWA's constructive trust claim.

### G.    Counts 7 & 8: Antitrust.

The TAC alleges that Verizon violated the Sherman Act and the New Jersey Antitrust Act by orchestrating an illegal boycott of JAWA by the aggregators and other wireless carriers in order to reduce competition in the PSMS market.  TAC, Doc. 220, ¶¶ 136-185.  Verizon argues that the Court should dismiss these claims primarily because JAWA has alleged no facts to support an agreement between the aggregators or to show that Verizon reached an agreement with other wireless providers.  Doc. 235 at 11-15.  The Court agrees, for the reasons already discussed in relation to JAWA's tortious interference claim, that the TAC only alleges demands Verizon made to each aggregator, individually, to protect Verizon's interests in ending JAWA's allegedly fraudulent sales practices on its own network.  The TAC alleges that an agreement existed between the aggregators not to do business with JAWA (TAC, Doc. 220, ¶ 142), but the TAC has not alleged facts to support a showing that Verizon took any actions to induce aggregators to operate in concert, according to a "contract, combination, or conspiracy" to restrain trade as required for a claim under Section 1 of the Sherman Act.  *See Tanaka v. Univ. of S. Cal.*, 252 F. 3d 1059, 1062 (9th Cir. 2001).  Additionally, although the TAC alleges that Verizon communicated with other wireless carriers and "coerced the Carriers to agree to boycott JAWA" (TAC, Doc. 220, ¶ 158), this allegation is conclusory.  *See* Doc. 235 at 12 ("JAWA does not allege any time or place in which any meeting or communication occurred, nor the individuals who may have communicated or agreed.").  The Supreme Court addressed the adequacy of a Sherman Act pleading in *Twombly* and concluded that "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  550 U.S. at 557.  Because the Court finds that the TAC fails to allege sufficient facts to show an agreement to boycott JAWA, the Court need not address JAWA's allegations based on the "rule of reason" that Verizon's alleged actions reduced competition.  *See* TAC, Doc. 220, ¶¶ 145-55; 170-80.  The Court will grant Verizon's request to dismiss JAWA's Sherman Act claim.  Because the New Jersey Antitrust Act mirrors federal antitrust law

(*See* N.J. STAT. ANN. § 56:9-18; *Inter-City Tire and Auto Ctr., Inc. v. Uniroyal, Inc.*, 701 F.Supp. 1120 (D. N.J. 1988), *aff'd Inter-City Tire and Auto Ctr., Inc. v. Uniroyal, Inc.*, 888 F.2d 1380 (3d Cir 1989), *Uniroyal, Inc. v. Erbesh*, 888 F.2d 1382 (3d Cir 1989)), the Court will also dismiss JAWA's New Jersey Antitrust claim.

### H.   Count 9: Abuse of Process.

The TAC alleges that Verizon used the judicial process for improper purposes including seeking customer goodwill by issuing refunds, seeking to retain profits owing to JAWA, and seeking to put JAWA out of business to enhance its competitive advantage in the same industry.  TAC, Doc. 220, ¶ 187.

The parties agree that to assert a claim for abuse of process, a party must allege "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings."  *See* Docs. 235 at 18; 242 at 15 (quoting *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 887 (Ariz. Ct. App. 2004) (quoting *Nienstedt v. Wetzel*, 651 P.2d 876, 881 (Ariz. Ct. App. 1982)).  Verizon argues, and the Court agrees, that JAWA has failed to allege facts to support its abuse of process claim.  *See* Doc. 235 at 18.  The TAC alleges no particular use of the legal process other than Verizon's filing of the complaint.  *See* TAC, Doc. 220, ¶ 59.  JAWA argues in its response that Verizon also abused the legal process by requesting injunctive relief.  Doc. 242 at 16.  Although the TAC alleges that Verizon had "ulterior motives" (TAC, Doc. 220, ¶ 187), its allegations fail to show how Verizon's actions used the legal process "primarily to accomplish a purpose for which the process was not designed."  *See Nienstedt*, 651 P. 2d at 881.  The Court will grant Verizon's request to dismiss JAWA's abuse of process claims.

### I.   Count 10: RICO.

The TAC alleges that Verizon, together with the aggregators, operated as an enterprise that engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1963(c) ("RICO").  TAC, Doc. 220, ¶¶ 190-91.  The TAC alleges that the predicate acts of racketeering included mail fraud and wire fraud under 18 U.S.C. §§ 1341, 1343.  *Id.*, ¶ 192.  In particular, the TAC alleges that Verizon and other members of the enterprise

used the U.S. mail and interstate communications to issue sham refunds and to steal and convert approximately $18 million owing to JAWA. *Id.*, ¶ 193.

Verizon argues that JAWA fails to plead key elements necessary for a RICO claim, including what the alleged "enterprise" is and what conduct Verizon engaged in with the aggregators in violation of RICO. Doc. 235 at 19 (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479 (1985)). Verizon also argues that JAWA fails adequately to plead the predicate acts of mail and wire fraud because it has pled no facts to show fraudulent misrepresentation and it fails to satisfy the requirement of Federal Rule 9(b) that acts of fraud be pled with particularity, including the time, place, and content of the misrepresentation. Doc. 235 at 19-20.

The Court agrees that the TAC fails to plead acts of fraudulent misrepresentation in relation to Verizon's alleged scheme to offer sham refunds and to withhold money from JAWA, and that this failure is fatal to its predicate claims of mail and wire fraud. To allege a violation of mail or wire fraud, a plaintiff must show (1) a scheme or artifice to defraud, (2) the use of U.S. mails or wires in furtherance of the scheme, and (3) specific intent to deceive or defraud. *See Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 620 (9th Cir.2004) (mail fraud); *Schreiber Dist. Co. v. Serv-Well Furniture Co.,* 806 F. 2d 1393, 1400 (9th Cir. 1986) (wire fraud). JAWA argues on the basis of *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008), that no allegations of fraud or misrepresentation are required. Doc. 242 at 19. *Bridge* stated that "[u]sing the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation." 553 U.S. at 648. *Bridge* held that mail fraud occurs through an attempt to defraud even if no one relies on the fraudulent misrepresentation, not that mail fraud does not require an attempt to defraud or deceive. *See id.* at 648-57 (rejecting the argument that fraud claims under RICO require "first-party reliance."). This distinction does not relieve JAWA of the need to allege specific acts of fraud or attempted fraud to establish the underlying offense. JAWA directs the Court to ¶¶ 194-209 of the TAC to

show that it has properly alleged racketeering activity with particularity.  Doc. 242 at 19. The only particulars cited in these paragraphs, however, are the letters Verizon sent to aggregators (who, JAWA alleges, are actually part of the racketeering enterprise), demanding that they cut off business with JAWA on Verizon's network and that they indemnify Verizon for its losses (TAC, Doc. 220, ¶¶ 194-95), and the filing of this lawsuit and unspecified solicitations to customers, encouraging them to seek refunds in apparent contradiction of the terms of Verizon's Illinois settlement (*id.*, ¶¶ 202-204).  The TAC alleges only that the letters caused the aggregators to be fearful of Verizon, not that they made fraudulent representations.  *See id.*, ¶ 197.  Moreover, even construing the communications to customers as made with the intent to deceive because they offered refunds in apparent contradiction to the terms of the Illinois settlement, the TAC does not allege with particularity the content of these communications or how they misrepresented the terms of that settlement.  *See id.*, ¶ 204.  Having found that the TAC fails to allege with particularity specific acts of fraud to support the alleged underlying RICO offenses, the Court need not address Verizon's other arguments that JAWA has failed to show that Verizon and the aggregators worked in concert as an "enterprise" or that their alleged conduct constituted a pattern of racketeering activity.  *See* Doc. 235 at 19.  The Court will grant Verizon's request to dismiss JAWA's RICO claims.

**IT IS ORDERED:**

1. Defendants' motion for an accounting and release of funds (Doc. 211) is **denied**.

2. Defendants' motion to dismiss Plaintiff's first amended complaint (Doc. 232) is **granted in part** and **denied in part** as set forth in this order.

3.      Plaintiff's motion to dismiss Defendants' third amended counterclaims (Doc. 235) is **granted in part** and **denied in part** as set forth in this order.

Dated this 30th day of January, 2012.

David G. Campbell
United States District Judge