# EXHIBIT B

Salkoff, Jonathan  4/1/2011  12:00:00 PM

```
1            IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF ARIZONA
3
     Cellco Partnership d/b/a Verizon  )
4    Wireless,                         )
                                       )
5              Plaintiff,              )
                                       )
6         vs.                          ) No. CV11-432-PHX-DGC
                                       )
7    Jason Hope, et al.,               )
                                       )
8              Defendants.             )
     _____)
9
10                     CONFIDENTIAL
11       VIDEOTAPED DEPOSITION OF JONATHAN LEE SALKOFF
12                     Phoenix, Arizona
                        April 1, 2011
13                      9:06 a.m.
14
15
16
17
18
19
20
21   REPORTED BY:
     PAMELA J. MAYER, RMR-CRR
22   Certified Reporter
     Certificate No. 50207
23
     PREPARED FOR:
24   ASCII/CONDENSED
25   (Copy)
```

Salkoff, Jonathan  4/1/2011  12:00:00 PM

| | |
|---|---|
| 1 | they were going to have to do that, and they had done |
| 2 | that in one other instance, so they basically reused a |
| 3 | process that they had done previously. |
| 4 | Q.  Okay.  By the way, do you know how many Verizon |
| 5 | customers have said they wanted a refund from that site? |
| 6 | A.  I don't.  I don't know. |
| 7 | Q.  Communications plan, internal and external. |
| 8 | What is -- what are you referring to there?  First, I |
| 9 | guess, internal. |
| 10 | A.  Well, internal, we have to tell the customer |
| 11 | service reps, we have to tell some executives that may |
| 12 | get impacted by this, so the finance VPs and things like |
| 13 | that.  But primarily, it's for the front-line folks who |
| 14 | would get asked questions when they get a call, so do |
| 15 | they know how to answer the question, do they know how to |
| 16 | direct a customer to do what they need to do. |
| 17 | Q.  Okay.  Communications plan, external.  What is |
| 18 | that referring to? |
| 19 | A.  That was just essentially getting around the |
| 20 | press release, and that was run, again, by our PR folks. |
| 21 | Q.  Okay.  Were there external communications to |
| 22 | other wireless carriers about this issue? |
| 23 | A.  Not directly to the -- to the carriers.  The day |
| 24 | after we met -- sorry.  The day after we sent out the |
| 25 | notice, I think it was the 8th, we have a weekly call |

1   with the CTIA group that deals with short codes, and we

2   basically directed people on that call to look at our --

3   if they hadn't already seen it, our press release about

4   what we were doing.

5       Q.  Is that a regular call, the CTIA group?

6       A.  It is.

7       Q.  And how often is it?

8       A.  It's usually weekly.  Yeah, that's --

9       Q.  Who is on that call, usually?

10      A.  There's a guy at the CTIA, his name is Jeff

11  Simmons, and he conducts the call.  He brings his

12  counsel, a guy named Mike Altschul, I think his name is.

13  I don't know how to spell that.  Sorry.  And he is sort

14  of the antitrust guy who's on the call with us.  And we

15  have representatives from all of the major carriers who,

16  you know, comprise the CTIA.

17      Q.  Okay.

18      A.  So AT&T, Sprint, Verizon Wireless, T-Mobile, and

19  there are -- there are a few minor carriers, but I can't

20  remember who.  So those are the primary ones.

21      Q.  Okay.  Is there -- is there an agenda circulated

22  for those calls?

23      A.  Jeff will usually update the meeting requests

24  with, you know, any topics that, you know, need to be

25  covered.

Salkoff, Jonathan 4/1/2011 12:00:00 PM

| | | |
|---|---|---|
| 1 | Q. | Is that an Outlook meeting request? |
| 2 | A. | It is. It is. |
| 3 | Q. | Okay. And was an Outlook meeting request sent |
| 4 | around for the March 9th, 2011, call? | |
| 5 | A. | I don't recall specifically for that, for that |
| 6 | meeting. | |
| 7 | Q. | Do you participate in those calls every week? |
| 8 | A. | Almost every week. So it's Dave's name, Dave |
| 9 | Burmester's name on the billet, so to speak, but I | |
| 10 | generally take that when he can't -- can't attend. | |
| 11 | | I should also say that at all of those carriers, |
| 12 | there's usually legal presence on the call. Not always. | |
| 13 | They're invited to the call. They're on the meeting | |
| 14 | invite. Some of them, you know, don't always attend. | |
| 15 | Q. | Okay. Was there legal for Verizon on the |
| 16 | March 9th call? | |
| 17 | A. | Yes. |
| 18 | Q. | And who was that? |
| 19 | A. | Brian Ashby. |
| 20 | Q. | Okay. And so did you speak on the call? |
| 21 | A. | No. |
| 22 | Q. | Who spoke on behalf of Verizon? |
| 23 | A. | It was mostly Brian and Dave. |
| 24 | Q. | Okay. And what did Brian and Dave tell the |
| 25 | other carriers? | |

1   A.  What I said before, that they should take a look

2   at our press release that we just went out with the day

3   before.

4   Q.  And did they actually send them a copy of the

5   press release?

6   A.  Not that I know of.

7   Q.  Okay.  And did the other carriers have questions

8   when they said, "Take a look at the press release"?

9   A.  I'm sure they did.  I don't exactly remember the

10  conversation, how it went, so -- there were some

11  questions, but Brian fielded all of those.

12  Q.  Do you recall any of the questions that were

13  asked?

14  A.  No.

15  Q.  Did Verizon make it clear that they were cutting

16  off all business with my clients?

17  A.  I don't think we said tha- -- I don't remember,

18  actually, so --

19  Q.  Did Verizon tell the other carriers that the

20  Texas AG was -- had filed suit?

21  A.  I don't -- I don't remember.

22  Q.  Did Verizon warn the other carriers?

23  A.  Like I said, I think we only really just pointed

24  everybody to the press release and just made everybody

25  aware of it.

1    Q.  So -- and Verizon prepared the press release

2    you're talking about.  Right?

3    A.  That's the one that we went out with on the --

4    on the 8th, yeah.

5    Q.  So Verizon prepared the March 8th press release,

6    and then on the 9th, they directed everybody and said,

7    "You need to read this press release."

8         MR. CHARLTON:  Object to form.

9    BY MR. LANGLEY:

10   Q.  Right?

11   A.  Like I said, on the call, we mentioned that

12   press release and recommended it -- I did not, but it was

13   recommended by the Verizon team to the rest of the people

14   on the call.

15   Q.  Did Verizon want those other carriers to

16   implement similar actions as Verizon had been taking

17   regarding my clients?

18   A.  I don't know.

19   Q.  Was Verizon's plan, you know, the inventorying

20   short codes, letter to aggregators, refunds, was that

21   discussed during the March 9th phone call?

22   A.  No.  We don't talk about internal stuff.

23   Q.  Did any of the other carriers on that call state

24   that they were going to look into these issues regarding

25   my clients?

1       A.  I don't recall specifically, so I don't know for

2   sure if they -- if they said they were going to do

3   anything.

4       Q.  Is there any sort of record of the discussions

5   during that phone call, other notes or a recording or --

6       A.  It's not recorded, and I'm -- I don't know who

7   does take notes.  I sometimes have some notes, but, you

8   know, I couldn't tell you if I did on this call or not.

9       Q.  Okay.  And did you subsequently learn that other

10  carriers had similarly cut off doing business with my

11  clients?

12      A.  In the last few days, recently, meaning in, you

13  know, like very end of March, I think I saw either a

14  FierceWireless article or something like it that

15  referenced that there had -- the other two major carriers

16  had taken some action.  I didn't actually read it.  I

17  just saw the headline.

18      Q.  Okay.  Is the CTIA group, is there a name --

19  formal name for this group you're talking about?

20      A.  You know, I think there is, but I don't --

21  I don't recall what it is.  I think it's something about,

22  you know, off-deck or something -- you know, off-deck --

23  Off Portal Action or something like that.  I can't

24  remember the name.

25      Q.  So were you involved in the next follow-up --

1   the next CTIA weekly call? It would have been on

2   March 16th.

3       A. On March 16th, I don't think I attended that

4   call. I'd have to look at my calendar, but I think I was

5   on travel that week. I can verify that, but I'm fairly

6   sure I didn't make that call.

7       Q. And then were you involved in the -- the next

8   weekly call after the 16th, the 23rd, maybe?

9       A. I'm sorry. I'm going to have to look at my

10  calendar. I mean, those are just too hard for me to pick

11  out of my --

12      Q. Do you recall whether or not you were involved

13  in any CTIA weekly calls after the March 9th one that

14  we've been discussing?

15      A. Well, we -- we had the CTIA trade show down in

16  Orlando last week, so that would have taken the place of

17  any weekly phone call, so we meet ahead of the larger

18  trade show. And that was on Monday, the -- I guess the

19  20th. I can't remember. 21st? Whatever Monday --

20      Q. Roughly Monday of last week?

21      A. That's right.

22      Q. Okay. And where was it? Orlando, Florida?

23      A. Orlando, Florida.

24      Q. Did you attend?

25      A. I did.

1    Q.  Who else from Verizon attended?

2    A.  Brian. I'm sorry, not Brian. Dave, Dave

3    Burmester was there, for the Monday.

4    Q.  And did your weekly telephone group meet down at

5    the trade show?

6    A.  Right. Yeah, that took the place of our weekly

7    call.

8    Q.  Okay. And so that was in person.

9    A.  Correct.

10   Q.  And what was handed out or distributed at that

11   meeting?

12   A.  I don't remember. There were -- there were some

13   materials from -- from a company called WMC, which is

14   this Wireless Media Consulting group, and they do some

15   other monitoring for -- for the industry.

16   Q.  And the handout from Wireless Media Consulting,

17   was that pertaining to my clients?

18   A.  I don't think so.

19   Q.  What was it pertaining to?

20   A.  Their work that they do on behalf of CTIA, so

21   they're starting up essentially a monitoring effort that

22   would be across all -- all the carriers.

23   Q.  Tell me what was discussed regarding my clients

24   at that meeting in Orlando.

25   A.  We didn't speak directly about your clients. We

| | |
|---|---|
| 1 | talked about some controls that we believe should be in |
| 2 | place on the registry side of actually, you know, signing |
| 3 | up for these short codes. We talked about that, because |
| 4 | that is the group that sort of drives what requirements |
| 5 | Neustar folks put on that website. |
| 6 | Q. And so what new controls on the registry side |
| 7 | were discussed? |
| 8 | A. Just getting some more information about who's |
| 9 | coming in to register for short codes, specifically what |
| 10 | kinds of -- specifically what kinds of identifying |
| 11 | information we would -- we'd like to see or we think -- |
| 12 | not "we," but sort of asking in general, you know, how do |
| 13 | we get better information on the front end so that we are |
| 14 | aware exactly who all these people are. |
| 15 | Q. And was that discussion driven because of |
| 16 | your -- Verizon's relationship with my clients? |
| 17 | A. Yes. |
| 18 | Q. And so what questions did the other participants |
| 19 | ask you guys about your experience with my clients? |
| 20 | A. I don't remember. |
| 21 | Q. But you do remember they asked questions, |
| 22 | though. Right? |
| 23 | A. I think in general, they were curious, but I |
| 24 | think our response was, pending litigation, we're not |
| 25 | talking about it in specifics, but we believe that we |

1   need to do something on the front end of this registry

2   process to make sure that we are all aware who it is

3   that's coming to these, you know, short code programs,

4   you know, the content providers identify themselves

5   completely and thoroughly.

6      Q.  Do you recall the terms being used, you know,

7   "massive fraud scheme" and that sort of thing, about my

8   client?

9      A.  No, I don't.

10     Q.  Do you remember if that term was used?

11     A.  I do not.

12     Q.  Did you let all the other carriers know that you

13  had completely cut us off?

14     A.  As I said, we -- our response uniformly has been

15  that we're in the midst of pending litigation and we're

16  not going to talk about the specifics.

17     Q.  Did any of the other carriers at the meeting ask

18  you if you had completely cut us off?

19     A.  They may have.  And they may have, you know,

20  spoken to Dave separately.  I don't know.  But they --

21  they didn't ask me.

22     Q.  Now, in -- I don't think I asked you this

23  earlier.  Are you involved in any on-deck premium

24  services --

25     A.  No.

Salkoff, Jonathan 4/1/2011 12:00:00 PM

| | |
|---|---|
| 1 | STATE OF ARIZONA   ) |
| 2 | COUNTY OF MARICOPA  ) |
| 3 | BE IT KNOWN that the foregoing deposition |
| 4 | was taken by me pursuant to stipulation of counsel; that |
| 5 | I was then and there a Certified Reporter in and for the |
| 6 | County of Maricopa, State of Arizona, and by virtue |
| 7 | thereof authorized to administer an oath; that the |
| 8 | witness before testifying was duly sworn by me to testify |
| 9 | to the whole truth; that the questions propounded by |
| 10 | counsel and the answers of the witness thereto were taken |
| 11 | down by me in shorthand and thereafter transcribed into |
| 12 | typewriting under my direction; that the foregoing pages |
| 13 | are a full, true and accurate transcript of all |
| 14 | proceedings and testimony had and adduced upon the taking |
| 15 | of said deposition, all to the best of my skill and |
| 16 | ability. |
| 17 | I FURTHER CERTIFY that I am in no way |
| 18 | related to nor employed by any parties hereto nor am I in |
| 19 | any way interested in the outcome hereof. |
| 20 | DATED at Phoenix, Arizona, this ____ day of |
| 21 | _____, 2011. |
| 22 | |
| 23 | |
| 24 | _____<br>Pamela J. Mayer<br>Certified Reporter |
| 25 | Certificate No. 50207 |